# PX34

## DECLARATION OF RICHARD KAPLAN

### Pursuant to 28 U.S.C. § 1746,

I, Richard Kaplan, hereby state that I have personal knowledge of the facts and matters set forth below, and if called as a witness, would testify competently thereto:

1. I am a U.S. citizen over the age of eighteen years old.

2. I am a Technical Computer Forensic Examiner for the U.S. Federal Trade Commission (FTC) in Washington, DC. My duties include managing the collection, preservation, examination, and analysis of evidentiary electronically stored information ("ESI"), which the FTC collects through voluntary submissions, discovery, and legal proceedings.

3. Prior to working for the FTC, I was employed by the United States Department of Justice (DOJ), Criminal Division, Child Exploitation and Obscenity Section, High Technology Investigative Unit (HTIU), in Washington DC as a Digital Investigative Analyst. As a Digital Investigative Analyst, my duties included conducting computer forensic examinations on various computer media, which included: hard drives, CDs/DVDs, thumb drives, mobile devices and memory cards. Additionally, my duties included preserving, collecting, and analyzing digital evidence.

4. I have a Bachelors of Science degree in Information Sciences and Technology from the Pennsylvania State University, a Masters of Sciences degree in Information Management from Syracuse University, and a Juris Doctor degree from Syracuse University.

5. I have completed formal classroom training in computer forensics and I am certified by the International Association of Computer Investigative Specialists (IACIS) as a Certified Electronic Evidence Collection Specialist (CEECS) and a Certified Computer Forensic Computer Examiner (CFCE).

1

6. I have completed formal classroom training in the use of forensic software programs from Guidance Software (EnCase) and the Access Data Corporation Forensic Toolkit (FTK). EnCase and FTK are two computer forensic software packages that are generally accepted by the scientific community for use in acquiring, processing and analyzing ESI. I have met the requirements for the EnCase Certified Examiner (EnCE) and the Access Data Certified Examiner (ACE) programs and was awarded both certifications.

8. As a forensic examiner for the FTC, my job duties include providing computer forensic support to FTC attorneys and FTC investigators. In the course of my duties, I was assigned to work on the case of *FTC v. Hylan Asset Management.*

9. On or about May 23, 2018, I identified 21 emails, which were downloaded and forensically preserved by FTC personnel from the email account 'hirsh@ashtonasset.com' as authorized by a TRO granted in FTC v. Stark Law on or about March 22, 2016. I converted these 21 emails to PDF files and have attached these PDFs and attachments of these emails to **Exhibit 1** of this declaration.

10. On or about May 23, 2018, I identified 4 emails, which were downloaded and forensically preserved by FTC personnel from the email account 'kamran@ashtonasset.com' as authorized by a TRO granted in FTC v. Stark Law on or about March 22, 2016. I converted these 4 emails to PDF files and have attached these PDFs and attachments of these emails to **Exhibit 2** of this declaration.

11. On or about May 23, 2018, I identified 5 emails, which were downloaded and forensically preserved by FTC personnel from the email account 'preetesh@ashtonasset.com' as authorized by a TRO granted in FTC v. Stark Law on or about March 22, 2016. I converted these 5 emails to PDF files and have attached these PDFs and attachments of these emails to **Exhibit 3** of this declaration.

PX34
000310

12. On or about May 24, 2018, I identified 2 emails located on a forensic image, 'DS-DEL-IT01-KelliMac.E01' of a computer hard drive which was forensically imaged by FTC Personnel, as authorized by a TRO granted in FTC v. Delaware Solutions on or about October 6, 2015. I converted these 2 emails to PDF files and have attached these PDFs and attachments of these emails to **Exhibit 4** of this declaration.

13. On or about May 24, 2018, I identified 1 email located on a forensic image, 'DS-MAIN-1053-IT03-Charity.E01' of a computer hard drive which was forensically imaged by FTC personnel, as authorized by a TRO granted in FTC v. Delaware Solutions on or about October 6, 2015. I converted this email to a PDF file and have attached this PDF and attachment of this email to **Exhibit 5** of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of June, 2018, in Washington, DC.

Richard Kaplan

3

# EXHIBIT 1

PX34

000312

**From:**              Ryan Zawistowski (Hylan)  <ryan@hylanasset.com>
**Sent:**              Thursday, May 7, 2015 12:02 PM
**To:**                Hirsh Mohindra  ;  Preetesh Patel
**Cc:**                Andrew J. Shaevel (Hylan) ; Jon's Gmail Account ;  "Greg Grigorian (Hylan)"
**Subject:**           Account Issue
**Attachments:**       (Alternate Body); image001.jpg; image002.png; image003.png


 Good Morning Hirsh-  Recently we have been receiving quite a few complaints on the file we purchased on 10/10/2014.
They are complaining of getting paid letters and we have continued to take the position that the paid letters must
differentiate the loans on several characteristics including loan date, charge off date, creditor, etc… We have sold a slice
of this portfolio and the buyer is raising an issue about paid priors. We asked him to provide documentation and he sent
over paid letters from two agencies we are familiar with. We reached out to those agency's owners and asked them to
provide us with more information about the loans in questions. We have learned that they purchased these loans from a
different seller (independent of Hylan or any Hylan connection). We compared their loans to our loans and found that
the Open Date, Creditor, Account number, and Charge Off Date are all the exact same. We are concerned about how
many factors these loans match on.  Here is the information on the loans owned by Spire and Tier One (the other
agency):  IMG  [994] Here is the information on the loans owned by Hylan, purchased from Ashton on 10/10/14:  IMG
[1186] We have heard significant noise from several different agencies on this file. Most of this file is not deployed yet,
so there hasn't been much activity to generate these complaints, but as we are placing more out, we are getting
consistent complaints. We have asked the agencies to provide documentation and this is the first example that we can
get the full picture, because we are friendly with the agency that owns the other loans.  Can you please take a look at
this and let us know your thoughts. We would like to try to resolve this noise as we are getting strong pressure from our
investors to liquidate this file more rapidly.  Please call me if you have any questions… Thanks,

Ryan

 Ryan Zawistowski Operations Manager  IMG  [206]5477 Main Street Amherst, NY 14221 (716) 580-3135 ext: 107 -
Office (855) 275-3651 - Toll-Free Hot Line (716) 580-3137 - Fax www.hylanasset.com [http://www.hylanasset.com/]
CONFIDENTIALITY NOTICE:  This communication and any attachments are confidential, and are only for the use of the
intended recipient.  If you have received this transmission in error, any disclosure, copying, distribution or the taking of
any action in reliance upon this communication is strictly prohibited.  If you have received this communication in error,
please contact the sender immediately and delete the original message.  Thank you.

PX34
000313

**From:**        Gaurav Mohindra   <gmohindra@randmlegal.com>
**Sent:**        Monday, January 11, 2016 9:34 AM
**To:**          Hirsh Mohindra
**Subject:**     Fwd: Email to Agencies
**Attachments:** (Alternate Body); image001.jpg; (Alternate Body)


Sent from my iPhone
Begin forwarded message:

From: "Andrew J. Shaevel" <andrew.shaevel@bobalew.com [mailto:andrew.shaevel@bobalew.com] >
Date: January 11, 2016 at 8:27:04 AM CST
To: "Ryan Zawistowski (Hylan)" <ryan@hylanasset.com [mailto:ryan@hylanasset.com] >, "Greg Grigorian (Hylan)"
<Greg@hylanasset.com [mailto:Greg@hylanasset.com] >
Cc: Jon's Gmail Account <barabanus@gmail.com [mailto:barabanus@gmail.com] >, Christian Lovelace
<clovelace@lippes.com [mailto:clovelace@lippes.com] >, "gmohindra@randmlegal.com
[mailto:gmohindra@randmlegal.com] " <gmohindra@randmlegal.com [mailto:gmohindra@randmlegal.com] >
Subject: Email to Agencies

 Ryan/Greg:  Please email the following message under your signature to agencies actively collecting for HDF.  Please let
me know if you think we should modify this message in any way.    January 11, 2016  Dear Agency:  As an independent
collection agency engaged by Hylan Asset Management, LLC on behalf of its clients, we hereby request an additional
report to assist us in managing our warranties from originators and our communications with debtors.   Effective today,
we ask that you send us a periodic report listing any debtors that dispute the validity of their debt.  Please know that we
may contact these debtors to further explore their claim.  In the meantime, please follow our prior instructions to (i)
status these accounts as "Disputes" and (ii) cease to any further collection of these accounts.     For each debtor
disputing their debt, please provide the following information in the form an excel spreadsheet: ·     Agency Name ·
Hylan ID Number ·     Debtor Last Name ·     Debtor Telephone Number (where contact was made) p
class="MsoListParagraph" style="text-indent:-.25in;mso-list:l0 level1 lfo1"·     Date of Contact with Debtor ·      Name
of Collector  Please provide this report no less frequently than once per week.   If you have any questions, please contact
our offices at your convenience.    Andy
 Andrew J. Shaevel Chief Executive Officer IMG  [288]Bobalew Ventures  5477 Main Street  Amherst, New York 14221
(716) 580-3133 - Office (716) 860-1125 - Mobile (716) 580-3137 - Fax
 website [http://www.bobalew.com/]   CONFIDENTIALITY NOTICE:  This communication and any attachments are
confidential, and are only for the use of the intended recipient.  If you have received this transmission in error, any
disclosure, copying, distribution or the taking of any action in reliance upon this communication is strictly prohibited.  If
you have received this communication in error, please contact the sender immediately and delete the original message.
Thank you.

PX34
000314

**From:**               Jon   <barabanus@gmail.com>
**Sent:**               Sunday, August 23, 2015 7:56 PM
**To:**                 Hirsh Mohindra
**Subject:**           Fwd: Hylan
**Attachments:**     (Alternate Body)

FYI - too bad. I have two more right now. Have to go meet with all the big guys, someone will buy. This guy wasn't against the idea, but he didn't want to go thrifting the bookshop of explaining the new product to the owner who already was against all pay days anyway

Sent from my iPhone
Begin forwarded message:

From: Lance DellaMea <LDellaMea@mercantilesolutions.com [mailto:LDellaMea@mercantilesolutions.com] >
Date: August 21, 2015 at 4:37:20 PM EDT
To: "Bruce H. Gray" <bruce.h.gray@gmail.com [mailto:bruce.h.gray@gmail.com] >, "barabanus@gmail.com [mailto:barabanus@gmail.com] " <barabanus@gmail.com [mailto:barabanus@gmail.com] >
Subject: FW: Hylan

  From: Brett Murray [mailto:Brett.Murray@credigy.net [mailto:Brett.Murray@credigy.net] ]
Sent: Friday, August 21, 2015 4:33 PM
To: Lance DellaMea <LDellaMea@mercantilesolutions.com [mailto:LDellaMea@mercantilesolutions.com] >
Subject: RE: Hylan  Interesting and impressive guy. I'm glad you set up the meeting.  We have some follow-ups for sure, but nothing immediate based on the file he has available now. We don't have any interest in paydays, even the way he's packaging it.   Have a good weekend.  -- Brett Murray | External Resources Manager  + 1 (678) 684-4148  CONFIDENTIALITY NOTICE This message, and all attachments transmitted with it, may contain confidential and/or legally-privileged information that is intended solely for the individual or entity to which it is addressed. If you are not the intended recipient, you are hereby notified that you are not authorized to read, distribute, copy, or otherwise use this message, its attachment(s), or any part thereof. If you have received this message in error, please notify the sender immediately by email or by telephone at +1 (678) 728-7310 and delete all copies of this message and all attachments.

PX34
000315

| | |
|---|---|
| **From:** | Andrew J. Shaevel  <andrew.shaevel@bobalew.com> |
| **Sent:** | Thursday, February 19, 2015 10:49 AM |
| **To:** | Mohindra Hirsh |
| **Cc:** | Jon's Gmail Account |
| **Subject:** | Fwd: Payday Lenders |

FYI.  This might be an issue.


Andy
**Andrew J. Shaevel, CEO Bobalew Ventures** 5477 Main Street  [x-apple-data-detectors://3/0]   Amherst, New York 14221 USA [x-apple-data-detectors://3/0]
(716) 580-3133 [tel:(716)%20580-3133]  - Office
(716) 860-1125 [tel:(716)%20860-1125]  - Mobile
(716) 580-3137 [tel:(716)%20580-3137]  - Fax
andrew.shaevel - Skype

Sent from my iPad, please forgive any spelling mistakes or typos.
***CONFIDENTIALITY NOTICE***:  This communication and any attachments are confidential, and are only for the use of the intended recipient.  If you have received this transmission in error, any disclosure, copying, distribution or the taking of any action in reliance upon this communication is strictly prohibited.  If you have received this communication in error, please contact the sender immediately and delete the original message.  Thank you.


Begin forwarded message:

**From:** "Greg Grigorian (Hylan)" <Greg@hylanasset.com [mailto:Greg@hylanasset.com] >
**Date:** February 19, 2015 at 10:16:47 AM EST
**To:** "Andrew J. Shaevel (Hylan)" <Andy@hylanasset.com [mailto:Andy@hylanasset.com] >, Jon's Gmail Account <barabanus@gmail.com [mailto:barabanus@gmail.com] >
**Subject: FW: Payday Lenders**

Please advise how I should respond to this??????  **From:** grega@ufsworks.com [mailto:grega@ufsworks.com] [mailto:grega@ufsworks.com [mailto:grega@ufsworks.com] ]
**Sent:** Wednesday, February 18, 2015 8:49 PM
**To:** Greg Grigorian (Hylan)
**Cc:** grega@ufsworks.com [mailto:grega@ufsworks.com]
**Subject:** Payday Lenders
**Importance:** High  Hi Greg:  Please have a look at the article below, which references lenders in the portfolio sold to UFS. Are you aware of this?  **U.S. halts payday loan schemes that siphoned $162 million from consumers' accounts** CLEVELAND, Ohio -- The U.S. government shut down two online payday lenders that siphoned a combined $162 million from consumers' bank accounts in what regulators described as a "cash-grab scam." The payday lenders used information from online loan shopping sites to deposit loans in unwitting consumers' accounts and then repeatedly dinged them for finance charges. "It is an incredibly brazen and deceptive scheme," said Richard Cordray, director of the Consumer Financial Protection Bureau, which joined the Federal Trade Commission in tag-team enforcement actions. When people disputed the debits with their banks, the lenders fabricated documents that purported to show customers had agreed to the loans, Cordray said. As a result, banks sometimes sided with the payday lenders, and customers lost their disputes. And if consumers tried to close their bank accounts to avoid charges, they were hounded by debt collectors. As many as 2,300 consumers nationwide complained to the CFPB and FTC about the unwanted payday loans. Two separate lending groups used the same basic scheme, which started with online payday loan shopping sites known as lead generators. Consumers shared personal and banking information with the sites, which promise to match consumers with lenders. The payday lenders bid for these sales leads. Once the payday groups had consumer information in hand, they deposited "payday loans" of several hundred dollars into people's bank accounts without their consent. Every two weeks, the companies then debited finance charges as high as $90 from their unwitting customers' accounts. Both companies established multiple corporate identities in what the agencies said was an attempt to throw off banks and regulators. "There were some consumers who appear to have actually applied for the loans," said Jessica

1

PX34

000316

Rich, director of the Federal Trade Commission. "But make no mistake: even these consumers were horribly deceived about the costs of the loans." The payday group the FTC sued advertised one-time fees, but repeatedly tapped accounts, in some cases, until they were drained, she said. Rich warned consumers who are shopping for loans online not to share personal information with companies they don't know -- because they sell it to other companies, some of whom might be scammers. "We're seeing more and more of these types of scams," she said. Rich said the agency is trying to identify online brokers who sold the information to the sued payday lenders. The CFPB won a court order temporarily halting Hydra Group, which the bureau said made as much as $97 million in payday loans and collected as much as $115 million from customers' bank accounts since 2011. The CFPB's lawsuit names Richard F. Moseley Sr., Richard F. Moseley Jr., and Christopher J. Randazzo, who control the Hydra Group. Other companies in the group include SSM Group, Hydra Financial Limited Funds, PCMO Services and Piggycash Online Holdings.  In a separate action, the FTC got a temporary court order shutting a web of companies owned by Timothy Coppinger and Frampton (Ted) Rowland III. Those include limited liability companies known as CWB Services; Orion Services; Sandpoint; Sand Point Capital; Basseterre Capital; Namakan Capital; Vandelier Group; St. Armands Group; Anasazi Group; Anasazi Services; Longboat Group, dba Cutter Group; Oread Group, dba Mass Street Group. The FTC said the CWB Services group made an estimated $28 million in loans and collected $47 million from consumers' accounts in an 11-month period. The court appointed a receiver. Both suits seek restitution for consumers.  ***Greg Apostolou*** *President &Chief Executive Officer*  ***Universal Financial Systems*** 5877 Pine Avenue, Suite 200 Chino Hills, CA 91709 **T**: (800) 837-5456 | **F**: (877) 240-7010 grega@ufsworks.com [mailto:grega@ufsworks.com]  |  www.ufsworks.com [http://www.ufsworks.com/]    **Important:** This message is intended solely for use by the individual/company to whom it is addressed and may contain information that is confidential and legally/medically privileged. If the reader of this message is not the intended addressee, you are hereby notified that any disclosure, copying, distribution or use of this information is strictly prohibited. If you have received this transmission in error, please immediately notify the sender by telephone, e-mail, or mail and destroy the message without



(Alternate Body)

reading it. Thank you.  li

PX34

000317

**From:**           Hirsh Mohindra   <hirsh@ashtonasset.com>
**Sent:**            Thursday, November 20, 2014 1:49 PM
**To:**               Preetesh Patel
**Subject:**        Fwd: Problem with BMG 10m accounts
**Attachments:**   (Alternate Body)

Take a look will discuss with you in few

Thank you,Hirsh MohindraAshton Asset Management500 Quail Ridge Dr.Westmont, IL 60559P:
630.479.0000www.ashtonasset.com [http://www.ashtonasset.com] Begin forwarded message:

From: "Andrew J. Shaevel" <andrew.shaevel@bobalew.com [mailto:andrew.shaevel@bobalew.com] >
Date: November 20, 2014 at 12:47:40 PM CST
To: Hirsh Mohindra <hirsh@ashtonasset.com [mailto:hirsh@ashtonasset.com] >
Cc: "Jeffrey Brooks (Hylan)" <Jeff@hylanasset.com [mailto:Jeff@hylanasset.com] >, Jon's Gmail Account
<barabanus@gmail.com [mailto:barabanus@gmail.com] >
Subject: FW: Problem with BMG 10m accounts

 This is an issue that has been raised from the first batch of the most recent batch of accounts (internal collected
Graywave).  Thoughts?  Andy  To: Jeff Brooks <jeff@hylanasset.com [mailto:jeff@hylanasset.com] >
 Subject: FW: Problem with BMG 10m accounts FYI – Uh oh..    From: Oleg Kio <okio@urgonline.com
[mailto:okio@urgonline.com] >
 Date: Thursday, November 20, 2014 at 10:29 AM
 Cc: Angel Lopez <alopez@urgonline.com [mailto:alopez@urgonline.com] >, Felix Lopez <flopez@urgonline.com
[mailto:flopez@urgonline.com] >
 Subject: Problem with BMG 10m accounts  David, As I mentioned yesterday, we are having issues with the BMG
accounts. Considerable number of people are saying that they never received the loan and we were able to get a few
bank statements showing that there was no deposit matching the loan amount anywhere near the loan date. If this
continues, we are looking into taking these accounts off the floor and getting a refund... Below are some examples.
RODNEY AHTUANGARUAK
██ -xx-██
TRIPLE SERVICES LLC ██████
 Bank statement does not show any deposits matching loan amount


VIKTORIA VAN EYCKE
██ -xx-██
EPPROCESSING ████████
 Bank statement does not show any deposits matching loan amount


GLENDON ARVIN
██ -xx-██
JHS MARKETING ██████
 Bank statement does not show any deposits matching loan amount


SANDRA BEITER
██ -xx-██
VISTA HOLDINGS GROUP ██████
 Bank statement does not show any deposits matching loan amount

PX34
000318

WESLEY ROBINSON

██ -xx- ██

BEL CAPITAL CORP ██████

Spoke with bank, bank account never existed --  Oleg

The information contained in this e-mail and any files transmitted with it may be a confidential communication or may otherwise be privileged and confidential.  If the reader of this message, regardless of the address or routing, is not an intended recipient, you are hereby notified that you have received this transmittal in error and any review, use, distribution, dissemination or copying is strictly prohibited.  If you have received this message in error, please delete this e-mail and all files transmitted with it from your system and immediately notify our offices by sending a reply e-mail to the sender of this message.

PX34
000319

| | |
|---|---|
| **From:** | Andrew J. Shaevel  <andrew.shaevel@bobalew.com> |
| **Sent:** | Friday, November 7, 2014 11:31 AM |
| **To:** | Hirsh Mohindra  ;  Preetesh Patel |
| **Cc:** | Jon's Gmail Account  ;  "Ryan Zawistowski (Hylan)" |
| **Subject:** | Internal Collected Graywave File |
| **Attachments:** | (Alternate Body); image001.jpg |

  Hirsh – There is a MAJOR problem with data on this file.  Either there was a data transformation error or there is major FRAUD with this file.  Ryan discovered that there are debtors with the same name and address that have different SSNs, same bank accounts but different names and/or SSN's.   THIS IS NOT KOSHER!  Andy
 Andrew J. Shaevel Chief Executive Officer IMG  [288]Bobalew Ventures  5477 Main Street  Amherst, New York 14221 (716) 580-3133 - Office (716) 860-1125 - Mobile (716) 580-3137 - Fax
 website [http://www.bobalew.com/]   CONFIDENTIALITY NOTICE:  This communication and any attachments are confidential, and are only for the use of the intended recipient.  If you have received this transmission in error, any disclosure, copying, distribution or the taking of any action in reliance upon this communication is strictly prohibited.  If you have received this communication in error, please contact the sender immediately and delete the original message. Thank you.

PX34
000320

**From:** Andrew Shaevel <andy@hylanasset.com>
**Sent:** Wednesday, November 11, 2015 7:57 AM
**To:** Larrygitman@gmail.com; jacob@prudentgroup.us
**Cc:** Jon Purizhansky; hirsh@ashtonasset.com
**Subject:** Participation Agreements bewteen HDF PS 110 and LGN - November 11, 2015
**Attachments:** UPDATED HDF BANK INFORMATION.PDF; HDF PS-110 - Participation Agreement - 2015-11-11 - LGN FInancial LLC.pdf

Jacob & Larry –

Based on your recent discussions with Jon, attached please find the participation agreements that purchase the cash flows from the liquidations of $13.4M of BMG Warehouse debt acquired from Ashton Asset Management and Hylan Debt Fund.  The agreed upon purchase price of the Participation Interests is $200,000 and Hylan Asset Management will earn a management fee of 5% consistent with our first deal.  Please execute this agreement and send back to me a scanned image of the executed documents.  In addition, I have attached our wire instructions, please instruct your bank to wire $200,000 to Hylan Debt Fund, LLC.

If you have any questions, feel free to contact Jon or me at your earliest convenience.

Warm regards…

Andy

**Andrew J. Shaevel**
*Chief Executive Officer*



| 5477 Main Street |
| Amherst, NY 14221 |
| (716) 362-7855 - Office |
| (716) 580-3137 – Fax |
| (716) 860-1125 - Mobile |
| www.hylanasset.com |

**_NOTICE_:**  Hylan Asset Management, LLC (Hylan) is the Manager of Hylan Debt Fund, LLC (HDF), a Delaware Series LLC, and the issuer of various series and/or securities registered with the Securities and Exchange Commission.  Any inquiries about HDF or one of its various series may be directed to Hylan.

**_CONFIDENTIALITY NOTICE_:**  This communication and any attachments are confidential, and are only for the use of the intended recipient.  If you have received this transmission in error, any disclosure, copying, distribution or the taking of any action in reliance upon this communication is strictly prohibited.  If you have received this communication in error, please contact the sender immediately and delete the original message.  Thank you.

PX34
000321

# PARTICIPATION AGREEMENT

This Participation Agreement ("Agreement") is entered into as of the 11th day of November, 2015 (the "Effective Date"), by and between **HYLAN DEBT FUND, LLC - PORTFOLIO SERIES 110**, a Delaware series limited liability company, (the "Company") and **LGN FINANCIAL, LLC**, whose address is 1111 Kane Concourse, Suite 518, Bay Harbour Islands, Florida 33154,  (the "Participator" and each of the Company and Participator being a "Party" and together the "Parties").

## RECITALS:

The Company is in the business of acquiring, managing, liquidating and/or disposing of distressed consumer debt obligations and currently has purchased or has contracted to purchase the Portfolio (as defined hereafter).

Participator desires to purchase derivative cash flows by participation hereunder and the Company desires to sell a percentage of net cash flow of the Portfolio that the Portfolio produces under the terms and conditions herein.

In consideration of the mutual covenants contained in this agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    **Definitions.**

(a)    "Effective Date" shall have the meaning ascribed to such term in the Preamble above.

(b)    "Governmental Entity" means any government or subdivision thereof, any governmental agency, department, bureau, commission, authority or instrumentality, court or arbitration tribunal of competent jurisdiction, and any governmental or non-governmental self-regulatory organization, agency or authority, whether international, foreign, domestic, federal, state or local.

(c)    "Gross Collections" shall be debtor payments received by collection agencies or law firms for accounts owned by Company.

(d)    "Incentive Fee" shall have the meaning ascribed to such term in Section 5 below.

(e)    "Law" means any constitutional provision, statute or other law, rule, ordinance, regulation, administrative ruling or executive order in the United States of America, any foreign country or any domestic or foreign national state, provincial, municipal or other local political subdivision thereof issued or promulgated by any Governmental Entity.

PX34

000322

(f)      "Liens" means any and all liens, pledges, encumbrances, claims, charges, security interests, rights of sellers and any third party, rights of redemption, equities, and any other restrictions or limitations of any kind or nature whatsoever.

(g)      "Manager" shall have the meaning ascribed to such term in Section 2(a).

(h)      "Management Fee" shall have the meaning ascribed to such term in Section 4 below.

(i)      "Net Collection Proceeds" shall mean the proceeds received by the Company from collection agencies and law firms as a result of the Portfolio being placed and collected upon by such collection agencies or law firms net of collection expenses.

(j)      "Net Portfolio Cash Flow" shall mean the net derivative cash flow generated by the Portfolio, and further defined as the Portfolio Cash Flow net of the Management Fee and Incentive Fee.

(k)      "Participation Percentage" shall have the meaning ascribed to such term in Section 2(b) below.

(l)      "Portfolio" shall mean the portfolio as detailed on Exhibit A  attached hereto may be comprised of retail credit card accounts, pay day loans, installment loans, title loans, student loans, automobile loans, home equity loans, mortgages, or other accounts, payables or payment intangibles, including, without limitation, any retail credit card account or other account, payable or payment intangible with respect to which there is a fresh, primary, secondary, tertiary or warehouse charged-off consumer receivable (including a VISA/MasterCard receivable, private label credit card receivable, consumer loan, line of credit or any other asset class) which are written off by a selling institution or other applicable party pursuant to their accounting practices and that are: (i) purchased by the Company within sixty (60) months from the date of charge-off, (ii) have average balances of less than $5,000 per account, (iii) are originated accounts within the United States, and (iv)  that shall either (x) not have been collected upon by a third-party since being sold by the originator of the account or (y) have only been owned and collected upon by one owner prior to being acquired by the Company.

(m)      "Portfolio Cash Flow" shall mean the sum of the Net Collection Proceeds and the Residual Proceeds.

(n)      "Portfolio Net Revenue" shall mean the Net Portfolio Cash Flow for the Portfolio in excess of the Company's purchase price for the Portfolio.

(o)      "Residual Proceeds" shall mean the proceeds received by the Company from the re-sale of the Portfolio, net of any broker fees or sale related expenses.

PX34
000323

2.      **Participation**.

(a)      The Company, or Hylan Asset Management, LLC (the "Manager") on behalf of the Company, has purchased or has agreed to purchase, the Portfolio containing approximately **$13,400,000.00** of delinquent and/or charged-off consumer loan accounts for a total purchase price of **$200,000.00** pursuant to one or more Purchase and Sale Agreements dated November 11, 2015.

(b)      The Participator agrees to a purchase 100% percent participation interest in the Net Portfolio Cash Flow produced by the Portfolio (the "Participation Percentage") for a purchase price of One hundred thousand Dollars and zero cents (US $200,000.00) to be payable by wire transfer of immediately available funds to the Company, subject to the terms and conditions contained herein.  Such Participation Percentage entitles the Participator only to a percentage of the derivative cash flows produced by the assets of the Portfolio in an amount equal to the Net Portfolio Cash Flow multiplied by the Participation Percentage.

(c)      Notwithstanding Participator's purchase of the Participation Percentage in the derivative cash flows produced by the Portfolio, the Participator hereby expressly acknowledges that Participator does not own or have any right or title to the Portfolio nor the underlying consumer debt accounts that compose the Portfolio.  Company hereby acknowledges an on-going liability to Participator equal to the Participation Percentage multiplied by the Net Portfolio Cash Flows.

3.      **Portfolio Management Services by Manager**.  With respect to the Portfolio, the Company has appointed Manager to provide portfolio management services on its behalf, and as such the Manager is responsible for, among other things, the following:

(a)      Appending data to the Portfolio from third party data sources;
(b)      Identifying and contracting with agencies to liquidate accounts in the Portfolio;
(c)      Marketing the Portfolio for resale;
(d)      Distributing the Net Portfolio Cash Flow generated from the resale of the Portfolio to the Participator and other participators if any in the Portfolio pursuant to this Agreement; and
(e)      Executing any documents necessary to facilitate the sale or liquidation of the Portfolio.

4.      **Management Fee**. The Manager shall be paid a management fee of five percent (5%) of the Net Collections and Residual Proceeds (the "Management Fee"). Such Management Fee shall be paid to the Manager immediately out of Portfolio Cash Flow actually received by the Company from the proceeds of the Portfolio.

5.      **Incentive Fee**.  The Manager shall be paid an incentive fee equal to zero percent (0%) of the Portfolio Net Revenue (the "Incentive Fee") to be paid as earned and as received by the Company.  Such Incentive Fee shall be paid to the Manager immediately out of Portfolio Cash Flows actually received by the Company from the proceeds of the Portfolio.

PX34

000324

6.      **Portfolio Cash Flow; Portfolio Statements**.

(a)      Following the payment of the Management Fees and Incentive Fees, the Participator shall be paid the Participation Percentage of the Net Portfolio Cash Flow.  The Company shall make such payments to the Participator weekly immediately following the receipt of Net Portfolio Cash Flow by the Company via ACH or wire transfer to an account designated by Participator to the Company in writing.  The Company may deduct from the payments of derivative cash flow made to Participator the cost to wire any such payment to Participator.

(b)      The Company shall deliver to the Participator within fifteen (15) business days of the end of each calendar month a statement of the Portfolio, which shall include information describing (i) the acquisition of the Portfolio, and (ii) Portfolio Cash Flow received by the Company attributable to the Portfolio, including the amount of Net Collection Proceeds, Residual Proceeds, Management Fees paid, and Incentive Fees paid.

7.      **Term of Agreement**.

(a)      This Agreement shall remain in effect until such time as all assets of the Portfolio are either liquidated or sold, the sale of which shall be in the Company's sole discretion.

(b)      If the Portfolio does not generate any Portfolio Cash Flow for a period of ninety (90) days or more, the Company may in its sole discretion choose to sell all the remaining accounts of the Portfolio at a purchase price of 0.05% of the face value of the accounts remaining in the Portfolio that have not otherwise been sold to third-parties to the Manager and all Net Portfolio Cash Flow shall be distributed in accordance with Section 6 above.

8.      **Representations and Warranties of Company as to the Portfolio.**  Company represents and warrants to Participator that, as to the Portfolio, the following is true and correct as of the Effective Date:

(a)      Title.  Company has good, marketable and valid title to, and is the owner of, the Portfolio, free and clear of all Liens.  No effective financing statements or like instruments will be on file in any jurisdiction with respect to any of the Company's rights in the Portfolio.

(b)      Compliance. The Portfolio has been purchased and maintained by the Company in compliance with all applicable Laws.

(c)      Authority to Sell and Assign. The Company has full right and authority to sell and assign its interest in the Portfolio.

9.      **Confidentiality**. The terms of this Agreement are strictly confidential and neither it nor its substance shall be disclosed publicly or privately, without the prior written consent of

PX34
000325

the Company. Such restriction shall not apply to information which is required to be disclosed by applicable law, regulation or court order.

10. **Miscellaneous**.

(a) **Securities Disclosure.** NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION, FOREIGN OR DOMESTIC, HAS REVIEWED, APPROVED OR DISAPPROVED THIS AGREEMENT OR THE PARTICIPATION (COLLECTIVELY, THE "SECURITY").  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR ANY OTHER LAW, AND THE COMPANY IS UNDER NO OBLIGATION TO REGISTER THE SECURITY UNDER THE SECURITIES ACT OR ANY OTHER APPLICABLE LAW IN THE FUTURE.

THIS SECURITY MAY NOT BE SOLD, PLEDGED, HYPOTHECATED, DERIVATED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION UNDER THE SECURITIES ACT AND OTHER APPLICABLE LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.  BASED UPON THE FOREGOING, THE PARTICIPATOR MUST BE PREPARED AND DOES HEREBY REPRESENT THAT PARTICIPATOR IS ABLE TO BEAR THE ECONOMIC RISK OF INVESTMENT THEREIN FOR AN INDEFINITE PERIOD OF TIME.

PARTICIPATOR ACKNOWLEDGES NO ONE HAS MADE ANY REPRESENTATIONS OTHER THAN WHAT IS SET FORTH HEREIN AND NO ONE IS AUTHORIZED TO MAKE ANY SUCH REPRESENTATION.

THIS SECURITY IS A RESTRICTED SECURITY UNDER THE SECURITY ACT.

(b) Taxes. Participator acknowledges that it is solely responsible to pay any taxes due any government associated with the gains generated pursuant to this Agreement.  Participator agrees to provide Company with a W-8BEN indicating that it accepts full responsibility for any taxes due the United States of America.

(c) Severability; Validity; Parties in Interest.   The provisions of this Agreement shall be severable in the event that any of the provisions hereof (including any provision within a single section, paragraph or sentence) are held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, and the remaining provisions shall remain enforceable to the fullest extent permitted by Law. Furthermore, to the fullest extent possible, the provisions of this Agreement (including, without limitations, each portion of this Agreement containing any provision held to be invalid, void or otherwise unenforceable that is not itself invalid, void or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

PX34

000326

(d)     <u>Amendments and Waivers</u>.  This Agreement may not be amended or modified in any manner nor may any of its provisions be waived except by written amendment executed by the Parties.  A waiver, modification or amendment by a Party shall only be effective if (i) it is in writing and signed by the Parties, (ii) it specifically refers to this Agreement and (iii) it specifically states that the Party, as the case may be, is waiving, modifying or amending its rights hereunder.  Any such amendment, modification or waiver shall be effective only in the specific instance and for the specific purpose for which it was given.

(e)     <u>Headings</u>. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(f)     <u>Notices</u>.   All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed given upon: (i) confirmed delivery by a standard overnight carrier or when delivered by hand, or (ii) the expiration of 5 Business Days after the day when mailed by registered or certified mail (postage prepaid, return receipt requested), addressed to the respective parties to the addresses first mentioned above (or such other address for a Party as shall be specified by like notice).

(g)     <u>Certain Rules of Construction</u>.

(i)     Unless the context otherwise requires, singular nouns and pronouns, when used herein, shall be deemed to include the plural of such noun or pronoun and pronouns of one gender shall be deemed to include the equivalent pronoun of the other gender.

(ii)     When used herein, the words "hereof," "herein" and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(iii)     When used herein, the terms "include," "includes," and "including" are not limiting.

(iv)     Unless the context requires otherwise, derivative forms of any term defined herein shall have a comparable meaning to that of such term.

(h)     <u>Survival of Representations, Warranties, and Covenants</u>.  All representations and warranties made by any of the Parties in this Agreement and in any instrument delivered pursuant to this Agreement shall survive the date of this Agreement and the consummation of the contemplated transactions; <u>provided</u>, <u>however</u>, that the covenants contained in this Agreement and in any instrument delivered pursuant to this Agreement shall survive the date of this Agreement and the consummation of the contemplated transactions, in accordance with their terms.

(i)     <u>Entire Agreement; Assignment</u>.   This Agreement: (i) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof, and (ii) shall not be assigned by

PX34
000327

operation of law or otherwise without the prior written consent of each of the Company and Participator.

(j)    Counterparts; Effectiveness.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  The exchange of copies of this Agreement and of signature pages by facsimile or electronic transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the Parties transmitted by facsimile or electronic transmission shall be deemed to be their original signatures for all purposes.

(k)    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the choice or conflict of laws principles thereof or of any other jurisdiction. The Parties hereby agree that all disputes arising out of or relating to this Agreement shall be resolved in the state or federal courts located in the State of New York, County of Erie, and the Parties hereby consent to the jurisdiction of such courts in connection with any action or proceeding initiated concerning or arising from this Agreement.

(l)    No Third-Party Beneficiaries. This Agreement is for the benefit of, and may be enforced only by the Company and Participator, and each of their respective successors and permitted transferees and assignees, and is not for the benefit of, and may not be enforced by, any third party.

(m)    Further Assurances.  From time to time, as and when requested by any Party, the other Party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions (subject to any limitations set forth in this Agreement), as such other Party may reasonably deem necessary or desirable to consummate the transactions contemplated by this Agreement and/or effectuate the intent of this Agreement and Company's ownership and responsibility for the Portfolio.

(n)    WAIVER OF JURY TRIAL.  EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT.

(o)    Successors and Assigns.  This Agreement shall be binding upon, and shall inure to the benefit of, the Parties and each of their respective legal representatives, successors and permitted assigns, including any trustee appointed under chapters 11 or 7 of the Bankruptcy Code and any responsible officer or examiner appointed for any of the Parties.

*[Signature page to Participation Agreement]*

PX34
000328

IN WITNESS WHEREOF, the parties have executed this Participation Agreement, to be effective as of the date first set forth above.

**COMPANY:**

**HYLAN DEBT FUND, LLC - PORTFOLIO SERIES 110**

By: _____

Name:   Andrew J. Shaevel

Title:    as CEO of Hylan Asset Management, LLC
          the Manager of Hylan Debt Fund, LLC – Portfolio Series 110

**PARTICIPATOR:**

**LGN FINANCIAL LLC**

By: _____

Name:   Larry Gitman

Title:    Managing Director

PX34
000329

**EXHIBIT A**

**Portfolio**

Number of Accounts:        TBD (to be updated upon Closing)

Face Value of Accounts:      $13,400,000.00

Originator:               Mixed Lender - BMG Warehoused Debt

Purchase Rate:          1.493%

Purchase Price:         $200,000.00

Accounts were previously acquired from Ashton Asset Management, Inc. who sourced the Accounts from Graywave Capital, LLC and JR Holdings, LLC, each at the time were affiliates of Joel Tucker ("Tucker Entities"). Joel Tucker was the principal at E-Data the origination servicing company for the various lenders. The loans were originated as online payday loans. Consumers submitted an application or indication of interest ("Lead") via the internet. E-Data acquired the lead, conducted limited due diligence and underwriting and then originated one or more loans to the debtor via one or more lenders. Mr. Tucker represented that he acquired the loans upon charge-off from the various lenders, inventoried the loans and remarketed the distressed debt as BMG Warehoused Debt. Manager, directly or indirectly via its affiliates, acquired a large volume of these loans, subsequently bundled the loans by Social Security Number (by debtor) and then sold the loans to Company and other buyers. On average, each debtor has 3 to 4 loans. Some loans in each debtor bundle may have never been collected prior to being sold to Company, while other loans may have been previously placed for collection by Manager or an affiliate. If the accounts had been placed for collection prior to sale to Company, all payment plans that may have been established now accrue to the benefit of Company.

PX34
000330

**HYLAN DEBT FUND**
**BANK INFORMATION**

A. <u>**ACH Instructions**</u>:

| | |
|---|---|
| Beneficiary: | Hylan Debt Fund, LLC<br>5477 Main St<br>Williamsville, NY 14221 |
| Account Name: | Hylan Debt Fund, LLC |
| Bank Name: | Bank of America |
| ABA Routing: | 021 000 322 |
| Account Number: | ████ 5836 |

B. <u>**Fed Wire Instructions**</u>:

| | |
|---|---|
| Beneficiary: | Hylan Debt Fund, LLC<br>5477 Main St<br>Williamsville, NY 14221 |
| Account Name: | Hylan Debt Fund, LLC |
| Bank Name: | Bank of America |
| ABA Routing: | 026 009 593 |
| Account Number: | ████ 5836 |
| SWIFT CODE: | BOFAUS3N |
| Bank Address: | Bank of America<br>100 W. 33rd Street<br><br>New York, NY 10001 |

**C.** <u>**SWIFT Wire Instructions**</u>:

| | |
|---|---|
| Beneficiary: | Hylan Debt Fund, LLC |
| | 5477 Main St |
| | Williamsville, NY 14221 |
| | |
| Account Name: | Hylan Debt Fund, LLC |
| | |
| Bank Name: | Bank of America |
| | |
| Account Number: | ███████ 5836 |
| | |
| SWIFT CODE: | BOFAUS3N |
| | |
| Bank Address: | Bank of America |
| | 100 W. 33rd Street |
| | New York, NY 10001 |

| | |
|---|---|
| **From:** | Andrew J. Shaevel  <andrew.shaevel@bobalew.com> |
| **Sent:** | Sunday, March 13, 2016 5:58 PM |
| **To:** | Hirsh Mohindra  ;  Hirsh Mohindra |
| **Cc:** | Jon's Gmail Account |
| **Subject:** | Placement Agreement Template |
| **Attachments:** | (Alternate Body); image001.jpg; Collection Agreement Input.xlsx; Collection Agreement - unsigned.docx |

This is the agreement and the excel input sheet to merge the input with word doc.  You can also just edit the word docs. The parties will need to be changed.  Either Jon or I will send you the name of the client –FSB (I think).  Dave's Info goes in the excel sheet  Andy  Andrew J. Shaevel Chief Executive Officer IMG  [288]Bobalew Ventures  5477 Main Street Amherst, New York 14221  (716) 580-3133 - Office (716) 860-1125 - Mobile (716) 580-3137 - Fax  website [http://www.bobalew.com/]   CONFIDENTIALITY NOTICE:  This communication and any attachments are confidential, and are only for the use of the intended recipient.  If you have received this transmission in error, any disclosure, copying, distribution or the taking of any action in reliance upon this communication is strictly prohibited.  If you have received this communication in error, please contact the sender immediately and delete the original message. Thank you.

PX34
000333

# COLLECTION AGREEMENT

This Collection Agreement ("Agreement") is made and entered into as of this  day of , by and between  a , located at  and acting as an independent contractor (hereinafter referred to as "Agency"), , an individual with an address at  (the "Guarantor") and **Hylan Asset Management, LLC**, a New York limited liability company, located at 5477 Main Street, Amherst, NY 14221 (hereinafter referred to as "HAM", both of whom may be collectively referred to throughout this Agreement as "Parties," or individually as "Party").

WHERAS, HAM is the owner of or the authorized manager of certain consumer debt obligations and distressed assets ("Accounts"); and

WHEREAS, Agency is in the business of debt collection and desires to contract with HAM to collect upon certain Accounts owned or managed by HAM; and

WHEREAS, in connection with the placement of the Accounts with the Agency for collection, the Parties desire to set forth their respective duties and obligations hereunder;

**NOW, THEREFORE**, the Parties mutually agree to the following promises, the receipt and sufficiency of consideration for which is hereby acknowledged:

1. <u>**Placement and Collection of Accounts.**</u>

a.     Agency agrees to accept upon the terms and conditions herein, any and all unpaid Accounts HAM places hereunder for collections with Agency, the amounts of which and form of which that shall be determined in HAM's sole discretion, and Agency shall promptly undertake through commercially reasonable and lawful means, the collection of Accounts referred by HAM.

b.     The placement of Accounts with Agency (a "Placement" or "Placements") shall be in HAM's sole discretion, and nothing in this Agreement shall be interpreted as requiring HAM to place Accounts to Agency for collection. In order to refer Accounts to Agency, HAM shall send Agency a placement email and data file.  The terms of each Placement shall incorporate the terms described within the transmittal email offering the Placement (each, a "Placement Email") with the terms and conditions of this Agreement. In the event of any inconsistency between the terms and conditions of the Placement Email and the terms and conditions of this Agreement, this Agreement shall control.   Agency shall accept or decline each Placement within forty eight (48) hours from the time of the delivery of the Placement Email by replying to the sender of the Placement Email. If the Agency does not reply to the sender at HAM that Agency accepts the Placement with the forty eight (48) hour time period, the Placement shall be deemed to be accepted.

   c. It is hereby agreed and acknowledged that there is no transfer of title to the Accounts upon a Placement to the Agency but merely assigns from HAM to the Agency the right to collect upon the underlying debt attributed to the Accounts.

**2.** **Payment and Fees.**

   a. <u>Percentage Fee</u>. The Agency shall be paid a contingency fee that shall be based off a percentage of gross revenue from collections collected upon for each Placement of Accounts (the "Percentage Fee"). HAM shall set the Agency's Percentage Fee for each Placement in the Placement Email.

   b. <u>Remitting of Collection Proceeds</u>. Each Monday, the Agency shall report gross revenue from collections and other information as may be reasonably requested by HAM for each Account collected in the prior calendar week. Agency shall remit to HAM each Thursday for all collections made on HAM's Accounts during the immediately prior calendar week, all gross revenue from collections less the Percentage Fee ("Remits"). Remits may be made via ACH or wire transfer to the bank account of HAM or as otherwise directed by HAM. If the Agency utilizes ACH to remit funds to HAM, the Agency agrees and acknowledges that it shall set up the ACH transfer so that that the Remit to be deposited into HAM's bank account becomes available on that Thursday. If the Agency utilizes a wire transfer, the Agency agrees to add a $20 wire transfer processing fee to the total Remit amount.

   c. <u>No Additional Fees and/or Interest</u>. Agency agrees and acknowledges that it shall not add any additional collection fees and/or interest to the Accounts unless previously agreed to by HAM in writing.

   d. <u>Direct Payments.</u> Agency agrees to immediately notify HAM when it learns that a debtor of any Account has paid another party. If HAM learns of any payment made to a third party for an Account placed with Agency, HAM agrees to immediately notify Agency. If the payment was received by the third party during the placement period, HAM agrees to pay Agency it's Percentage Fee based upon the amount received by HAM within fifteen (15) days of its receipt of the payment by the third party. Agency shall not offset any pending direct payments to be made under this subsection (d) against any weekly Remits.

   e. <u>Compromise Settlements.</u> HAM hereby grants Agency the authority to settle all Accounts in the Agency's sole discretion at an amount not to be less than 80% of the outstanding balance. HAM may provide Agency with greater settlement authority for specific Placements in the Placement Email. Agency may not send blanket settlement letters on Accounts placed by HAM.

   f. <u>Cancellation of Accounts.</u> HAM reserves the right to recall or cancel any Account at any time. Agency reserves the right to maintain all actively paying Accounts. An Account shall be deemed "actively paying" if payment was received in any two (2) consecutive months during placement or if fewer than sixty (60) days have passed since the date of last payment. As a

practical matter, Agency may, from time to time and in its sole discretion, effect a cancellation of the Account and return the Account prior to the sixty (60) day deadline.

**3.     Guaranty.**   The Guarantor does hereby unconditionally and irrevocably guaranty the obligations of Agency hereunder, including, but not limited to, the full, prompt, complete and faithful payment by the Agency of all Remits and any other amounts due to HAM by Agency now or hereafter becoming due (collectively, the "Obligations").   The Guarantor hereby promises, in the event the Agency fails to make payment of any of the Obligations when due, to promptly make such payment to the HAM.  Obligations shall include each cost and expense (including, but not limited to, reasonable attorneys' fees and disbursements) hereafter incurred by HAM in endeavoring to enforce any obligation of Agency or Guarantor pursuant to this Agreement or preserve or exercise any right or remedy of HAM pursuant to this Agreement or arising or accruing as a result of this Agreement.  The guaranty contained herein shall not be limited to any particular period of time but rather shall continue until all of the Obligations have been fully and completely performed by the Agency or otherwise discharged and released by HAM, and the Guarantor shall not be released from any duty, obligation, or liability hereunder so long as there is any claim of HAM against the Agency arising out of the Obligations which has not been performed, paid, settled or discharged in full.  Further, the Guarantor shall not be released, nor shall the Obligation hereunder be in any way diminished by: (a) any extension of time for payment granted to the Agency by HAM, (b) any action taken by HAM against the Agency in the exercise of any right it may have against Agency, (c) any delay, failure or omission on the part of HAM to enforce any such right, (d) any bankruptcy, insolvency, reorganization, arrangements, assignment for the benefit of creditors, receivership or trusteeship affecting the Agency, or (e) any act or event which might, but for this provision of this instrument be deemed a legal or equitable discharge of a surety. The Guarantor hereby waives: (i) notice of acceptance and reliance upon this Guaranty by HAM, (ii) notice of any and all extensions, modifications and/or waivers in the obligations of the Agency with respect to the Agreement, and (iii) notice of any default by or on the part of the Agency under the Agreement.

**4.     Relationship of the Parties.**  The parties intend and Agency acknowledges that Agency, in performing the services hereunder, is an independent contractor, and not an employee of HAM or any of HAM's subsidiaries or affiliates. Nothing herein shall be construed to create an employer-employee relationship between the HAM and Agency, and Agency will not represent to be or hold themselves out as an employee of HAM.  Accordingly, Agency shall pay all costs and expenses of Agency's operations and shall be solely responsible for all taxes, social security contributions, worker's compensation premiums and any similar or different taxes and payments which may be applicable to Agency or any of its employees.  Agency and its employees shall not be eligible for any of HAM's employee benefit programs, and Agency shall have no claim against HAM for sick leave, retirement benefits, social security, worker's compensation, disability or unemployment benefits or any other similar benefits. HAM shall not be required to withhold any of such taxes or payments from sums to be paid hereunder to Agency, nor be liable for the payment of same to any federal, state or local government or agency.  HAM shall not be liable for any injury or damage to any person or property whatsoever by reason of, or in any manner growing out of, any of Agency's, or its agents and/or employees, acts or failure to act

hereunder.  Agency shall indemnify and hold HAM harmless from and against any and all expenses which HAM may incur that are contrary to the express provisions of this Section. Agency shall not, by letterhead, advertising or otherwise, create the impression that Agency is an employee or agent of the HAM.  At no time during the term or after the Agreement's termination shall Agency challenge or put at issue either the validity or the ownership of HAM's patents, trademarks, trade names and other intellectual property.  Should Agency become aware of any facts which may represent a potential infringement of any patent, trademark, trade name or other proprietary right of the HAM, it shall immediately inform HAM and take such action as HAM may reasonably request to protect such rights, including assistance to HAM in any legal action brought by HAM.  Agency agrees to permit HAM's authorized personnel or its agents to enter Agency's premises at all reasonable times, with or without advance notice, for the purpose of determining whether Agency is properly carrying out its duties under this Agreement.

**5.**    <u>**Agency Representations and Warranties.**</u>

a.    <u>Organization; Authority</u>.  Agency has all requisite power and authority (i) to execute and deliver this Agreement and (ii) to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement by Agency, the performance by Agency of its obligations hereunder and the consummation by Agency of the transactions contemplated herein have been duly authorized pursuant to and in accordance with all laws governing and/or applicable to Agency and no other proceedings on the part of Agency are necessary to authorize such execution, delivery and performance. This Agreement has been duly and validly executed and delivered by Agency and constitutes the valid and binding obligation of Agency , enforceable against Agency in accordance with its terms. Agency is validly existing and in good standing under the laws of each respective jurisdiction of formation and has all requisite company power and authority to own, lease, operate or otherwise hold each of its respective assets and to carry on each of its respective businesses as now being conducted, including, without limitation, holding all necessary licenses and permits necessary to collect upon the Accounts in each jurisdiction where the responsible debtor of such Account resides.

b.    <u>Association Memberships and Ethics.</u> Agency is a member of the American Collectors Association and shall comply strictly with the Code of Ethics adopted by this organization, as well as with the Federal Fair Debt Collection Practices Act (15 U.S.C. §§ 1692 et seq., as amended), the guidelines provided by the Federal Trade Commission and any and all individual state law requirements that are in existence and applicable at the time Agency attempts to collect the Accounts.

c.    <u>Compliance</u>. Agency currently does not operate in a manner that (i) is illegal under any laws, decrees, rules or regulations in any jurisdiction in which the Agency does business, or (ii) would have the effect of causing HAM to be in violation of any laws, decrees, rules or regulations in effect in any such jurisdiction, including, without limitation, the United States Fair Debt Collections Practices Act, Telephone Consumer Protection Act or any State fair debt collection laws.

d.     <u>Litigation</u>. There is no federal, state, or other governmental or regulatory proceedings, litigation, claims or arbitration against Agency ("Proceedings"), and the Agency shall notify HAM of any Proceedings prior to the acceptance of any Placement.

**6.     <u>Agency Covenants.</u>**

a.     <u>Legal Action.</u> Agency will not threaten or initiate any form of legal action in the name of or on behalf of HAM on any Account without the prior written consent of HAM. Agency will advance all costs of legal action including attorneys' fees and court costs. HAM agrees to reimburse Agency for such costs exclusively from funds collected as a result of such legal action. HAM shall have no obligation to reimburse Agency for any such costs to the extent that such costs exceed the net amount of funds collected as a result of such legal action after deduction of other amounts paid on any Account, including fees of Agency. Agency shall provide HAM with an itemized invoice of all legal costs. In no event shall Agency initiate criminal proceedings on behalf of HAM. In any case involving the institution of civil proceedings, the Agency shall immediately notify HAM in the event that the debtor answers the complaint with an affirmative defense or counterclaim, and shall immediately deliver a copy of said affirmative defense or counterclaim to HAM. In the event of said affirmative defense or counterclaim, HAM shall have the right but not the obligation to direct and control any further litigation with respect to said claim and to substitute attorneys or to provide additional legal counsel with respect thereto. Removal of said Accounts from Agency shall not constitute grounds for compensation nor shall additional compensation be paid in the event HAM deems it proper for the Agency to continue with such action unless it is specifically agreed otherwise in writing.

b.     <u>Compliant Activities</u>. Agency agrees that it will neither undertake, nor cause, nor permit to be undertaken, any activity which either (i) is illegal under any laws, decrees, rules or regulations in any jurisdiction in which the Agency does business, or (ii) would have the effect of causing HAM to be in violation of any laws, decrees, rules or regulations in effect in any such jurisdiction, including, without limitation, the United States Fair Debt Collections Practices Act, Telephone Consumer Protection Act or any State fair debt collection laws.

c.     <u>Audit Rights</u>. HAM reserves the rights to request backup documentation or audit the books and records of the Agency with respect to collection activities on the Accounts. Agency further agrees and acknowledges HAM has both a tremendous interest in making sure that Agency does not violate any laws or regulations in the collection of the Accounts and must have the ability to review the books and records of the Agency to verify the accuracy of the payments made in Section 2 above. Therefore, Agency shall allow HAM or any representative or agent thereof upon 24 hours notice and during regular business hours to review and collect copies of any records pertaining to the Accounts, collection activity or business operations and practices of Agency.  Upon any non-payment or non-compliance with reporting requirements under this Agreement that result in the auditing of books and records of Agency by HAM, the Agency shall be responsible for HAM's reasonable costs and fees associated with such audits and HAM shall have the right to appoint its own representatives to complete the audits.

     d.    <u>Reporting to Consumer Reporting Agencies</u>. Agency will not report or threaten to report any Account to a consumer reporting agency or credit bureau without the express prior written consent of HAM.

     e.    <u>Changes</u>. Agency agrees to promptly notify HAM within five (5) business days in writing of (i) any change in its principal place of business, chief executive officer or jurisdiction of organization, and (ii) the earlier of the notification of or commencement of any federal, state, or other governmental or regulatory proceeding, litigation or arbitration against Agency or any of Agency's affiliates, subsidiaries, officers, directors, members or managers.

**7.    <u>Confidentiality, Non-Disparagement and Non-Solicitation</u>.**

     a.    <u>Confidentiality</u>. Agency shall keep confidential and not disclose to any person or entity (except attorneys, employees, officers, partners or directors of Agency who have a need to know such information) any customer Account information which Agency receives from HAM relating to delinquent Accounts referred to Agency by HAM. Agency agrees to use confidential customer Account information solely for the purposes of tracing, collecting and initiating legal action under this Agreement. Disclosure of Account information or collection activity may be made if required by law or pursuant to a request of a governmental agency, in which case Agency shall immediately notify HAM concerning the reasons for and the nature of the proposed disclosure so HAM may seek an appropriate protective order or take such other action if deemed necessary. In addition, each Party shall comply, to the extent applicable, with the requirements of the implementing regulations of Title V of the Gramm-Leach Bliley Act of 1999, specifically including, 16 Code of Federal Regulations, Chapter I, Subchapter C, Part 313.11 and 313.13.

     b.    <u>Non-Disparagement</u>. During the term and following any termination of this Agreement, the Agency shall not directly or indirectly, in any capacity or manner, make, express, transmit, speak, write, verbalize or otherwise communicate in any way (or cause, further, assist, solicit, encourage, support or participate in any of the foregoing), any remark, comment, message, information, declaration, communication or other statement of any kind, whether verbal, in writing, electronically transferred or otherwise, that might reasonably be construed to be derogatory or critical of, or negative toward, HAM or any of its managers, members, officers, affiliates, subsidiaries, employees, agents or representatives.

     c.    <u>Non-Solicitation</u>. Commencing on the date of this Agreement and continuing for a period of 180 days after its termination, expiration or cancellation, Agency may not, directly or indirectly at any time, hire or solicit to hire or assist in soliciting or hiring, any employee or consultant working for HAM or any of its affiliates, or cause such employee or consultant to leave the services of HAM or assist such employee or consultant to take up employment with HAM or HAM's competitors or other companies. Further, commencing on the date of this Agreement and continuing for a period of three (3) years, Agency may not, directly or indirectly, solicit, attempt to solicit or assist in the solicitation of any collections related

business from any other client engaged in collections activity with HAM or holding any Account given to Agency by HAM or cause, induce or encourage any material customer or supplier of HAM or any other person who has a material business relationship with HAM, to terminate or modify any such actual or prospective relationship. In the event that any or all of this covenant shall be determined by a court of competent jurisdiction to be unenforceable by reason of its geographic or temporal restrictions being too great or by reason that the range of activities are too great or for any other reason, this clause shall be interpreted to extend over the maximum geographic area, period of time, range of activities or other restrictions to which it may be enforceable. This section shall survive the termination of this Agreement.

**8.     Indemnification.** Agency agrees to indemnify and hold HAM (including its officers, managers, employees, members, and agents) harmless from and against any claims, actions, suits or other actual or threatened proceedings, and all losses, judgments, damages, expenses or other costs (including all fees and disbursements of counsel) incurred or suffered by HAM by reason of the misconduct or violation of any applicable law, rule or regulation by Agency (or its employees, representatives, agents or successors) in connection with the services, collection or enforcement of the Accounts.  Agency additionally agrees to indemnify and hold HAM (including its officers, managers, employees, members, and agents) harmless from and against any claims, actions, suits or other actual or threatened proceedings, and all losses, judgments, damages, expenses or other costs (including all fees and disbursements of counsel) incurred or suffered by HAM as the result of Agency's breach of this Agreement, including, without limitation any representation, warranty or covenant contained herein or entered into pursuant to the terms and conditions of any Placement through the acceptance of a Placement Email. At its option, HAM shall have the right to require Agency to assume the defense of any claims, actions, suits or other actual or threatened proceedings and to directly pay for all losses, judgments, damages, expenses or other costs (including all fees and disbursements of counsel) which may be imposed.

**9.     Term and Termination.**

        a.     The term of this Agreement shall commence on the date hereof and shall continue until terminated in accordance with Section 9(b) below.

        b.     This Agreement may be terminated: (i) upon the mutual written consent of Agency and HAM, (ii) by HAM immediately upon notice to the Agency via email to , or (iii) by Agency upon 15 days prior written notice to HAM.

        c.     Upon termination for any reason: (i) all Accounts shall be returned to HAM immediately and within no more than 24 hours after termination, except that Agency may retain all actively paying Accounts, as well as those Accounts which have been referred to legal counsel, (ii) Agency shall cease and desist from all collection activity immediately unless directed otherwise by HAM, (iii) Agency shall continue to make all payments in accordance with Section 2 above. Further following termination for any reason, HAM may request and Agency hereby agrees and acknowledges is shall deliver to HAM within 48 hours of request, an export file detaining the current balance for each Account as of the last day of collection.

10.    **Miscellaneous.**

a.      Remedies. No remedy by the terms of this Agreement conferred upon or reserved to any Party is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and in addition to every other remedy given under this Agreement or existing at Law (including, without limitation, the right to such equitable relief by way of injunction), or by statute on or after the date of this Agreement. Notwithstanding the foregoing, Agency agrees and acknowledges that the failure to comply with the terms of Sections 7 and 9(c) will cause irreparable harm to HAM, for which damages may not be adequate compensation and acknowledges that HAM shall be entitled to equitable relief including a temporary restraining order and an injunction, in order to stop any breach, threatened breach or continued breach of Agency's obligations herein. Agency further agrees to notify HAM immediately of any breach of its obligations under this Agreement which comes to Agency's attention.

b.      Severability; Validity; Parties in Interest.   The provisions of this Agreement shall be severable in the event that any of the provisions hereof (including any provision within a single section, paragraph or sentence) are held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, and the remaining provisions shall remain enforceable to the fullest extent permitted by law. Furthermore, to the fullest extent possible, the provisions of this Agreement (including, without limitations, each portion of this Agreement containing any provision held to be invalid, void or otherwise unenforceable that is not itself invalid, void or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

c.      Governing Law; Venue. This Agreement shall be governed by and construed in accordance with the Laws of the State of New York, without regard to the choice or conflict of laws principles thereof or of any other jurisdiction. The Parties hereby agree that all disputes arising out of or relating to this Agreement shall be resolved in the state or federal courts located in the State of New York, County of Erie, and the Parties hereby consent to the jurisdiction of such courts in connection with any action or proceeding initiated concerning or arising from this Agreement.

d.      Entire Agreement. This Agreement contains the entire Agreement between the parties. Any change to this Agreement shall require a written document signed by HAM and Agency and the proposed amendment or modification shall become effective on the date specified in such notice.

e.      Notices.   All notices, claims, demands, and other communications hereunder, except as where indicated in this Agreement to be delivered via electronic mail, shall be in writing and shall be deemed given upon (i) confirmed delivery by a standard overnight carrier or when delivered by hand, or (ii) the expiration of 5 Business Days after the day when mailed by registered or certified mail (postage prepaid, return receipt requested), addressed to the

respective parties at the addresses first mentioned above (or such other address for a Party as shall be specified by like notice).

f.     <u>Survival of Representations, Warranties, and Covenants</u>.  All representations, warranties and covenants made by any of the Parties in this Agreement and in any instrument delivered pursuant to this Agreement shall survive the date of this Agreement, each Placement made hereunder and the consummation of the contemplated transactions.

g.     <u>Amendment</u>. This Agreement may not be amended or modified except by an instrument in writing signed by each of HAM and Agency.

h.     <u>Counterparts; Effectiveness</u>. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  The exchange of copies of this Agreement and of signature pages by facsimile or electronic transmission shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the Parties transmitted by facsimile or electronic transmission shall be deemed to be their original signatures for all purposes.

i.     <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT.

j.     <u>No Third-Party Beneficiaries</u>. This Agreement is for the benefit of, and may be enforced only by HAM and Agency, and each of their respective successors and permitted transferees and assignees, and is not for the benefit of, and may not be enforced by, any third party.

k.     <u>Attorney's Fees</u>. If any action at law or in equity is brought to enforce or interpret the terms of this Agreement, then the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which it may be entitled.

l.     <u>Successors and Assigns</u>. This Agreement shall be binding upon, and shall inure to the benefit of, the Parties and each of their respective legal representatives, successors and permitted assigns, including any trustee appointed under chapters 11 or 7 of the Bankruptcy Code and any responsible officer or examiner appointed for any of the Parties.

*[Remainder of page left blank; Signature page follows]*

*[Signature page to Collections Agreement]*

     IN WITNESS WHEREOF the parties have executed this Agreement on the date first written above.

**HAM:**

**Hylan Asset Management, LLC**


By: _____

Name: Andrew J. Shaevel

Title: CEO

**AGENCY:**


By: _____

Name: _____

Title: _____


**GUARANTOR:**


_____

Name:

| | |
|---|---|
| **From:** | Ryan Zawistowski (Hylan)  <ryan@hylanasset.com> |
| **Sent:** | Wednesday, July 9, 2014 4:57 PM |
| **To:** | Hirsh Mohindra |
| **Cc:** | Andrew J. Shaevel (Hylan) ; Jon's Gmail Account ;  David Carr |
| **Subject:** | Possible Double Sold Accounts |
| **Attachments:** | (Alternate Body); image001.jpg |

 Good Afternoon Hirsh-  Please see the below complaint we received from an agency we have placed a small sample of our QKD file with. It appears that a significant amount of accounts are claiming that they have already been called on by multiple different agencies.  "Just want you to know we started on this new file today and are a little disappointed. We have issued almost 90 files today and we have been getting the same story about" we are the second or third company calling trying to collect on these accounts". We have encountered at least 6-8 files that must have been double sold to more than Hyland. I'm assuming it wasn't Hyland that double sold the accounts so someone prior to you did. I have a handful of accounts that you can look into to verify the fact that they have been paid to another agency.  Acct: ███████ Ashley Campbell Acct: ███████ April Floyd Acct: ███████ Rebecca McDonald Acct: ███████ Leisa Payne"  Also, they are claiming that over half the accounts they called on today (roughly 50 accounts) are being collected on by an agency called Delaware Solutions.  Please look into this ASAP. This agency is going to pull this file off the floor if we can't address this ASAP.  Thanks,  Ryan

 Ryan Zawistowski Operations Manager  IMG  [206]5477 Main Street Amherst, NY 14221 (716) 580-3135 ext: 107 - Office (855) 275-3651 - Toll-Free Hot Line (716) 580-3137 - Fax www.hylanasset.com [http://www.hylanasset.com/] CONFIDENTIALITY NOTICE:  This communication and any attachments are confidential, and are only for the use of the intended recipient.  If you have received this transmission in error, any disclosure, copying, distribution or the taking of any action in reliance upon this communication is strictly prohibited.  If you have received this communication in error, please contact the sender immediately and delete the original message.  Thank you.  LEGAL DISCLOSURE: Hylan Asset Management, LLC ("Hylan") is not offering nor selling securities of any kind.  Hylan is solely an advisory and portfolio management services firm that assists clients to acquire, liquidate and dispose of pools of distressed consumer receivables ("portfolios"). Investing in distressed consumer receivables is by definition an alternative investment. There is no way to guarantee a positive return on each and every portfolio acquired, and as such, Hylan recommends that clients seriously consider limiting their investment in this sector to 5% or less of their net worth.  Hylan only offers its services pursuant to the terms of a Master Servicing Agreement. Prospective clients must be an accredited investor and must acknowledge that there are inherent risks associated with acquiring portfolios of distressed consumer receivables. Hylan does not and cannot guarantee any specific return on any investment.

PX34
000344

**From:**        Andrew J. Shaevel  <andrew.shaevel@bobalew.com>
**Sent:**        Wednesday, December 30, 2015 8:43 AM
**To:**          Jon's Gmail Account
**Cc:**          Mohindra Hirsh  ; Mohindra Hirsh  ; Dennis Klemming  ; Ryan Zawistowski (Hylan) ;
                 Lovelace Christian
**Subject:**     Re: Draft of PSA


Dennis -
Thanks for the chat a few minutes ago and I better understand your objective, which we have no objection to helping fulfill:
- one closing with two payments;  - elimination of the two tranche concept  - inclusion of the Brazilian law as a courtesy with conflicts leaning toward Delaware law.
We acknowledge that this is a trust transaction and that our affiliates are servicing the paper so in effect we have control of the debt and the cash.
We further understand that the Brazilian countersigner will be out as of this afternoon for the New Year so today is critical.

I will get it fixed.  No problem.
Andy

Andrew J. Shaevel, CEO
Bobalew Ventures
5477 Main Street
Amherst, New York 14221 USA [x-apple-data-detectors://3/0]
(716) 580-3133 [tel:(716)%20580-3133]  - Office
(716) 860-1125 [tel:(716)%20860-1125]  - Mobile
(716) 580-3137 [tel:(716)%20580-3137]  - Fax
andrew.shaevel - Skype

Sent from my iPhone, please forgive any spelling mistakes or typos.

CONFIDENTIALITY NOTICE:  This communication and any attachments are confidential, and are only for the use of the intended recipient.  If you have received this transmission in error, any disclosure, copying, distribution or the taking of any action in reliance upon this communication is strictly prohibited.  If you have received this communication in error, please contact the sender immediately and delete the original message.  Thank you.
On Dec 30, 2015, at 8:19 AM, Dennis Klemming <dennis@prudentgroup.us [mailto:dennis@prudentgroup.us] > wrote:

It is a very different document that changes the flow of whole business transaction...you are always in charge of every step of the way of this process as we have zero knowledge about this industry except for you and Jon. This means that you will always be in full control disregarding what any paper document will say. This is now two transactions which we wanted to avoid.

On 12/30/15 8:03 AM, Andrew J. Shaevel wrote:
Dennis -
Everyone here is still sleeping.  I thought most were cleanup edits.  What materially changed?  I will then get Christian on the phone to fix as necessary.  Accept and then mark it up if easier.


Andy
**Andrew J. Shaevel, CEO Bobalew Ventures** 5477 Main Street  Amherst, New York 14221 USA
(716) 580-3133 - Office
(716) 860-1125 - Mobile
(716) 580-3137 - Fax
andrew.shaevel - Skype

Sent from my iPad, please forgive any spelling mistakes or typos.

1

PX34
000345

*CONFIDENTIALITY NOTICE*: This communication and any attachments are confidential, and are only for the use of the intended recipient. If you have received this transmission in error, any disclosure, copying, distribution or the taking of any action in reliance upon this communication is strictly prohibited. If you have received this communication in error, please contact the sender immediately and delete the original message. Thank you.

On Dec 30, 2015, at 7:52 AM, Dennis Klemming <dennis@prudentgroup.us> wrote:

Andrew,

This rewritten contract is very different than we discussed and is missing the point. How early can I call you?

Dennis

On 12/30/15 7:43 AM, Andrew J. Shaevel wrote:
 Dennis -
Attached please find a marked copy of the PSA representing our counsel's edits. In addition, he has drafted a termination agreement for the prior Participation Agreement. Please review and let me know if you are ok to proceed to execution.


Andy
**Andrew J. Shaevel, CEO Bobalew Ventures** 5477 Main Street  Amherst, New York 14221 USA
 (716) 580-3133 - Office
 (716) 860-1125 - Mobile
 (716) 580-3137 - Fax
 andrew.shaevel - Skype

Sent from my iPad, please forgive any spelling mistakes or typos.
*CONFIDENTIALITY NOTICE*: This communication and any attachments are confidential, and are only for the use of the intended recipient. If you have received this transmission in error, any disclosure, copying, distribution or the taking of any action in reliance upon this communication is strictly prohibited. If you have received this communication in error, please contact the sender immediately and delete the original message. Thank you.

Begin forwarded message:

**From:** Christian Lovelace <clovelace@lippes.com>
 **Date:** December 29, 2015 at 10:49:04 PM EST
 **To:** "'Andrew J. Shaevel'" <andrew.shaevel@bobalew.com>
 **Cc:** Jon's Gmail Account <barabanus@gmail.com>
 **Subject: RE: Draft of PSA**

Attached is a mark-up of the PSA and a draft termination agreement for your review. I am in meetings from 10AM until probably around 1PM but available in the afternoon. Thanks,  Christian M. Lovelace *Partner*
--
Prudent Investment Fund Dennis Klemming 2 Blvd de la Foire L-1528 Luxembourg Dennis@PrudentGroup.us
www.PrudentGroup.us +1 305 764 9400
--
Prudent Investment Fund Dennis Klemming 2 Blvd de la Foire L-1528 Luxembourg Dennis@PrudentGroup.us

(Alternate Body)

www.PrudentGroup.us +1 305 764 9400

PX34
000346

| | |
|---|---|
| **From:** | Gaurav Mohindra   <gmohindra@randmlegal.com> |
| **Sent:** | Thursday, April 30, 2015 4:42 PM |
| **To:** | bruce@bikavergroup.com |
| **Cc:** | Hirsh Mohindra  ; Hylan Shaevel  ; Bruce Passen  ;  Paul Traub |
| **Subject:** | Re: Follow up - Hirsh. |
| **Attachments:** | (Alternate Body); 2015_04_30_15_20_35 (1).pdf |

Gentlemen:

Please refer to the attached agreement executed by Ashton.  Should you have any questions, please don't hesitate to contact us.

Best regards,Gaurav

On Thu, Apr 30, 2015 at 2:41 PM, <bruce@bikavergroup.com [mailto:bruce@bikavergroup.com] > wrote:

Gents:

Attached is the Final Settlement Document which has been signed and notarized by me.  Please have all necessary signatures and notary send back to me for our files.

Thank you all for handling this manner so professionally.  I wish nothing but the best for all concerned.

Thank You

Bruce Passen

 -------- Original Message --------

 Subject: Follow up - Hirsh.

 From: Hirsh Mohindra <hirsh@ashtonasset.com [mailto:hirsh@ashtonasset.com] >

 Date: Tue, April 21, 2015 2:11 pm

 To: Hylan Shaevel <andy@hylanasset.com [mailto:andy@hylanasset.com] >, bruce <bruce@bikavergroup.com [mailto:bruce@bikavergroup.com] >,  Bruce Passen <bpassen@hotmail.com [mailto:bpassen@hotmail.com] >, Paul Traub <paul@bikavergroup.com [mailto:paul@bikavergroup.com] >,  Gaurav Mohindra <gmohindra@randmlegal.com [mailto:gmohindra@randmlegal.com] >

Gentleman,

I am pleased an amicable resolution was found.I spoke to each of you individually, and to ensure we are all on the same page - please refer to the following points of agreement :

1) Hylan/Ashton will remit $30,000,000 of principal face balance paper to Bruce/Paul.2) In consideration of the same, Bruce/Paul will provide a release relinquishing Hylan/Ashton/Lender from any liability associated with this paper, and the previously sold paper.  3) Bruce/Paul are prohibited to sell the $30,000,000 paper portfolio, and the previously sold paper portfolio.4) Settlement shall remain confidential.

I think I captured our separate conversations in this email.  Please advise if there are any material changes necessary to this, as Andy is going to have his counsel proceed execution of settlement / release agreements.

Regards, Hirsh MohindraAshton Asset Management500 Quail Ridge Dr., Westmont, IL 60559M: 630.479.0000 [tel:630.479.0000]    D: 630.243.4210 [tel:630.243.4210]  IMG [http://www.ashtonasset.com/wp-content/uploads/2013/04/email-...]www.ashtonasset.com [http://www.ashtonasset.com]

--

Gaurav K. Mohindra, Esq. Ravani &Mohindra P.C.500 Quail Ridge DriveWestmont IL 60559direct - 630-243-4207fax - 312-276-4309

1

PX34

000347

NOTICE: THIS MESSAGE IS FROM A LAW FIRM AND IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN CERTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER ATTORNEY-CLIENT PRIVILEGE OR OTHER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

PX34
000348

# SETTLEMENT AGREEMENT AND GENERAL RELEASE

**THIS SETTLEMENT AGREEMENT AND RELEASE** (the "Agreement") is entered into as of this __ day of April 2015 by and between **ASHTON ASSET MANAGEMENT, INC.**, an Illinois corporation ("Ashton"), **BIKAVER GROUP, LLC**, a New Jersey limited liability company ("Bikaver"), **HYLAN DEBT FUND, LLC**, a Delaware series limited liability company ("HDF"), and **HYLAN ASSET MANAGEMENT, LLC**, a New York limited liability company ("HAM"), which are each hereinafter sometimes referred to individually as a "Party" and collectively as the "Parties."

## Recitals:

**WHEREAS**, Ashton purchased certain warehoused distressed consumer debt from JR Holdings, LLC ("JR Holdings") and/or Graywave Capital, LLC ("Graywave"), commonly marketed as debt "sold by" Bahamas Marketing Group ("BMG"), a consortium of various lenders managed and/or serviced by JR Holdings and Graywave (the "BMG Debt");

**WHEREAS**, between February 1, 2014 and April 21, 2015 certain series of HDF each purchased a portion of the BMG Debt from Ashton, which was internally branded by HDF as "QKD" (the "QKD Debt");

**WHEREAS**, pursuant to four separate purchase and sale agreements, respectively dated September, 30, 2014, November 26, 2014, January 9, 2015, and February 23, 2015 (collectively the "Purchase Agreements"), Bikaver purchased or otherwise acquired ownership of QKD Debt in the amount of approximately $54,090,000.00 in face value from HAM, that HAM purchased from one or more series of HDF (the "Purchased Debt");

**WHEREAS**, one or more disputes have arisen among the Parties related to the BMG Debt, the QKD Debt, the Purchase Agreements and the Purchased Debt;

**WHEREAS**, Ashton, HDF, and HAM (collectively "Debt Sellers") do not acknowledge the validity or veracity of the disputes and/or claims alleged, threatened, or otherwise asserted by Bikaver, but have nonetheless determined it prudent, convenient or otherwise advantageous to compromise, settle, and resolve all past, current and future disputes and claims in any way related to the BMG Debt, the QKD Debt, the Purchase Agreements and the Purchased Debt;

**WHEREAS**, the Parties desire that this Agreement have binding effect on Ashton, Bikaver, HDF, HAM, each of them, and their parents, subsidiaries, series, agents, representatives, attorneys, members, shareholders, owners, managers, officers, employees, vendors, insurers, reinsurers, agents successors, heirs, and assigns.

PX34
000349

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained in this Agreement, the Parties agree as follows:

1.      **Recitals.** The foregoing recitals are incorporated herein, acknowledged, and agreed to.

2.      **Settlement Amount.** Bikaver shall accept in full settlement of any and all past, current, or future claims, whether implied, asserted, alleged, or threatened, in any way related to the BMG Debt, the QKD Debt, the Purchase Agreements and the Purchased Debt, whether for damages, interest, costs, or other relief, additional BMG Debt from Ashton, on behalf of all the Debt Sellers, with a face value equal to $30,000,000.00 (the "New Debt").

3.      **New Debt.**

        a.   The New Debt shall be randomly selected by Ashton in accordance with past practices used by Ashton for prior portfolios of debt and in aggregate represents an approximate share of accounts by state, lender, average balance, and charge-off year to the whole of the BMG Debt. Further, Ashton represents that the New Debt: (i) has not been placed for collection with any third-party collection agency or law firm, or collected by Ashton since being acquired from JR Holdings and/or Graywave, (ii) will include debtors that have other accounts that are not being transferred to Bikaver, and (iii) does not contain any accounts that the debtor is known to be deceased or bankrupt (filed for bankruptcy after the account open date and not otherwise dismissed), as of the date of this Agreement.

        b.   Ashton shall send to Bikaver, via encrypted file transfer a masked file for the review and acceptance of the New Debt by Bikaver. Bikaver shall have 72 hours to accept the New Debt by giving written notice to Ashton from any Debt Buyer. Once Ashton has received the acceptance of the masked file and a fully executed copy of this Agreement, the New Debt shall be transferred by Ashton to the Bikaver pursuant to an Assignment and Bill of Sale ("Assignment") in the form as provided in Exhibit A to this Agreement, and Ashton shall cause an encrypted file detailing the New Debt to be delivered to Bikaver.

4.      **No Reliance.** Except for those representations made by Ashton contained in Section 3(a) above, Bikaver acknowledges and agrees that none of the other Parties to this Agreement have made any representation or warranty, express or implied, regarding the New Debt or as to the accuracy or completeness of any information related to the New Debt furnished or made available to Bikaver, except as expressly set forth in this Agreement. Further, none of the terms and conditions, representations, warranties or covenants contained in the Purchase Agreements shall apply to the transfer of New Debt or any other terms and conditions under this Agreement. Bikaver further acknowledges and agrees that none of the other Parties to this Agreement shall have or be subject to any liability to Bikaver or any other person resulting from Bikaver's use of, or reliance on, any such information or any information, documents or material made available to Bikaver in any other form.  The representations made by Ashton in Section 3(a) of this Agreement shall survive this Agreement and the transfer of New Debt to Bikaver.

PX34
000350

5.    **Restriction on Transfer.** Bikaver shall not sell, transfer title or otherwise assign the ownership of the Purchased Debt or the New Debt without the prior express written consent of both Ashton and HAM, which consent shall not unreasonably be withheld or delayed. Notwithstanding the foregoing, it shall be deemed reasonable for Ashton or HAM to withhold consent of any sale if the sale rate is less than the current sales rate QKD Debt is being offered for sale by HAM at such time of transfer, relative to its prior liquidation, or if Ashton or HAM, in either of their sole discretion, deem the proposed buyer to be unsuitable.

6.    **Indemnification.** Bikaver shall release, defend, indemnify and hold harmless, Ashton, HAM, HDF, and each of their respective parents, subsidiaries, series, agents, representatives, attorneys, members, shareholders, owners, managers, officers, employees, vendors, insurers, reinsurers, agents successors, heirs, and assigns (collectively, the "Indemnified Parties") from and against any losses, liabilities, claims, obligations and/or expenses including, without limitation, court costs and reasonable attorneys' fees that may be incurred by or asserted against any of the Indemnified Parties, arising from or related to, in whole or in part: (i) any breach of this Agreement by Bikaver; or (ii) any claims asserted by or liability to third parties arising from or related to, in whole or in part, Bikaver's business or the collection or sale of the Purchased Debt and New Debt.

7.    **Confidentiality.** The Parties agree not to disclose the existence or the terms of this Agreement to any third party without the prior written consent of each and every other Party to this Agreement and to keep the existence and terms of this Agreement confidential to the extent permitted by law. Notwithstanding these confidentiality obligations, the Parties agree that either party may disclose the terms of this Agreement to its attorneys, tax advisors, and any employees required to know of the settlement but only if each agrees to abide by the obligations required in this paragraph. The Parties may also disclose the terms of this Agreement pursuant to any duty imposed by any federal or state law requiring such disclosure.

8.    **Non-Disparagement.**

a.   The Parties agree that each of them, including each of their respective parents, subsidiaries, agents, representatives, attorneys, members, shareholders, owners, managers, officers, employees, vendors, agents, successors, heirs, and assigns, shall not, directly or indirectly, say, write or cause to be said or written, any statement that may be reasonably considered defamatory, derogatory or disparaging of any or all of the Indemnified Parties or encourage or induce others to do so, in any forum or setting, public or private, by any means, including, without limitation, internet blogs, social media sites or any other kind of electronic communication, or engage in any conduct, directly or indirectly, that would otherwise interfere with or jeopardize the business opportunities of any or all of the Indemnified Parties' operations and/or reputation, whether true or not. If any of the Parties violate the provisions of this Section 8, the disparaging Party agrees to pay each injured party, as applicable, the sum of $100,000 immediately upon the determination of an arbitrator as set forth in Section 8(b) below. The Parties agree that such amount shall be deemed as liquidated damages and shall not be a penalty but are instead a reasonable pre-estimate of the actual damages for each injured Party affected by a breach of this Section 8, which damages are difficult to ascertain.

PX34
000351

b.   Any controversy or claim arising out of a claim under Section 8(a) above shall be settled by arbitration and administered by the American Arbitration Association ("AAA") in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.   The arbitral tribunal shall consist of three arbitrators (the "Board of Arbitration") appointed in the following fashion: each of the filing Party or Parties shall appoint a single arbitrator, the responding Party or Parties shall appoint a single arbitrator and the two arbitrators so appointed shall appoint a third arbitrator, who shall be the chairperson.   In the event that the Parties fail to appoint their respective arbitrator, or the two arbitrators so appointed fail to agree on a third arbitrator within sixty (60) business days of the initial request for arbitration, then the arbitrator(s) not appointed by the Parties and/or the third arbitrator, as the case may be, shall be appointed by the AAA in accordance with AAA rules.  The arbitration proceedings shall take place in Buffalo, New York. The decision of the Board of Arbitration shall be final and binding on the Parties and may, if necessary, be reduced to a judgment in any court of competent jurisdiction.   The Parties agree to facilitate the arbitration by (i) making available to one another and to the Board of Arbitration for inspection and extraction all documents, books, records and personnel under their control or under the control of a person controlling or controlled by such party if determined by the Board of Arbitration to be relevant to the dispute, (ii) conducting arbitration hearings to the greatest extent possible on successive business days and (c) using their best efforts to observe the time periods established by the rules of the AAA or by the Board of Arbitration for the submission of evidence and briefs. Each Party to the arbitration shall be responsible for its own costs and expenses of arbitration, including legal and filing fees. The Board of Arbitration shall be authorized and directed to award reasonable costs and attorneys' fees to the prevailing party as part of its award. This agreement to arbitrate Section 8(a) shall survive any termination or expiration of the Agreement.

9.     **Non-Solicitation.** In exchange for the consideration of this Agreement, Bikaver and its parents, subsidiaries, members, managers, officers, employees, agents, successors, heirs, and assigns shall not solicit, induce, or attempt to induce any past, or current customer, client, vendor, collection agency, law firm, debt buyer, debt seller, or investor of HDF, HAM or Ashton to cease doing business in whole or in part with or through HDF, HAM or Ashton.

10.     **General Release.** In exchange for the consideration of this Agreement, Bikaver, on behalf of itself and its past, present and future shareholders, parents, subsidiaries, affiliates, members, directors, managers, direct or indirect owners, officers, employees, agents, attorneys, owners, insurers, reinsurers, predecessors, successors, heirs, and assigns, does hereby forever release, acquit and discharge on Ashton, HDF, HAM and their past, present and future shareholders, parents, subsidiaries, affiliates, series, members, directors, managers, officers, employees, agents, attorneys, owners, vendors, insurers, reinsurers, predecessors, successors, heirs, and assigns from any and all past, present or future claims, demands, obligations, judgments, actions, causes of action and liabilities, at law or equity, for injuries, losses and damages, whether personal, property or economic, whether now known or unknown, vested or contingent, direct or indirect, that were or could have been raised, from the beginning of time through the date of this Agreement.

PX34
000352

11. **Adequate Consideration.** The Parties hereby agree and jointly represent that they have each provided a fair and reasonable exchange of consideration in entering into this Agreement.

12. **No Admission of Liability.** This Agreement represents a compromise of disputed claims, and any actions taken hereunder shall not be construed as an admission of liability by the Parties.

13. **Authority.** The undersigned for each of the Parties represent and warrant that each has all the necessary and proper authority to enter into the Agreement and to settle with and release the other regarding the aforesaid matters, and that there are no known or unknown party(ies) in interest to any of the foregoing who can, may, or will make any claim regarding any of the aforesaid matters being released, and that there has not been any assignment or other transfer of any interest in, and there are no other parties in interest regarding any claim and/or matter referenced, settled or released herein, or for which payment has been made herein, all as referenced above.

14. **Entire Agreement.** This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements and, understandings, representations and warranties, both written and oral, among the Parties with respect to the subject matter hereof and thereof. It is further agreed that this Agreement may not be altered, amended or terminated except by an instrument in writing signed by each party hereto.

15. **Settlement Agreement Jointly Drafted.** This Agreement shall not be construed in favor of any of the Parties to the Agreement but shall be construed as if it were drafted by all Parties to the Agreement.

16. **Advice of Counsel Obtained.** The Parties each have obtained the advice of legal counsel prior to executing this Settlement Agreement. The Parties each enter into this Agreement freely and voluntarily and with a full understanding of its terms and significance.

17. **Invalid Provisions.** The provisions of this Agreement are severable. If any part of this Agreement is found to be unenforceable, all other provisions shall remain fully valid and enforceable.

18. **Choice of Law.** The Parties agrees that the construction and enforcement of this Agreement shall be governed by New York law, regardless of the venue of any litigation related to the Settlement Agreement, and that the exclusive and proper venue for any litigation arising out of the terms of this Settlement Agreement is the New York State Supreme Court, Erie County or the U.S. District Court for the Western District of New York.

19. **Binding Effect.** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective legal representatives, heirs, successors and assigns. No assignment or transfer or rights and obligations hereunder shall be made except with

PX34
000353

the prior written consent of the Parties hereto. Other than as explicitly set forth in this Agreement, nothing in this Agreement is intended to, or docs, create any rights in third parties.

20. **Specific Performance.** The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms and that monctary damages, even if available, would not be an adequate remedy therefor. It is accordingly agreed that the Parties shall be entitled to specific performance of the terms hereof, this being in addition to any other remedy to which they are entitled at law or in equity. The Parties acknowledge that the awarding of equitable remedies is within the discretion of the applicable court.

21. **Counterparts.** This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. One or more electronic copies of this Agreement collectively bearing the signatures of all Parties shall be treated as a single, original document for all purposes.

*[SIGNATURES ON FOLLOWING PAGE]*

PX34
000354

*[Signature page to Settlement Agreement and General Release]*

IN WITNESS, HEREOF, the Parties hereto have duly executed this Agreement on and as of the date first set forth above.

**BIKAVER GROUP, LLC**

By: _____
　　Bruce Passen, Manager

Date: April 30 , 2015

Sworn to before me this
30th   day of April, 2015

_____
Notary Public

> OFFICIAL SEAL
> BRIAN J CRARY
> Notary Public - State of Illinois
> My Commission Expires Jul 7, 2015

**HYLAN ASSET MANAGEMENT, LLC**

By: _____
　　Andrew J. Shaevel, CEO

Date: April ___, 2015

Sworn to before me this
_____ day of April, 2015

_____
Notary Public

**ASHTON ASSET MANAGEMENT, INC.**

By: _____
　　Hirsh Mohindra, CEO

Date: April 30 , 2015

Sworn to before me this
30   day of April, 2015

_____
Notary Public

> OFFICIAL SEAL
> STEPHANIE PALMA
> NOTARY PUBLIC – STATE OF ILLINOIS
> MY COMMISSION EXPIRES JUNE 24, 2018

**HYLAN DEBT FUND, LLC**

By: _____
　　Andrew J. Shaevel, CEO

Date: April ___, 2015

Sworn to before me this
_____ day of April, 2015

_____
Notary Public

PX34
000355

## EXHIBIT A

FORM OF

## ASSIGNMENT AND BILL OF SALE

Transfer of Accounts from Ashton Asset Management, Inc. to Bikaver Group, LLC on April __, 2015

| | |
|---|---|
| File Name: | BMG Warehouse |
| Receivable Amount | $30,000,000.00 |
| Accounts | TBD |

Ashton Asset Management, Inc. (hereinafter called "Seller") has entered into an Settlement Agreement and General Release dated April ___, 2015 ("Agreement") for the transfer of Accounts to Bikaver Group, LLC (hereinafter called "Purchaser"), upon the terms and conditions set forth in that Agreement.

THEREFORE, effective, for good and valuable consideration, Seller hereby sells, assigns, and transfers to Purchaser, its successors and assigns, all of Seller's rights, title, and interest in each and every one of the Accounts referenced in the electronic file referenced in the Agreement.

ASHTON ASSET MANAGEMENT, INC.

By: _____
Hirsh Mohindra, CEO

PX34
000356

**From:**            Jeffrey Brooks (Hylan)   <Jeff@hylanasset.com>
**Sent:**            Friday, April 24, 2015 1:04 PM
**To:**              Hirsh Mohindra
**Cc:**              Jon's Gmail Account
**Subject:**         Re: How did it go?
**Attachments:**     (Alternate Body)


 It did. He sees and knows that he can hit the numbers needed. Given what just happened with his groups in Charlotte he's concerned that if they don't want to work it that he needs a backup plan. He'd also like to hear from us/ our attorneys regarding our due diligence into things like hydra and that there is no question that even if they come at lending practices. But he's getting comfortable. Just doesn't want to lose Charlotte as they are a huge part of his business. So has onboarded 5 agencies in this week alone. Just building up backup plans.


 Jeff Brooks Business Development Executive  IMG  [206]


5477 Main Street [x-apple-data-detectors://0/0]  Amherst, NY 14221 [x-apple-data-detectors://0/0]  (716) 713-2634 [tel:(716)%20713-2634]  - Mobile (716) 580-3135 [tel:(716)%20580-3135]  - Hylan Main Office (855) 275-3651 [tel:(855)%20275-3651]  - Toll-Free Hot Line (716) 580-3137 [tel:(716)%20580-3137]  - Fax www.hylanasset.com [http://www.hylanasset.com/] On Apr 24, 2015, at 12:54 PM, Hirsh Mohindra <hirsh@ashtonasset.com [mailto:hirsh@ashtonasset.com] > wrote:

everything went well.. jeff can fill in more, we talked for about 15 mins. i think his comfort level moved up.   Hirsh Mohindra Ashton Asset Management 500 Quail Ridge Dr., Westmont, IL 60559 M: 630.479.0000    D: 630.243.4210 IMG  [96]www.ashtonasset.com [http://www.ashtonasset.com]
On Fri, Apr 24, 2015 at 11:24 AM, Jon <barabanus@gmail.com [mailto:barabanus@gmail.com] > wrote:


Sent from my iPhone

PX34
000357

| | |
|---|---|
| **From:** | Andrew J. Shaevel   <andrew.shaevel@bobalew.com> |
| **Sent:** | Friday, November 7, 2014 7:04 PM |
| **To:** | Preetesh Patel |
| **Cc:** | Ryan Zawistowski (Hylan) ; Hirsh Mohindra ;  Jon's Gmail Account |
| **Subject:** | Re: Internal Collected Graywave File |

 Preeteesh -
We understand the business and the data.  These problems are not consistent with the data we have received in the last
$500m of payday loans.  This is a problem that needs to be fixed.

Andy

Andrew J. Shaevel, CEO
 Bobalew Ventures
5477 Main Street
Amherst, New York 14221 USA [x-apple-data-detectors://3/0]
(716) 580-3133 [tel:(716)%20580-3133]  - Office
(716) 860-1125 [tel:(716)%20860-1125]  - Mobile
(716) 580-3137 [tel:(716)%20580-3137]  - Fax
 andrew.shaevel - Skype

Sent from my iPhone, please forgive any spelling mistakes or typos.

CONFIDENTIALITY NOTICE:  This communication and any attachments are confidential, and are only for the use of the
intended recipient.  If you have received this transmission in error, any disclosure, copying, distribution or the taking of any
action in reliance upon this communication is strictly prohibited.  If you have received this communication in error, please
contact the sender immediately and delete the original message.  Thank you.
On Nov 7, 2014, at 3:47 PM, Preetesh Patel <preetesh@ashtonasset.com [mailto:preetesh@ashtonasset.com] > wrote:

Hi Ryan, I understand your concern, but these are payday loans.  There are going to be loans with bad SSN's.  We have
seen this issue with every portfolio we have run in our office from various lenders.  People type it in wrong into the
website and that gets passed on.
If you would like to have that $4.79mm replaced with new accounts we can go ahead and do that.
Thanks, Preetesh

On Fri, Nov 7, 2014 at 1:51 PM, Ryan Zawistowski (Hylan) <ryan@hylanasset.com [mailto:ryan@hylanasset.com] >
wrote:
 Preetesh-  We are aware of the same banking info and different debtors. That is not a problem for us. We understand a
couple/relatives can be using the same bank account. As I explained on the phone, we had to resort to sorting by bank
account number in order to find the problem because we have not faith in the accuracy of the SSNs.  We really need the
correct SSNs for these accounts. Considering the known issues regrding "customer numbers" instead of unique account
numbers, the accurate SSN is of critical importance.  If the SSN is inaccurate, there is no way to verify if any of the other
information is accurate or not.  Can we determine how the SSNs got scrambled in the first place? We really need the
accurate SSNs for each account.
Thanks,

Ryan    **From:** Preetesh Patel [mailto:preetesh@ashtonasset.com [mailto:preetesh@ashtonasset.com] ]
**Sent:** Friday, November 7, 2014 1:42 PM
 **To:** Andrew J. Shaevel
 **Cc:** Hirsh Mohindra; Jon's Gmail Account; Ryan Zawistowski (Hylan)
 **Subject:** Re: Internal Collected Graywave File  I looked over the file that Ryan sent to me regarding debtors with the
same address, bank accounts but different names.  I do not believe that there is major fraud with the file.   **1.  Same
banking info, address but different names and SSN.**  People living together can take out loans and use the same
address and banking info.  I found a few examples in the spreadsheet and compared the names to the TLO Skip.  The
duplicate records do show up as relatives or associates in the skip.  This will resolve a large amount of files.  **2.  Different**

1

PX34
000358

**SSN's for same debtor** Some of the SSN's are off by a digit or numbers are reversed.  Even though the SSN was incorrect the TLO skip did return the corect information.  This will resolve a large amount of files.  Some of the debtors took out mulptile loans using different SSN's.  Joel was not verfiying these SSN's and loans were issued.  In some cases, TLO is not returning any information.  I can say that over the years we have found multiple debtors across multiple lenders that have shown up in our system with this exact issue.   Joel has said that if you would like some of the files replaced he is willing to do that.  Preetesh  On Fri, Nov 7, 2014 at 10:31 AM, Andrew J. Shaevel <andrew.shaevel@bobalew.com [mailto:andrew.shaevel@bobalew.com] > wrote:  Hirsh –  There is a MAJOR problem with data on this file.  Either there was a data transformation error or there is major FRAUD with this file.  Ryan discovered that there are debtors with the same name and address that have different SSNs, same bank accounts but different names and/or SSN's.   THIS IS NOT KOSHER!  Andy

 **Andrew J. Shaevel** *Chief Executive Officer*
<image001.jpg> **Bobalew Ventures**  5477 Main Street
 Amherst, New York 14221  (716) 580-3133 [tel:%28716%29%20580-3133]  - Office (716) 860-1125 [tel:%28716%29%20860-1125]  - Mobile (716) 580-3137 [tel:%28716%29%20580-3137]  - Fax
 website [http://www.bobalew.com/]   ***CONFIDENTIALITY NOTICE***:  This communication and any attachments are confidential, and are only for the use of the intended recipient.  If you have received this transmission in error, any disclosure, copying, distribution or the taking of any action in reliance upon this communication is strictly prohibited.  If you have received this communication in error, please contact the sender immediately and delete the original message.
Thank you.



(Alternate Body)


u

PX34
000359

**From:**           Hirsh Mohindra   <hirsh@ashtonasset.com>
**Sent:**           Friday, November 7, 2014 11:58 AM
**To:**             Andrew J. Shaevel ; Preetesh Patel
**Subject:**        Re: Internal Collected Graywave File
**Attachments:**    (Alternate Body)


Jumping on it now.  We will get to bottom of asap.. Joel would not and is not fruding over these amounts.. Can you send us more specifically the issues or accounts in question ?


On Nov 7, 2014, at 10:31 AM, Andrew J. Shaevel <andrew.shaevel@bobalew.com [mailto:andrew.shaevel@bobalew.com] > wrote:

  Hirsh –  There is a MAJOR problem with data on this file.  Either there was a data transformation error or there is major FRAUD with this file.  Ryan discovered that there are debtors with the same name and address that have different SSNs, same bank accounts but different names and/or SSN's.   THIS IS NOT KOSHER!  Andy
 Andrew J. Shaevel Chief Executive Officer <image001.jpg> Bobalew Ventures  5477 Main Street  Amherst, New York 14221  (716) 580-3133 - Office (716) 860-1125 - Mobile (716) 580-3137 - FaxThank you,Hirsh MohindraAshton Asset Management500 Quail Ridge Dr.Westmont, IL 60559P: 630.479.0000www.ashtonasset.com [http://www.ashtonasset.com]  website [http://www.bobalew.com/]

   CONFIDENTIALITY NOTICE:  This communication and any attachments are confidential, and are only for the use of the intended recipient.  If you have received this transmission in error, any disclosure, copying, distribution or the taking of any action in reliance upon this communication is strictly prohibited.  If you have received this communication in error, please contact the sender immediately and deete the original message.  Thank you.   s

PX34
000360

| | |
|---|---|
| **From:** | Jon   <barabanus@gmail.com> |
| **Sent:** | Monday, January 19, 2015 10:42 AM |
| **To:** | Omar@mdwc.net |
| **Cc:** | Hirsh Mohindra |
| **Subject:** | Re: Omar / Jon. |

Hi Omar. I spoke with Andy and I spoke with Hirsh. We would love to be able to put something together that would assist you make some money and pay us back. Unfortunately, Dave made some promises to Andy to send to Hylan 50 or 70K last week and then he "went ghost". I know that Andy was texting and emailing him all day Friday and nothing. The funds didn't arrive either.  We continue to suffer serious financial damages because of all this. Despite the fact that David and I don't speak, I have been able to hold off my investors from filing suit. I am not certain whether I can hold them off any longer. If we do file suit, please don't take this personally, as I happen to like you.

Hirsh, Andy and I are continuing to discuss the best way to handle this situation. I would really love to put the whole story behind us. My intuition and life experience, however, tell me that this story is very far from over. Hopefully, my intuition is wrong.

Financially, as Hirsh can explain to you, it makes more sense to us to dump this paper on dialer agencies that compliantly clear 3-4% ( as opposed to 8-12% ) and then sell for a penny on the back end. When we raised capital to buy this warehouse, the securities explicitly stated that we were raising capital to purchase BMG for placement purposes only. Having said that, we are also selling this paper sometimes. Every time we sell it, we have to notify the investors of the sale. Typically, we sell this paper for 1.75 to 2.25 in bulk. Smaller purchases we do for higher numbers. Considering the fact that we have liquidation liqs on about 500M of this product that we have moved out, this is 2% paper all day. Companies liquidate from 5% on the soft side to 12+% on the aggressive side.

Therefore, we would certainly be open to structure a "bulk" sale, as long as don't shoot ourselves in the foot by undermining the market in the US. It's unreasonable for us to sell this paper for 1.4%.

Having said that, we could sell this paper on terms, where we would get 1.4% upfront and then carry another 60bps, which could be paid to us over 3 months at 20bp per month rate. We would also have to receive full transparency into who the buyers are to ensure that its not ending up with anyone we do business with currently. We would be willing to execute a non-circumvention agreement to provide you with comfort.

Lastly, I think it's important for me to say that even if we do end up filing law suits ( and it's really not our call whether to file or not ), it doesn't mean that we cannot mutually look for ways to amicably settle and cancel out the suits.

Thank you,

Jon

Sent from my iPhone
On Jan 19, 2015, at 9:23 AM, Omar@mdwc.net [mailto:Omar@mdwc.net]  <omar@mdwc.net [mailto:omar@mdwc.net] > wrote:

Jon,
Wanted to touch base and check if you spoke to Andy in regards to our discussion last week.

Omar Hussain
On Jan 14, 2015, at 1:19 PM, Jon <barabanus@gmail.com [mailto:barabanus@gmail.com] > wrote:

call ████████, I am by the phone

Sent from my iPhone
On Jan 14, 2015, at 2:18 PM, Omar@mdwc.net [mailto:Omar@mdwc.net]  <omar@mdwc.net [mailto:omar@mdwc.net] > wrote:

No Answer.
Called twice left VM for Andrew.

Omar HussainbrOn Jan 14, 2015, at 2:14 PM, Jon <barabanus@gmail.com [mailto:barabanus@gmail.com] > wrote:

PX34
000361

███████

Sent from my iPhone
On Jan 14, 2015, at 2:13 PM, Omar@mdwc.net [mailto:Omar@mdwc.net] <omar@mdwc.net [mailto:omar@mdwc.net] > wrote:

Didn't receive call.Text me your number and I will call
Omar Hussain
On Jan 14, 2015, at 2:09 PM, Jon <barabanus@gmail.com [mailto:barabanus@gmail.com] > wrote:

Calling

Sent from my iPhone
On Jan 14, 2015, at 2:04 PM, Jon <barabanus@gmail.com [mailto:barabanus@gmail.com] > wrote:

Ok

Sent from my iPhone
On Jan 14, 2015, at 1:55 PM, Omar Hussain <omar@mdwc.net [mailto:omar@mdwc.net] > wrote:

I am in Jamaica, you can call me on my local cell.
███████

On Wed, Jan 14, 2015 at 1:51 PM, Jon <barabanus@gmail.com [mailto:barabanus@gmail.com] > wrote:
Ill all you on your cell

Sent from my iPhone
On Jan 14, 2015, at 1:49 PM, Omar Hussain <omar@mdwc.net [mailto:omar@mdwc.net] > wrote:

Jon,
Am I calling you on your cell or at the office?
On Tue, Jan 13, 2015 at 5:56 PM, Hirsh Mohindra <hirsh@ashtonasset.com [mailto:hirsh@ashtonasset.com] > wrote:
Guys,
I have spoken to the both of you over the last few days regarding each other's interests.  Omar / Dave have secured some large sized buyers and had turned to me regarding being able to purchase paper to execute their deals.  I relayed to them that all paper in my inventory and forth coming  paper has been exclusively committed to Hylan.  I told him I would try to smooth things out with Jon, so that you guys can explore if this deal is right for both parties.
It sounds like the deal / deals are sizable in size and could be a win for both parties.  Omar, as mentioned, Jon has had a very bad experience over the past few months with MDWC, he needs to get the outstanding debts addressed; hopefully via this deal and that should work to get Hylan / MDWC relationship back on track.
Guys, please take over this conversation, I don't like to be caught in the middle of things and hope you guys can cut a deal together that works for all.
Regards,  Hirsh MohindraAshton Asset Management500 Quail Ridge Dr., Westmont, IL 60559M: 630.479.0000 [tel:630.479.0000]     D: 630.243.4210 [tel:630.243.4210]  IMG  [96]www.ashtonasset.com [http://ww.ashtonasset.com]


--

Regards,
Omar HussainManaging Member
Midwestern Alliance


--

Regards,
Omar HussainManaging Member
Midwestern Alliance

PX34
000362



(Alternate Body)

c

PX34
000363

**From:**          Jim Levin   <jlevin@animus-group.com>
**Sent:**          Monday, September 14, 2015 3:49 PM
**To:**            Hirsh Mohindra
**Cc:**             Preetesh Patel
**Subject:**       Re: Participation Agreement - signed


Please send me 2 files ASAP 1- 2.5mm of option 3 for replacement 2- 50mm of option 3 for placement to replace previous placement of older stuff
Many thanks,
Jim LevinDirector Animus Group312.391-2000Skype: jimhlevinwww.animus-group.com [http://www.animus-group.com]

Our Philosophies are simple."We never over promise and under deliver, we always under promise and over deliver""A deal cannot be good for one, it must be good for all""May your YES's be YES and your NO's be NO"


On Sep 14, 2015, at 1:59 PM, Hirsh Mohindra <hirsh@ashtonasset.com [mailto:hirsh@ashtonasset.com] > wrote:

he got out of an old batch that correct is like hylans .. is he looking for new accounts.. look at that email i sent you on 3 options.. and pick the option he wants...  and we will send him the proper file he is looking for  Hirsh MohindraAshton Asset Management500 Quail Ridge Dr., Westmont, IL 60559M: 630.479.0000     D: 630.243.4210 IMG [96]www.ashtonasset.com [http://www.ashtonasset.com]
On Mon, Sep 14, 2015 at 1:10 PM, Jim Levin <jlevin@animus-group.com [mailto:jlevin@animus-group.com] > wrote:
Hirsh,We have had this file working for a couple days and according to Todd and his floor manager are stating that this is nowhere near previous files.It most resembles Ham 7 file from Hylan.There is a tremendous amount of denials and refusals.He also states that this is nowhere near the strats from the 2.3 bb file.Also, there is 11 suspect lenders that cannot be collected on.He is calling me after 6:30 to let me know the results after today, but thus far not good.

Jim LevinDirectorAnimus GroupPH: 312.391-2000 [tel:312-391-2000] SKYPE: JIMHLEVINwww.animus-group.com [http://www.animus-group.com]
  Our Philosophies are simple."We never over promise and under deliver, we always under promise and over deliver""A deal cannot be good for one, it must be good for all""May your YES's be YES and your NO's be NO"

CONFIDENTIALITY NOTICE: This is an unofficial response to your request for information and/or a private, proprietary and confidential communication and is for information purposes only. This is not intended to be, and must not be construed to be in any form or manner a solicitation of investment funds or a securities offering. This e-mail is confidential and is legally privileged. Nothing in this message should be interpreted as a digital or electronic signature that can be used to authenticate a contract or other legal document. This electronic communication and any files included in the communication may contain confidential information that is for the intended recipient only. If you are the recipient, you are hereby notified that any disclosure, copying, distribution or use of ay of the information contained in, or attached to, this transmission is STRICTLY PROHIBITED. If you have received this in error, please immediately notify us by return e-mail, fax and/or telephone and destroy this E-Mail.
DISCLAIMER: Sender is NOT a United States Securities Dealer or Broker or U.S. Investment Adviser. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender.

On Sep 4, 2015, at 12:31 PM, Preetesh Patel <preetesh@ashtonasset.com [mailto:preetesh@ashtonasset.com] > wrote:

Hi Jim,Attached is the executed Participation Agreement.  We added the date in section 1.  Can you initial and send back a copy.
I will send the file through Sharefile.
Thanks,Preetesh PatelVice PresidentAsset Recovery

1

PX34
000364

IMG  [http://www.ashtonasset.com/wp-content/uploads/2013/04/email-...]Ashton Asset Management
500 Quail Ridge DriveWestmont, IL 60559M: 630.605.6285 [tel:630.605.6285]    D: 630.343.0710 [tel:630.343.0710]
On Thu, Sep 3, 2015 at 8:31 PM, Jim Levin <jlevin@animus-group.com [mailto:jlevin@animus-group.com] > wrote:
Hirsh,
 Both Kevin and I have signed the attached document.
 Please sign and return and send me the file.

Many thanks,




Jim Levin
 Director
 Animus Group
 PH: 312.391-2000 [tel:312.391-2000]
 SKYPE: JIMHLEVIN
 www.animus-group.com [http://www.animus-group.com]



Our Philosophies are simple.
 "We never over promise and under deliver, we always under promise and over deliver"
 "A deal cannot be good for one, it must be good for all"
 "May your YES's be YES and your NO's be NO"


CONFIDENTIALITY NOTICE: This is an unofficial response to your request for information and/or a private, proprietary and confidential communication and is for information purposes only. This is not intended to be, and must not be construed to be in any form or manner a solicitation of investment funds or a securities offering. This e-mail is confidential and is legally privileged. Nothing in this message should be interpreted as a digital or electronic signature that can be used to authenticate a contract or other legal document. This electronic communication and any files included in the communication may contain confidential information that is for the intended recipient only. If you are the recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in, or attached to, this transmission is STRICTLY PROHIBITED. If you have received this in error, please immediately notify us by return e-mail, fax and/or telephone and destroy this E-Mail.

DISCLAIMER: Sender is NOT a United States Securities Dealer or Broker or U.S. Investment Adviser Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender.


<Participation Agreement.pdf>



(Alternate Body)

PX34

000365

| | |
|---|---|
| **From:** | Hirsh Mohindra <hirshm@gmail.com> |
| **Sent:** | Thursday, February 19, 2015 11:30 AM |
| **To:** | Andrew J. Shaevel |
| **Cc:** | Mohindra Hirsh; Jon's Gmail Account |
| **Subject:** | Re: Payday Lenders |

This is not new news.. They do have regulators on them and a lot of the lenders are getting looked into under bmg umbrella .. The only loans that they pulled back were the 285million of the 1billion the Tucker's never sold in the marketplace as they knew that those are the ones that were going to be pulled back.

Allegations of high charges and unfair underwriting .. We know that's why they are out of business ..


On Feb 19, 2015, at 9:49 AM, Andrew J. Shaevel <andrew.shaevel@bobalew.com> wrote:

> FYI.  This might be an issue.
>
>
> Andy
>
> **Andrew J. Shaevel, CEO**
> **Bobalew Ventures**
> 5477 Main Street
> Amherst, New York 14221 USA
> (716) 580-3133 - Office
> (716) 860-1125 - Mobile
> (716) 580-3137 - Fax
> andrew.shaevel - Skype
>
> Sent from my iPad, please forgive any spelling mistakes or typos.
>
>
> ***CONFIDENTIALITY NOTICE***:  This communication and any attachments are confidential, and are only for the use of the intended recipient.  If you have received this transmission in error, any disclosure, copying, distribution or the taking of any action in reliance upon this communication is strictly prohibited.  If you have received this communication in error, please contact the sender immediately and delete the original message.  Thank you.
>
>
> Begin forwarded message:
>
>> **From:** "Greg Grigorian (Hylan)" <Greg@hylanasset.com>
>> **Date:** February 19, 2015 at 10:16:47 AM EST
>> **To:** "Andrew J. Shaevel (Hylan)" <Andy@hylanasset.com>, Jon's Gmail Account <barabanus@gmail.com>
>> **Subject: FW: Payday Lenders**
>>
>> Please advise how I should respond to this??????

1

PX34
000366

**From:** grega@ufsworks.com [mailto:grega@ufsworks.com]
**Sent:** Wednesday, February 18, 2015 8:49 PM
**To:** Greg Grigorian (Hylan)
**Cc:** grega@ufsworks.com
**Subject:** Payday Lenders
**Importance:** High

Hi Greg:

Please have a look at the article below, which references lenders in the portfolio sold to UFS. Are you aware of this?

# U.S. halts payday loan schemes that siphoned $162 million from consumers' accounts

CLEVELAND, Ohio -- The U.S. government shut down two online payday lenders that siphoned a combined $162 million from consumers' bank accounts in what regulators described as a "cash-grab scam."

The payday lenders used information from online loan shopping sites to deposit loans in unwitting consumers' accounts and then repeatedly dinged them for finance charges.

"It is an incredibly brazen and deceptive scheme," said Richard Cordray, director of the Consumer Financial Protection Bureau, which joined the Federal Trade Commission in tag-team enforcement actions.

When people disputed the debits with their banks, the lenders fabricated documents that purported to show consumers had agreed to the loans, Cordray said. As a result, banks sometimes sided with the payday lenders, and customers lost their disputes.

And if consumers tried to close their bank accounts to avoid charges, they were hounded by debt collectors.

As many as 2,300 consumers nationwide complained to the CFPB and FTC about the unwanted payday loans. Two separate lending groups used the same basic scheme, which started with online payday loan shopping sites known as lead generators.

PX34
000367

Consumers shared personal and banking information with the sites, which promise to match consumers with lenders. The payday lenders bid for these sales leads.

Once the payday groups had consumer information in hand, they deposited "payday loans" of several hundred dollars into people's bank accounts without their consent. Every two weeks, the companies then debited finance charges as high as $90 from their unwitting customers' accounts.

Both companies established multiple corporate identities in what the agencies said was an attempt to throw off banks and regulators.

"There were some consumers who appear to have actually applied for the loans," said Jessica Rich, director of the Federal Trade Commission. "But make no mistake: even these consumers were horribly deceived about the costs of the loans." The payday group the FTC sued advertised one-time fees, but repeatedly tapped accounts, in some cases, until they were drained, she said.

Rich warned consumers who are shopping for loans online not to share personal information with companies they don't know -- because they sell it to other companies, some of whom might be scammers.

"We're seeing more and more of these types of scams," she said. Rich said the agency is trying to identify online brokers who sold the information to the sued payday lenders.

The CFPB won a court order temporarily halting Hydra Group, which the bureau said made as much as $97 million in payday loans and collected as much as $115 million from customers' bank accounts since 2011.

The CFPB's lawsuit names Richard F. Moseley Sr., Richard F. Moseley Jr., and Christopher J. Randazzo, who control the Hydra Group. Other companies in the group include SSM Group, Hydra Financial Limited Funds, PCMO Services and Piggycash Online Holdings.

In a separate action, the FTC got a temporary court order shutting a web of companies owned by Timothy Coppinger and Frampton (Ted) Rowland III. Those include limited liability companies known as CWB Services; Orion Services; Sandpoint; Sand Point Capital; Basseterre Capital;

3

PX34
000368

Namakan Capital; Vandelier Group; St. Armands Group; Anasazi Group; Anasazi Services; Longboat Group, dba Cutter Group; Oread Group, dba Mass Street Group.

The FTC said the CWB Services group made an estimated $28 million in loans and collected $47 million from consumers' accounts in an 11-month period. The court appointed a receiver.

Both suits seek restitution for consumers.

**Greg Apostolou**
*President & Chief Executive Officer*

**Universal Financial Systems**
5877 Pine Avenue, Suite 200
Chino Hills, CA 91709
**T**: (800) 837-5456 | **F**: (877) 240-7010
grega@ufsworks.com | www.ufsworks.com

**Important:** This message is intended solely for use by the individual/company to whom it is addressed and may contain information that is confidential and legally/medically privileged. If the reader of this message is not the intended addressee, you are hereby notified that any disclosure, copying, distribution or use of this information is strictly prohibited. If you have received this transmission in error, please immediately notify the sender by telephone, e-mail, or mail and destroy the message without reading it. Thank you.

PX34
000369

| | |
|---|---|
| **From:** | Jeffrey Brooks (Hylan)  <Jeff@hylanasset.com> |
| **Sent:** | Thursday, November 20, 2014 2:15 PM |
| **To:** | Andrew J. Shaevel |
| **Cc:** | Hirsh Mohindra  ;  Jon's Gmail Account |
| **Subject:** | Re: Problem with BMG 10m accounts |
| **Attachments:** | (Alternate Body) |

I am going to setup a call w angel and/or angel. There are a few possible variables. One, if you look up certain lenders the cfpb case and allegations are readily available. As such, easy for debtor to find a plausible defense. Second, it's possible that the account funds were to be drafted from for repayment was not the account the loan was deposited into.
Now, to play the Devils advocate, one could argue there is some potential substantiation to the claims made against certain lenders. Regardless, the file performs and given the price point, with appropriate rebuttals and insight on the file itself by the agency owners these should have a minimal impact.


Jeff Brooks Business Development Executive  IMG  [206]5477 Main Street [x-apple-data-detectors://0/0]  Amherst, NY 14221 [x-apple-data-detectors://0/0]  (716) 713-2634 [tel:(716)%20713-2634]  - Mobile (716) 580-3135 [tel:(716)%20580-3135]  - Hylan Main Office (855) 275-3651 [tel:(855)%20275-3651]  - Toll-Free Hot Line (716) 580-3137 [tel:(716)%20580-3137]  - Fax www.hylanasset.com [http://www.hylanasset.com/] On Nov 20, 2014, at 1:47 PM, Andrew J. Shaevel <andrew.shaevel@bobalew.com [mailto:andrew.shaevel@bobalew.com] > wrote:

This is an issue that has been raised from the first batch of the most recent batch of accounts (internal collected Graywave).  Thoughts?  Andy  To: Jeff Brooks <jeff@hylanasset.com [mailto:jeff@hylanasset.com] >  Subject: FW: Problem with BMG 10m accounts FYI   Uh oh..   From: Oleg Kio <okio@urgonline.com [mailto:okio@urgonline.com] >
Date: Thursday, November 20, 2014 at 10:29 AM
Cc: Angel Lopez <alopez@urgonline.com [mailto:alopez@urgonline.com] >, Felix Lopez <flopez@urgonline.com [mailto:flopez@urgonline.com] >
Subject: Problem with BMG 10m accounts  David, As I mentioned yesterday, we are having issues with the BMG accounts. Considerable number of people are saying that they never received the loan and we were able to get a few bank statements showing that there was no deposit matching the loan amount anywhere near the loan date. If this continues, we are looking into taking these accounts off the floor and getting a refund... Below are some examples.
RODNEY AHTUANGARUAK
 -xx-▮▮▮
TRIPLE SERVICES LLC ▮▮▮▮▮▮▮
Bank statement does not show any deposits matching loan amount


VIKTORIA VAN EYCKE
▮▮ -xx-▮▮▮
EPPROCESSING ▮▮▮▮▮▮
Bank statement does not show any deposits matching loan amount


GLENDON ARVIN
▮▮ -xx-▮▮▮
JHS MARKETING ▮▮▮▮▮▮▮
Bank statement does not show any deposits matching loan amount

PX34
000370

SANDRA BEITER
██ -xx- ██
VISTA HOLDINGS GROUP ██████
 Bank statement does not show any deposits matching loan amount


WESLEY ROBINSON
██ -xx- ██
BEL CAPITAL CORP ████████
 Spoke with bank, bank account never existed --  Oleg


The information contained in this e-mail and any files transmitted with it may be a confidential communication or may otherwise be privileged and confidential.  If the reader of this message, regardless of the address or routing, is not an intended recipient, you are hereby notified that you have received this transmittal in error and any review, use, distribution, dissemination or copying is strictly prohibited.  If you have received this message in error, please delete this e-mail and all files transmitted with it from your system and immediately notify our offices by sending a reply e-mail to the sender of this message.

PX34
000371

**From:**          Jon   <barabanus@gmail.com>
**Sent:**          Monday, December 1, 2014 2:58 PM
**To:**            Preetesh Patel
**Cc:**            Jeffrey Brooks (Hylan) ; Hirsh Mohindra
**Subject:**       Re: Two questions
**Attachments:**   (Alternate Body)


Preetesh, Hirsh and I spoke about you talking to Jeff on how to best collect on this paper ( the internal ).
Would you be so kind to schedule a call with Jeff and really tell him as much as possible on how to collect on it, the talk
offs, the whole bit ....please be very open with him Hirsh, plz confirm Thank you, Jon Sent from my iPhone On Dec 1,
2014, at 2:42 PM, Preetesh Patel <preetesh@ashtonasset.com [mailto:preetesh@ashtonasset.com] > wrote:

Hi Jeff,I will resend the file. I have not spoken to Ryan. I will call him shortly to find out about the file.
Thanks,Preetesh
On Dec 1, 2014, at 1:34 PM, Jeffrey Brooks (Hylan) <Jeff@hylanasset.com [mailto:Jeff@hylanasset.com] > wrote:

 Hey buddy, I hope all is well. Will you send me the guaranteed fast cash (although I may have name wrong) at your
earliest convenience? Also, I believe Ryan spoke with you about batch skipping a file for us. What is the status of this?
Thanks.


 Jeff Brooks Business Development Executive  IMG  [206]5477 Main Street [x-apple-data-detectors://0/0]  Amherst, NY
14221 [x-apple-data-detectors://0/0]  (716) 713-2634 [tel:(716)%20713-2634]  - Mobile (716) 580-3135
[tel:(716)%20580-3135]  - Hylan Main Office (855) 275-3651 [tel:(855)%20275-3651]  - Toll-Free Hot Line (716) 580-3137
[tel:(716)%20580-3137]  - Fax www.hylanasset.com [http://www.hylanasset.com/]

PX34
000372

| | |
|---|---|
| **From:** | Andrew Shaevel   <andy@hylanasset.com> |
| **Sent:** | Thursday, June 11, 2015 9:45 PM |
| **To:** | 'Hirsh Mohindra' |
| **Cc:** | 'Gaurav Mohindra' ; Jon's Gmail Account ; Ryan Zawistowski (Hylan) ; Preetesh Patel |
| **Subject:** | Request for Swap of Unqualified Accounts |
| **Attachments:** | (Alternate Body); image002.jpg; HAM Letter to Ashton regardingUnqualified Accounts - 2015-06-08.pdf |

Hirsh –

As we discussed on Monday, attached please find the letter regarding Unqualified Accounts resulting from our recent notice of legal actions against certain lenders included in prior sales.  While I know you are heading out of town, I would appreciate your efforts to empower your team to proceed with the requested swap of accounts.  Warm personal regards… Andy

 Andrew J. ShaevelChief Executive Officer IMG  [Picture_x0020_2]5477 Main StreetAmherst, NY 14221(716) 362-7855 - Office(716) 580-3137 –Fax(716) 860-1125 - Mobilewww.hylanasset.com [http://www.hylanasset.com/]  NOTICE:   Hylan Asset Management, LLC (Hylan) is the Manager of Hylan Debt Fund, LLC (HDF), a Delaware Series LLC, and the issuer of various series and/or securities registered with the Securities and Exchange Commission.  Any inquiries about HDF or one of its various series may be directed to Hylan. CONFIDENTIALITY NOTICE:  This communication and any attachments are confidential, and are only for the use of the intended recipient.  If you have received this transmission in error, any disclosure, copying, distribution or the taking of any action in reliance upon this communication is strictly prohibited.  If you have received this communication in error, please contact the sender immediately and delete the original message.  Thank you.

PX34

000373



June 8, 2015

Hirsh Mohindra, Principal
Ashton Asset Management, Inc.
500 Quail Ridge Drive
Westmont, IL 60559

Dear Hirsh,

As discussed in our meeting earlier today, Hylan Asset Management, LLC ("Hylan") as the Manager of Hylan Debt Fund, LLC – Portfolio Series 70, Hylan Debt Fund, LLC – Portfolio Series 80 and Hylan Debt Fund, LLC – Portfolio Series 87 (collectively "HDF Series") are hereby providing our written request for the replacement of certain "Unqualified Accounts" transferred to HDF Series under the Receivables Purchase Agreements dated as of October 10, 2014,  December 12, 2014 and January 8, 2015 by and between Ashton Asset Management, Inc. ("Ashton") and a HDF Series (the "PSAs").

It came to our attention on June 5, 2015 that certain lenders have been named in one or more actions brought by the FTC or CFPB questioning the validity of accounts originated by such lenders (Federal trade Commission v. CWB Services, LLC, et. al. U.S.D.C. Western District of Missouri and Consumer Financial Protection Bureau v. Richard F. Moseley, Sr. et. al., U.S.D.C. Western District of Missouri). These two actions were filed September 5, 2015 and September 8, 2015, respectively, and predate the PSAs. These lenders originated accounts that are summarized on the attached page and that were included in the accounts transferred under the PSAs.  As such, we assert that these accounts are Unqualified Accounts under the PSAs.  In order to remedy the Unqualified Accounts, we are requesting a swap of the same face value amount of like-kind accounts with similar geographic, charge-off year, balance and debtor makeup. A summary of Unqualified Accounts by lender and HDF Series are attached, and upon your agreement to swap Unqualified Accounts, we can provide a detailed listing, as well as stratification detailing state, charge-off year, balance and debtor distributions.

As we acknowledge your upcoming vacation, please provide your acknowledgement to our request and your agreement to swap accounts on or before June 29, 2015.  The sooner we can proceed with this swap, the better for all parties involved.

Thank you in advance for your cooperation and assistance.

Very truly yours,

Andrew J. Shaevel,
Chief Executive Officer

350 Essjay Road, Suite 304 | Amherst, NY 14221 USA | **Office:** 716.580.3135 | **Fax:** 716.580.3137 | www.hylan.com   PX34

000374

## Summary of Unqualified Accounts

| Lender | Purchase Date 10/10/2014 PS-70 | 12/12/2014 PS-80 | 1/8/2015 PS-87 | Total |
|---|---|---|---|---|
| Anasazi Group LLC | $ 10,994,606.00 | $ 5,292,395.00 | $ 7,288,882.00 | $ 23,575,883.00 |
| Anasazi Services LLC | $ 5,558,656.00 | $ - | $ - | $ 5,558,656.00 |
| BCD/Hydra Financial Limited | $ 83,100.00 | $ - | $ - | $ 83,100.00 |
| Cutter Group LLC | $ 13,232,301.00 | $ 5,355,879.00 | $ 7,407,034.00 | $ 25,995,214.00 |
| DJR Group LLC | $ 24,405,306.00 | $ 5,404,692.00 | $ 7,350,119.00 | $ 37,160,117.00 |
| Hydra Financial Limited | $ 2,802,482.00 | $ - | $ - | $ 2,802,482.00 |
| Mass Street Group | $ 11,421,132.00 | $ 5,420,059.00 | $ 7,397,528.00 | $ 24,238,719.00 |
| SSM Group LLC | $ 22,846,354.00 | $ - | $ - | $ 22,846,354.00 |
| St. Armands Group | $ 15,070,105.00 | $ 5,417,973.00 | $ 7,338,639.00 | $ 27,826,717.00 |
| Vandelier Group LLC | $ 12,497,194.00 | $ 5,416,997.00 | $ 7,299,300.00 | $ 25,213,491.00 |
| | $ 118,911,236.00 | $ 32,307,995.00 | $ 44,081,502.00 | $ 195,300,733.00 |

| | |
|---|---|
| **From:** | Ryan Zawistowski (Hylan)  <ryan@hylanasset.com> |
| **Sent:** | Wednesday, January 27, 2016 5:44 PM |
| **To:** | Mohindra Hirsh  ;  Hirsh Mohindra |
| **Cc:** | Andrew J. Shaevel ; Jon's Gmail Account ;  Christian Lovelace |
| **Subject:** | Returned Accounts |
| **Attachments:** | (Alternate Body); image001.jpg; 2016-1-27 - Affadavit Debtors.pdf |

 Hirsh-  Please find the attached list of debtors that have submitted Sworn Affidavits disputing the validity of their debt.  Pursuant to the representations and warranties of our contracts, we are returning these accounts and asking for replacement accounts.
Additionally, for the two accounts that are noted with "VOD Required," we have received verification of debt requests.  Please provide us with supporting media or documentation as soon as possible, as we are required to return the VOD to the consumer in the next 20 days.  Thanks, Ryan
 Ryan Zawistowski Operations Manager  IMG  [206]5477 Main Street Amherst, NY 14221 (716) 580-3135 ext: 107 - Office (855) 275-3651 - Toll-Free Hot Line (716) 580-3137 - Fax www.hylanasset.com [http://www.hylanasset.com/]
CONFIDENTIALITY NOTICE:  This communication and any attachments are confidential, and are only for the use of the intended recipient.  If you have received this transmission in error, any disclosure, copying, distribution or the taking of any action in reliance upon this communication is strictly prohibited.  If you have received this communication in error, please contact the sender immediately and delete the original message.  Thank you.

PX34
000376

| No. | Debtor Name | Account Number | Original Creditor | Face Value | Verification of Debt |
|---|---|---|---|---|---|
| 1 | Edmond Morrow | | Archway Holdings | $ 510.00 | |
| 2 | Edmond Morrow | | Oakwood Services, LLC | $ 580.00 | |
| 3 | Edmond Morrow | | Alliance Online | $ 590.00 | |
| 4 | Edmond Morrow | | Alliance Online | $ 400.00 | |
| 5 | Kelly German | | Bel Capital Corp | $ 605.00 | |
| 6 | Kelly German | | EP Processing | $ 480.00 | |
| 7 | Kelly German | | JVC Processing | $ 455.00 | |
| 8 | Kelly German | | WTJ Capital, LLC | $ 570.00 | |
| 9 | Brandon Hanley | | Bel Capital Corp | $ 480.00 | |
| 10 | Brandon Hanley | | Lazer Lending | $ 590.00 | |
| 11 | Brandon Hanley | | Liberty Group, LLC | $ 510.00 | |
| 12 | Brandon Hanley | | JD Marketing | $ 480.00 | |
| 13 | Jeffrey Noell | | Alpine Direct Services | $ 430.00 | |
| 14 | Jeffrey Noell | | Vin Capital, LLC | $ 480.00 | |
| 15 | Jeffrey Noell | | Twin Bluffs Financial | $ 355.00 | |
| 16 | Jeffrey Noell | | WTJ Captial LLC | $ 510.00 | |
| 17 | Steven Walker | | St. Armands Group | $ 270.00 | |
| 18 | Steven Walker | | Mass Street Group | $ 485.00 | |
| 19 | Steven Walker | | Vista Holdings Group | $ 420.00 | |
| 20 | Steven Walker | | EP Processing | $ 625.00 | |
| 21 | Jeffrey Way | | WTJ Capital, LLC | $ 750.00 | |
| 22 | Jeffrey Way | | JD Marketing | $ 430.00 | |
| 23 | Jeffrey Way | | Global Group Holding | $ 510.00 | |
| 24 | Marcia Bresnahan | | WTJ Capital, LLC | $ 590.00 | |
| 25 | Marcia Bresnahan | | Kingston Marketing LLC | $ 400.00 | |
| 26 | Marcia Bresnahan | | Mesa Financial | $ 490.00 | |
| 27 | Marcia Bresnahan | | Horizon Opportunities, LLC | $ 510.00 | |
| 28 | Austin Watkins | | Horizon Opportunities, LLC | $ 260.00 | |
| 29 | Austin Watkins | | Westgate Group, LLC | $ 480.00 | |
| 30 | Geoffrey Berstein | | Kenwood Services | $ 570.00 | |
| 31 | Geoffrey Berstein | | Alpine Direct Services | $ 510.00 | |
| 32 | Geoffrey Berstein | | Mack Development Group | $ 480.00 | |
| 33 | Geoffrey Berstein | | Oakwood Services, LLC | $ 350.00 | |
| 34 | William Prusiensky | | Greenwood Holding Group | $ 255.00 | |
| 35 | William Prusiensky | | Cardinal Management | $ 460.00 | |
| 36 | William Prusiensky | | Kenwood Services | $ 510.00 | |
| 37 | Rhonda Gayle | | Mesa Financial | $ 625.00 | |
| 38 | Rhonda Gayle | | SJM Marketing | $ 400.00 | |
| 39 | Rhonda Gayle | | Kingston Marketing LLC | $ 510.00 | |
| 40 | Rhonda Gayle | | The Seven Group, LLC | $ 357.00 | |
| 41 | Lorraine Yarngo | | Kenwood Services | $ 650.00 | |
| 42 | Lorraine Yarngo | | Kenwood Services | $ 590.00 | |
| 43 | Lorraine Yarngo | | SGQ Processing | $ 250.00 | |
| 44 | Lorraine Yarngo | | Highland Holdings, LLC | $ 480.00 | |
| 45 | Maya Young | | Midland Financial | $ 560.00 | |
| 46 | Maya Young | | Lazer Lending | $ 520.00 | |
| 47 | Maya Young | | Lazer Lending | $ 480.00 | |
| 48 | Lynell Ingram | | Fox Enterprises | $ 560.00 | |
| 49 | Lynell Ingram | | Manhattan Processing | $ 455.00 | |
| 50 | Lynell Ingram | | EP Processing | $ 480.00 | |
| 51 | Stanley Robinson | | Shamrock Holding Group | $ 510.00 | |
| 52 | Angel Day | | Liberty Group, LLC | $ 510.00 | |
| 53 | Angel Day | | JVC Processing | $ 430.00 | |
| 54 | Angel Day | | The Seven Group, LLC | $ 480.00 | |
| 55 | Brian Dresky | | DJR Group | $ 510.00 | |
| 56 | Brian Dresky | | Cornerstone Partners | $ 465.00 | |
| 57 | Brian Dresky | | Horizon Opportunities, LLC | $ 600.00 | |
| 58 | Brian Dresky | | JD Marketing | $ 625.00 | |

| 59 | James Askew | Lazer Lending | $ | 590.00 | |
| 60 | James Askew | Compass Capital, LLC | $ | 420.00 | |
| 61 | James Askew | Highland Holdings, LLC | $ | 355.00 | |
| 62 | James Askew | The Seven Group, LLC | $ | 480.00 | |
| 63 | David Burt | Anasazi Group, LLC | $ | 785.00 | |
| 64 | Daniel Gorman | JHS Marketing | $ | 550.00 | |
| 65 | Daniel Gorman | JVC Processing | $ | 480.00 | |
| 66 | Daniel Gorman | Manhattan Processing | $ | 440.00 | |
| 67 | Daniel Gorman | EP Processing | $ | 510.00 | |
| 68 | Paris Johnson | The Seven Group, LLC | $ | 305.00 | x |
| 69 | Paris Johnson | Tior Capital | $ | 520.00 | x |
| 70 | Paris Johnson | Global Group Holding | $ | 550.00 | x |
| 71 | Paris Johnson | Titan Group, LLC | $ | 550.00 | x |
| 72 | Michael Basile | Lazer Lending | $ | 420.00 | x |
| 73 | Michael Basile | Cardinal Management | $ | 460.00 | x |
| 74 | Michael Basile | JD Marketing | $ | 360.00 | x |
| 75 | | | | | |
| 76 | | | | | |
| 77 | | | | | |

# EXHIBIT 2

PX34
000379

| | |
|---|---|
| **From:** | Kamran Bashir   <kamran@ashtonasset.com> |
| **Sent:** | Monday, November 9, 2015 12:54 PM |
| **To:** | Frank Ungaro |
| **Subject:** | Re: contract |
| **Attachments:** | (Alternate Body); WPG AAM Placement Contract. Executed Copy.pdf; signed Schedule A WPG.pdf |

Frank,
My apologies, you are right; here is the executed copy for your record as well as I am updating the dropbox too. Kamran Bashir Vice President of Operations

IMG  [http://www.ashtonasset.com/wp-content/uploads/2013/04/email-...]Ashton Asset Management 500 Quail Ridge DriveWestmont, IL 60559M: 801.662.8341   D: 630.343.0710 On Mon, Nov 9, 2015 at 11:29 AM, <fungaro@worldwideprocessinggroup.info [mailto:fungaro@worldwideprocessinggroup.info] > wrote:
Kamran,
I just resent the email that had the signed contract attached.
Frank UngaroMember ManagerWorld Wide Processing Group,LLCOffice: 1-877-472-4590 [tel:1-877-472-4590] Cell: 1-970-218-2465 [tel:1-970-218-2465] Fax: 1-800-213-7915 [tel:1-800-213-7915]

PX34
000380

## Schedule "A"

### Acknowledgement and Receipt Form

| DATE | RECALL DATE | AMOUNT | RECORDS |
|------|-------------|--------|---------|
| 10/12/2015 | 10/27/2015 | $ 2,628,815 | 5,000 |
| 10/19/2015 | 11/3/2015 | $ 2,638,215 | 5,000 |

**Placement Details**
**Number of Accounts:**   **10,000**
**Face Value:**   **$ 5,267,030**

## COMMISSION FEE ARRANGEMENT:

- Chuck Joy is entitled to a Ten percent (10%) management fee.  The management fee is payable from the first gross proceeds received.  Thereafter, Agency is entitled to Fifty (50%) percent of all gross fees collected from the Accounts after the management fee is debited; and AAM is entitled to Fifty percent (50%) of all gross fees collected from the Portfolios and Accounts after the management fee is debited.
- Agency **must** return the Accounts to AAM on or before twelve (12) days pursuant to this Agreement.
- **Agency may not add any fees or add to the balance to any Accounts or Portfolios**.

Upon importing the Accounts, Agency agrees to send to AAM an Export File, including all Accounts information imported into Agency and Agency assigned account numbers.  The purpose of the export is to provide Ashton Asset Management with Agency internal reference identification for each Account so that all future reports can be mapped in our systems.

Pursuant to said Agreement and Schedule, Agency must remit commissions to AAM as follows:

- On the 5th and 20th day of each month.

<u>Bank Information:</u>

| | |
|---|---|
| Account Name | Ashton Asset Management, Inc.<br>500 Quail Ridge<br>Westmont, IL 60559 |
| | |
| Bank | Bank of America |
| ABA Routing | 081904808 |
| Account Number | ██████6657 |

**REMIT INFORMATION:** **Please send all remit and file activity to** preetesh@astonasset.com **and** kamran@ashtonasset.com

**Agreed and Acknowledged:**

Frank Ungaro                          10-23-15
Name                                        Date

PX34
000382

## COLLECTION SERVICE AGREEMENT

**THIS COLLECTION SERVICE AGREEMENT** ("Agreement") is made as of this 14th day of October, 2015 ("Effective Date") by and between **ASHTON ASSET MANAGEMENT, INC.,** an Illinois corporation, with its principal place of business located in Westmont, Illinois ("**AAM**") and **World Wide Processing Group,** a limited liability Company, with its principal place of business located at 5817 South Park Avenue, Hamburg, NY 14075 ("**Agency**"). AAM and Agency may be referred to herein each as a **"Party"** and collectively as the **"Parties."**

      **WHEREAS,** AAM is an entity which owns and possesses various delinquent consumer debts;

      **WHEREAS,** Agency is an experienced licensed and certified collection agency with its respective jurisdiction(s) and is in the business of engaging in collection efforts of delinquent consumer debts; and

      **WHEREAS,** AAM desires to engage Agency to assist in the collection efforts of outstanding delinquent consumer debt owned by AAM ("Portfolio(s)," "Account(s)," Account(s) and Portfolio(s)," and/or "Portfolio(s) and Account(s)").

      **NOW, THEREFORE,** in consideration of the terms, covenants, representations, and warranties set forth herein, and for other good and valuable consideration, the parties hereby agree as follows:

## 1. GRANT OF RIGHTS

1.1. <u>Grant</u>. AAM agrees to place with Agency, from time to time, Accounts and Portfolios for collection of delinquent consumer debts (see schedule "A"). Relative to each account placed with Agency, AAM agrees to provide account information in its possession that is customary for collection upon such Accounts, along with other information that is typically provided by AAM to collection agencies. On request by Agency, AAM will provide such additional and readily accessible information that is reasonably necessary for Agency to collect on the placed accounts.

1.2. <u>Duration of Possession of Account(s) and Portfolio(s)</u>. AAM may provide Agency with Account(s) and Portfolio(s) every week. Agency shall have possession and the right to proceed with collection efforts on such Accounts and portfolios for a duration specified by AAM and in accordance to a campaign as specified by AAM. Upon expiration of the possession period, Agency agrees to return, relinquish, and surrender any and all materials in connection with the Accounts and Portfolios to AAM within twelve (12) business days of taking possession of said Account. Agency understands and agrees that AAM may change the delivery of such Accounts and Portfolios and the possession period at any time and shall give Agency reasonable notice, which shall not be less than one (1) business day.

PX34
000383

## 2. TERM

2.1. Term and Duration. The term of this Agreement shall be for twelve (12) months, commencing on the Effective Date as stated above. Upon completion of the aforementioned term, this Agreement shall automatically renew for an additional twelve (12) months. AAM may terminate at will, at any time, pursuant to Section 7 of this Agreement. Agency may terminate this Agreement with thirty (30) days' written notice to AAM. Should Agency decide not to renew the term of this Agreement, Agency shall provide AAM with thirty (30) days' written notice prior to expiration of such election.

## 3. COLLECTION EFFORTS

3.1. General Collection Efforts. Agency agrees to use its best efforts to collect the consumer debt accounts placed with it in accordance with procedures specified by AAM. AAM is relying on the exercise of Agency's independent professional judgment and collection expertise, but it is understood that Agency shall not deviate its collection efforts from procedures specified by AAM. Agency shall fully comply with all federal, state and local laws and/or regulations relevant to collections activities undertaken, per the terms of this Agreement, including without limitation Agency's obligation to comply with the Federal Debt Collection Practices Act.

3.2. Collection Instructions. As stated above in Section 3.1, Agency shall fully comply with all federal, state, and local laws and regulations relevant to the collections efforts undertaken by Agency. Furthermore, AAM shall provide, written or orally, instructions, guidelines, procedures, and/or any other information regarding Agency's collection efforts. **Agency agrees to fully comply with AAM's instructions, guidelines, procedures, and/or any other information regarding Agency's collection efforts. Agency further agrees not to deviate, alter, or change their collection efforts from the instructions provided by AAM for any of the portfolio(s) or account(s) that AAM may provide to Agency.** In an effort to comply with all laws, rules, and regulations in the industry, AAM and only AAM shall have full discretion over Agency's collection efforts entailed to the account(s) and portfolio(s) provided by AAM. In the event that Agency's collections effort differs, without consideration as to how minimal, Agency agrees to strictly follow only AAM's instructions for all portfolio(s) and account(s) provided by AAM.

Failure to comply with this Section and any other provision of this Agreement shall constitute a breach and may result in immediate termination by AAM pursuant to Section 7 of this Agreement.

## 4. PAYMENT AND COMMISSION; REMITTANCE; REPORTING

4.1. Commission. Agency agrees to pay AAM a commission as listed in Schedule "A" of the gross amount collected by Agency for all portfolio(s) and account(s) that AAM provides to Agency. Any amount(s) collected by Agency and the commission to AAM entailed therein, in connection with the Portfolio(s) and Account(s) shall be pursuant to the terms of this Agreement, including but not limited to Section 7 of this Agreement. Agency absolutely, unconditionally, irrevocably, guarantee to make the full and prompt payment of all gross commissions when due, whether at stated

2

remittance period, upon acceleration or otherwise; to reimburse AAM for any Enforcement Costs incurred to collect remittances from Agency due under said Agreement; and to comply with the full, complete and punctual observance, performance and satisfaction of the obligations, and duties of Agency, under this Agreement.

4.2. Payments on Recalled, Terminated, or Returned Accounts and Portfolios. In the event that any Accounts or Portfolios are to be recalled or terminated, returned to AAM, or unsuccessful collection efforts by Agency, AAM shall still be entitled to commissions, as stated in Section 4.1 of this Agreement, to the extent that Agency has collected or will collect on the Portfolios and Accounts. There is no expiration on the commissions to be paid to AAM for any reason or circumstance and Agency understands and agrees that any monies collected by Agency through its collection efforts towards the Accounts and Portfolios provided by AAM shall be subject to commission payment, whether throughout the term of this agreement or thereafter, whether after termination, expiration, breach, recall, return, or any other event. Commission entailed to the monies collected on any of the Portfolio and Accounts provided by AAM to Agency is property of AAM and AAM is entitled to any and all commissions as stated in Section 4.1 regardless of whether AAM and Agency engage in business or have any sort of relationship.

4.3. Remittance Report. Agency agrees to complete and submit to AAM a Remittance Report, along with the commission payment as stipulated in Section 4.1 and 4.2 of this Agreement. Such Remittance Report form or instructions on the format for the Remittance Report shall be provided by AAM and may be provided by AAM in writing or orally. Agency agrees to fully comply with AAM's instructions on such Remittance Report. AAM's requirements of the Remittance Report, or any other report or documentation that shall be requested by AAM, may change from time to time. Agency agrees not to deviate, alter, or change AAM's requirements and instructions on such reports or documentation.

4.4. Daily Reporting. Agency agrees to complete and submit to AAM a Daily Report of the collection efforts by Agency that is entailed to the Accounts and Portfolios provided by AAM. Such Daily Report form or instructions on the format for the Daily Report shall be provided by AAM and may be provided by AAM in writing or orally. Agency agrees to fully comply with AAM's instructions on such Daily Report. AAM's requirements of the Daily Report, or any other report or documentation that shall be requested by AAM, may change from time to time. Agency agrees not to deviate, alter, or change AAM's requirements and instructions on such reports or documentation.

## 5. BOOKKEEPING; AUDIT

5.1. Bookkeeping. Agency shall at all times maintain accurate and complete records of all business conducted through the use of any portfolios and/or accounts. AAM shall instruct Agency on bookkeeping and record keeping procedures and information. Agency shall maintain records in a manner that is reasonable and is in accordance to not only the ordinary course of business but also in accordance to industry standards.

PX34
000385

5.2. <u>Audit</u>. AAM shall have the right at all times during the business day to enter the premises where your books and records relative to the portfolio(s) and/or accounts are kept and to evaluate, copy and audit such books and records. AAM shall also have the right to request information from Agency to the extent that it is reasonable and in connection with the terms of this Agreement. Books and records shall include, but is not limited to, any documents, materials, software, hardware, or any other platform, mechanism, or any other record keeping methods. In the event that any such evaluation or audit reveals any understatement, variance, or any other deviation from which AAM deems to be in violation of this Agreement, it shall constitute a breach of this Agreement and AAM shall retain the right to immediately terminate this Agreement. Agency shall thereafter return all Portfolio(s), Accounts, or any other materials provided by AAM, directly or in connection with the same, within twenty four (24) hours. In the event that Agency breaches and/or AAM terminates this Section (or any other), Agency shall continue to comply with the Confidentiality provision as stated in Section 6 of this Agreement.

Agency must fully cooperate with AAM in performing these activities and Agency shall reimburse any costs, fees, or penalties incurred by AAM from such lack of cooperation by Agency.

## 6. CONFIDENTIALITY

6.1. <u>Confidential Information</u>. Agency agrees not to disclose any terms of this Agreement to any third party, at any time during the term of this Agreement or after expiration, termination, or revocation. Agency agrees not to disclose any information entailed to AAM, its personnel, employees, affiliates, business affairs, procedures, operations, any information related to any accounts and/or portfolio(s), operations, processes, procedures, or any other items relating to this Agreement at any time during the term of this Agreement or after expiration, termination, or revocation.

6.2. <u>Compulsory Disclosure</u>. Should Agency be required to disclose any confidential information in connection to AAM or its personnel, Accounts and Portfolios, and any other information, by order of a competent court, Agency shall notify AAM immediately to allow AAM the opportunity to obtain an injunction, consent to such disclosure, or otherwise contest such disclosure.

## 7. TERMINATION; RECALL; CURE; WITHDRAWAL

7.1. <u>Termination</u>. AAM retains the right to terminate this Agreement at will, with or without cause, written or orally, at any time. In the event that AAM decides to exercise its right to terminate this Agreement, Agency shall return, relinquish, and surrender all materials, information, and documents provided by AAM and any materials, documents, and information, direct or indirect, in connection with the Accounts and Portfolios provided by AAM within one (1) business day. AAM shall still be entitled to any and all commissions pursuant to Section 4 of this Agreement.

7.2. <u>Recall</u>. AAM reserves the right to recall any and all Accounts and Portfolios provided by them and any materials, documents, or information in connection therein at any time. In the event of a Recall, Agency shall return, relinquish, and surrender all materials, information, and documents

PX34
000386

provided by AAM and any materials, documents, and information, direct or indirect, in connection with the Accounts and Portfolios provided by AAM within one (1) business day. AAM shall still be entitled to any and all commissions pursuant to Section 4 of this Agreement.

7.3. Cure. In the event that Agency breaches this Agreement or AAM exercises its right to terminate, Agency shall not have the right to cure any breach, defect, or deficiency. AAM shall retain sole discretion whether to permit Agency to cure, if it all.

7.4. Withdrawal of Placed Accounts. AAM has the right to withdraw any account placed with Agency for collection at any time for any reason, except those that are actively in a payment agreement (I.e., payment plan, settlement, postdates pending). Should AAM withdraw any account due to a complaint relating to Agency's unreasonable collection tactics or alleged violations of applicable law, AAM shall have the right to request exclusion of account from the Agency's remittance report and Agency will only receive residual value of payments currently set forth prior to complaint but once last payment is processed no additional collection efforts shall be made by Agency.

## 8. INSURANCE

8.1. Insurance. Agency agrees to carry any and all insurances as required by the State or Federal Government. Coverage shall be at least the minimum amount required by the State, Federal Government, local government, and any other parties that may require such insurance coverage(s).

## 9. INDEMNFICATION

9.1. Indemnification. Agency agrees to use its best efforts to collect the consumer debt accounts placed with it. AAM is relying on the exercise of Agency's independent professional judgment and collection expertise. Agency will fully comply with all federal, state and local laws and/or regulations relevant to collections activities undertaken in AAM's name including without limitation Agency's obligation to comply with the Federal Debt Collection Practices Act.  In the event that AAM is named as a defendant in any lawsuit arising out of or related to collection activities that Agency initiated, excluding lawsuit/litigation that has been previously filed from prior placements and/or purchases of the debt, Agency will fully reimburse AAM for its reasonable defense costs, including attorneys' fees, court costs, and judgments entered or settlement amounts reached.

Agency further agree to indemnify and hold such AAM (including its officers, directors, employees, stockholders, and agents) harmless from and against any claims, actions, suits or other actual or threatened proceedings, and all losses, judgments, damages, expenses or other costs (including all fees and disbursements of counsel) incurred or suffered by AAM by reason of willful misconduct or violation of any applicable law, rule or regulation by Agency (or its Members, employees, representatives, agents or successors). At its option, AAM shall have the right to require Agency to assume the defense of any claims, actions, suits or other actual or threatened proceedings and to directly pay for all losses, judgments, damages, expenses or other costs (including all fees and disbursements of counsel) which may be imposed.

PX34
000387

## 10. REPRESENTATIONS AND WARRANTIES

10.1. Agency agrees to the following representations and warranties:

(i) It, its employees, personnel, officers, directors, independent contractors, and any other personnel handling the Accounts and Portfolios, is and will remain fully compliant with all federal, state, and local laws, regulations, and rules including but not limited to the regulations set forth by the Fair Debt Collections Practices Act, throughout the terms of this Agreement;

(ii) It shall obtain and maintain all necessary licenses, permits, certificates, and authorizations by all federal, state, and local government and agencies to conduct business and collection efforts entailed to the Accounts and Portfolios provided by AAM;

(iii) It is in good standing with its respective jurisdiction(s) and is authorized and capable of entering into this Agreement;

(iv) It is an experienced and sophisticated purchaser of consumer debt and an experienced and sophisticated collections agency that understands the industry and business, and the risks entailed, as a reasonable person would in the industry; and

(v) It understands and acknowledges that the Accounts and Portfolios provided "AS IS" AND WITHOUT WARRANTY BY AAM AND, TO THE MAXIMUM EXTENT ALLOWED BY APPLICABLE LAW, SOURCE EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## 11. MISCELLANEOUS

11.1. Choice of Law and Venue. This Agreement shall be construed under the laws of the State of Illinois. The parties hereby irrevocably agree to the jurisdiction and venue of any State or Federal court in Illinois. The parties freely, unconditionally and irrevocably waive any right to a trial by jury, with respect to any litigation directly or indirectly arising out of or relating to this Agreement.

11.2. Assignability. Agency shall not assign this Agreement unless agreed to by AAM in writing. Any assignment, in part or whole, by Agency without approval or consent in writing by AAM is prohibited and shall be null and void and constitute a breach of this Agreement.

11.3. Independent Relationship. The parties expressly acknowledge that they will not hold themselves out as an agent, partner, or co-venture of the other. The parties further agree that nothing in this Agreement shall be construed to create or imply a partnership, joint venture, collaboration, or contract of employment.

6

PX34
000388

11.4. <u>Communication</u>. Agency agrees that AAM retains the right to communicate all notices, instruction, guidelines, procedures, amendments, and any other information in writing or orally, via in person, e-mail, fax, phone, or mail.

11.5. <u>Misappropriation; Bad Actor</u>. Agency shall not misappropriate or otherwise use any information, materials, and documents connected to AAM and the Accounts and Portfolios, in a manner that is detrimental or damaging to AAM. Further, Agency and its employees, officers, directors, affiliates, and any other personnel shall not engage in any conduct, written or orally, directly or indirectly, that shall be damaging to AAM, its personnel, and its business affairs and relationships including but not limited to defamation, circumvention, competition, and solicitation.

11.6. <u>Amendments</u>. Agency understands, agrees, and acknowledges that AAM may amend this Agreement, in part or whole, and any schedules entailed from time to time. AAM shall give Agency reasonable notice to Agency of such amendment, if any. Agency shall not amend this Agreement or any part thereof, at any time, unless agreed upon, in writing, by AAM.

11.7. <u>Use of Name</u>. Agency shall not use the name, logo, likeness or trademarks of AAM, for any advertising, marketing or endorsement purposes without the prior written consent of AAM.

11.8. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute but one instrument.

## (*SIGNATURE PAGE TO FOLLOW ON NEXT PAGE*)

7

PX34
000389

(*SIGNATURE PAGE TO THE COLLECTION SERVICES AGREEMENT*)

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed.

**ASHTON ASSET MANAGEMENT, INC.**     **World Wide Processing Group, LLC**

By: _____          By: _____

Name: _____          Name: _____

Date: _____          Date: _____

8

PX34
000390

**From:**              fungaro@worldwideprocessinggroup.info
**Sent:**              Thursday, October 22, 2015 11:37 AM
**To:**                Kamran Bashir
**Subject:**           RE: Contract Pending
**Attachments:**     signed service agreement WPG.pdf

Here you go.
Frank UngaroMember ManagerWorld Wide Processing Group,LLCOffice: 1-877-472-4590Cell: 1-970-218-2465Fax: 1-800-213-7915


-------- Original Message --------
Subject: RE: Contract Pending
From: <fungaro@worldwideprocessinggroup.info [mailto:fungaro@worldwideprocessinggroup.info] >
Date: Thu, October 22, 2015 10:27 am
To: "Kamran Bashir" <kamran@ashtonasset.com [mailto:kamran@ashtonasset.com] >

I will be sending over contracts shortly. We are currently using a domestic processor.
Frank UngaroMember ManagerWorld Wide Processing Group,LLCOffice: 1-877-472-4590Cell: 1-970-218-2465Fax: 1-800-213-7915


-------- Original Message --------
Subject: Contract Pending
From: Kamran Bashir <kamran@ashtonasset.com>
Date: Tue, October 20, 2015 3:41 pm
To: fungaro@worldwideprocessinggroup.info,
ncurtis@worldwideprocessinggroup.info
Cc: Preetesh Patel <preetesh@ashtonasset.com>

Hi Frank,


Following up on the placement contract that was sent to you yesterday. Please submit the contract at your earliest and if you have any questions or concerns please do not hesitate to call me directly. Also can you confirm the processor that you are currently using (i-e; Domestic or Offshore).

Your prompt reply is highly appreciated.


Sincerely,


Kamran Bashir
Vice President of Operations

IMG  [http://www.ashtonasset.com/wp-content/uploads/2013/04/email-...]Ashton Asset Management
500 Quail Ridge DriveWestmont, IL 60559M: 801.662.8341  D: 630.343.0710 =

PX34
000391

# COLLECTION SERVICE AGREEMENT

**THIS COLLECTION SERVICE AGREEMENT** ("Agreement") is made as of this 14th day of October, 2015 ("Effective Date") by and between **ASHTON ASSET MANAGEMENT, INC.,** an Illinois corporation, with its principal place of business located in Westmont, Illinois ("**AAM**") and **World Wide Processing Group**, a limited liability Company, with its principal place of business located at 5817 South Park Avenue, Hamburg, NY 14075 ("**Agency**"). AAM and Agency may be referred to herein each as a "**Party**" and collectively as the "**Parties**."

WHEREAS, AAM is an entity which owns and possesses various delinquent consumer debts;

WHEREAS, Agency is an experienced licensed and certified collection agency with its respective jurisdiction(s) and is in the business of engaging in collection efforts of delinquent consumer debts; and

WHEREAS, AAM desires to engage Agency to assist in the collection efforts of outstanding delinquent consumer debt owned by AAM ("Portfolio(s)," "Account(s)," Account(s) and Portfolio(s)," and/or "Portfolio(s) and Account(s)").

NOW, THEREFORE, in consideration of the terms, covenants, representations, and warranties set forth herein, and for other good and valuable consideration, the parties hereby agree as follows:

## 1. GRANT OF RIGHTS

1.1. Grant. AAM agrees to place with Agency, from time to time, Accounts and Portfolios for collection of delinquent consumer debts (see schedule "A"). Relative to each account placed with Agency, AAM agrees to provide account information in its possession that is customary for collection upon such Accounts, along with other information that is typically provided by AAM to collection agencies. On request by Agency, AAM will provide such additional and readily accessible information that is reasonably necessary for Agency to collect on the placed accounts.

1.2. Duration of Possession of Account(s) and Portfolio(s). AAM may provide Agency with Account(s) and Portfolio(s) every week. Agency shall have possession and the right to proceed with collection efforts on such Accounts and portfolios for a duration specified by AAM and in accordance to a campaign as specified by AAM. Upon expiration of the possession period, Agency agrees to return, relinquish, and surrender any and all materials in connection with the Accounts and Portfolios to AAM within twelve (12) business days of taking possession of said Account. Agency understands and agrees that AAM may change the delivery of such Accounts and Portfolios and the possession period at any time and shall give Agency reasonable notice, which shall not be less than one (1) business day.

## 2. TERM

2.1. <u>Term and Duration</u>. The term of this Agreement shall be for twelve (12) months, commencing on the Effective Date as stated above. Upon completion of the aforementioned term, this Agreement shall automatically renew for an additional twelve (12) months. AAM may terminate at will, at any time, pursuant to Section 7 of this Agreement. Agency may terminate this Agreement with thirty (30) days' written notice to AAM. Should Agency decide not to renew the term of this Agreement, Agency shall provide AAM with thirty (30) days' written notice prior to expiration of such election.

## 3. COLLECTION EFFORTS

3.1. <u>General Collection Efforts</u>. Agency agrees to use its best efforts to collect the consumer debt accounts placed with it <u>in accordance with procedures specified by AAM</u>. AAM is relying on the exercise of Agency's independent professional judgment and collection expertise, but it is understood that Agency shall not deviate its collection efforts from procedures specified by AAM. Agency shall fully comply with all federal, state and local laws and/or regulations relevant to collections activities undertaken, per the terms of this Agreement, including without limitation Agency's obligation to comply with the Federal Debt Collection Practices Act.

3.2. <u>Collection Instructions</u>. As stated above in Section 3.1, Agency shall fully comply with all federal, state, and local laws and regulations relevant to the collections efforts undertaken by Agency. Furthermore, AAM shall provide, written or orally, instructions, guidelines, procedures, and/or any other information regarding Agency's collection efforts. **Agency agrees to fully comply with AAM's instructions, guidelines, procedures, and/or any other information regarding Agency's collection efforts. Agency further agrees not to deviate, alter, or change their collection efforts from the instructions provided by AAM for any of the portfolio(s) or account(s) that AAM may provide to Agency**. In an effort to comply with all laws, rules, and regulations in the industry, AAM and only AAM shall have full discretion over Agency's collection efforts entailed to the account(s) and portfolio(s) provided by AAM. In the event that Agency's collections effort differs, without consideration as to how minimal, Agency agrees to strictly follow only AAM's instructions for all portfolio(s) and account(s) provided by AAM.

Failure to comply with this Section and any other provision of this Agreement shall constitute a breach and may result in immediate termination by AAM pursuant to Section 7 of this Agreement.

## 4. PAYMENT AND COMMISSION; REMITTANCE; REPORTING

4.1. <u>Commission</u>. Agency agrees to pay AAM a commission as listed in Schedule "A" of the gross amount collected by Agency for all portfolio(s) and account(s) that AAM provides to Agency. Any amount(s) collected by Agency and the commission to AAM entailed therein, in connection with the Portfolio(s) and Account(s) shall be pursuant to the terms of this Agreement, including but not limited to Section 7 of this Agreement. Agency absolutely, unconditionally, irrevocably, guarantee to make the full and prompt payment of all gross commissions when due, whether at stated

PX34
000393

remittance period, upon acceleration or otherwise; to reimburse AAM for any Enforcement Costs incurred to collect remittances from Agency due under said Agreement; and to comply with the full, complete and punctual observance, performance and satisfaction of the obligations, and duties of Agency, under this Agreement.

4.2. Payments on Recalled, Terminated, or Returned Accounts and Portfolios. In the event that any Accounts or Portfolios are to be recalled or terminated, returned to AAM, or unsuccessful collection efforts by Agency, AAM shall still be entitled to commissions, as stated in Section 4.1 of this Agreement, to the extent that Agency has collected or will collect on the Portfolios and Accounts. There is no expiration on the commissions to be paid to AAM for any reason or circumstance and Agency understands and agrees that any monies collected by Agency through its collection efforts towards the Accounts and Portfolios provided by AAM shall be subject to commission payment, whether throughout the term of this agreement or thereafter, whether after termination, expiration, breach, recall, return, or any other event. Commission entailed to the monies collected on any of the Portfolio and Accounts provided by AAM to Agency is property of AAM and AAM is entitled to any and all commissions as stated in Section 4.1 regardless of whether AAM and Agency engage in business or have any sort of relationship.

4.3. Remittance Report. Agency agrees to complete and submit to AAM a Remittance Report, along with the commission payment as stipulated in Section 4.1 and 4.2 of this Agreement. Such Remittance Report form or instructions on the format for the Remittance Report shall be provided by AAM and may be provided by AAM in writing or orally. Agency agrees to fully comply with AAM's instructions on such Remittance Report. AAM's requirements of the Remittance Report, or any other report or documentation that shall be requested by AAM, may change from time to time. Agency agrees not to deviate, alter, or change AAM's requirements and instructions on such reports or documentation.

4.4. Daily Reporting. Agency agrees to complete and submit to AAM a Daily Report of the collection efforts by Agency that is entailed to the Accounts and Portfolios provided by AAM. Such Daily Report form or instructions on the format for the Daily Report shall be provided by AAM and may be provided by AAM in writing or orally. Agency agrees to fully comply with AAM's instructions on such Daily Report. AAM's requirements of the Daily Report, or any other report or documentation that shall be requested by AAM, may change from time to time. Agency agrees not to deviate, alter, or change AAM's requirements and instructions on such reports or documentation.

## 5. BOOKKEEPING; AUDIT

5.1. Bookkeeping. Agency shall at all times maintain accurate and complete records of all business conducted through the use of any portfolios and/or accounts. AAM shall instruct Agency on bookkeeping and record keeping procedures and information. Agency shall maintain records in a manner that is reasonable and is in accordance to not only the ordinary course of business but also in accordance to industry standards.

PX34
000394

5.2. <u>Audit</u>. AAM shall have the right at all times during the business day to enter the premises where your books and records relative to the portfolio(s) and/or accounts are kept and to evaluate, copy and audit such books and records. AAM shall also have the right to request information from Agency to the extent that it is reasonable and in connection with the terms of this Agreement. Books and records shall include, but is not limited to, any documents, materials, software, hardware, or any other platform, mechanism, or any other record keeping methods.  In the event that any such evaluation or audit reveals any understatement, variance, or any other deviation from which AAM deems to be in violation of this Agreement, it shall constitute a breach of this Agreement and AAM shall retain the right to immediately terminate this Agreement. Agency shall thereafter return all Portfolio(s), Accounts, or any other materials provided by AAM, directly or in connection with the same, within twenty four (24) hours. In the event that Agency breaches and/or AAM terminates this Section (or any other), Agency shall continue to comply with the Confidentiality provision as stated in Section 6 of this Agreement.

Agency must fully cooperate with AAM in performing these activities and Agency shall reimburse any costs, fees, or penalties incurred by AAM from such lack of cooperation by Agency.

## 6. CONFIDENTIALITY

6.1. <u>Confidential Information</u>. Agency agrees not to disclose any terms of this Agreement to any third party, at any time during the term of this Agreement or after expiration, termination, or revocation. Agency agrees not to disclose any information entailed to AAM, its personnel, employees, affiliates, business affairs, procedures, operations, any information related to any accounts and/or portfolio(s), operations, processes, procedures, or any other items relating to this Agreement at any time during the term of this Agreement or after expiration, termination, or revocation.

6.2. <u>Compulsory Disclosure.</u> Should Agency be required to disclose any confidential information in connection to AAM or its personnel, Accounts and Portfolios, and any other information, by order of a competent court, Agency shall notify AAM immediately to allow AAM the opportunity to obtain an injunction, consent to such disclosure, or otherwise contest such disclosure.

## 7. TERMINATION; RECALL; CURE; WITHDRAWAL

7.1. <u>Termination</u>. AAM retains the right to terminate this Agreement at will, with or without cause, written or orally, at any time. In the event that AAM decides to exercise its right to terminate this Agreement, Agency shall return, relinquish, and surrender all materials, information, and documents provided by AAM and any materials, documents, and information, direct or indirect, in connection with the Accounts and Portfolios provided by AAM within one (1) business day. AAM shall still be entitled to any and all commissions pursuant to Section 4 of this Agreement.

7.2. <u>Recall</u>. AAM reserves the right to recall any and all Accounts and Portfolios provided by them and any materials, documents, or information in connection therein at any time. In the event of a Recall, Agency shall return, relinquish, and surrender all materials, information, and documents

PX34
000395

provided by AAM and any materials, documents, and information, direct or indirect, in connection with the Accounts and Portfolios provided by AAM within one (1) business day. AAM shall still be entitled to any and all commissions pursuant to Section 4 of this Agreement.

7.3. Cure. In the event that Agency breaches this Agreement or AAM exercises its right to terminate, Agency shall not have the right to cure any breach, defect, or deficiency. AAM shall retain sole discretion whether to permit Agency to cure, if it all.

7.4. Withdrawal of Placed Accounts. AAM has the right to withdraw any account placed with Agency for collection at any time for any reason, except those that are actively in a payment agreement (I.e., payment plan, settlement, postdates pending).  Should AAM withdraw any account due to a complaint relating to Agency's unreasonable collection tactics or alleged violations of applicable law, AAM shall have the right to request exclusion of account from the Agency's remittance report and Agency will only receive residual value of payments currently set forth prior to complaint but once last payment is processed no additional collection efforts shall be made by Agency.


## 8. INSURANCE

8.1. Insurance.  Agency agrees to carry any and all insurances as required by the State or Federal Government. Coverage shall be at least the minimum amount required by the State, Federal Government, local government, and any other parties that may require such insurance coverage(s).

## 9. INDEMNFICATION

9.1. Indemnification. Agency agrees to use its best efforts to collect the consumer debt accounts placed with it. AAM is relying on the exercise of Agency's independent professional judgment and collection expertise. Agency will fully comply with all federal, state and local laws and/or regulations relevant to collections activities undertaken in AAM's name including without limitation Agency's obligation to comply with the Federal Debt Collection Practices Act.  In the event that AAM is named as a defendant in any lawsuit arising out of or related to collection activities that Agency initiated, excluding lawsuit/litigation that has been previously filed from prior placements and/or purchases of the debt, Agency will fully reimburse AAM for its reasonable defense costs, including attorneys' fees, court costs, and judgments entered or settlement amounts reached.

Agency further agree to indemnify and hold such AAM (including its officers, directors, employees, stockholders, and agents) harmless from and against any claims, actions, suits or other actual or threatened proceedings, and all losses, judgments, damages, expenses or other costs (including all fees and disbursements of counsel) incurred or suffered by AAM by reason of willful misconduct or violation of any applicable law, rule or regulation by Agency (or its Members, employees, representatives, agents or successors). At its option, AAM shall have the right to require Agency to assume the defense of any claims, actions, suits or other actual or threatened proceedings and to directly pay for all losses, judgments, damages, expenses or other costs (including all fees and disbursements of counsel) which may be imposed.

PX34
000396

## 10. REPRESENTATIONS AND WARRANTIES

10.1. Agency agrees to the following representations and warranties:

(i)     It, its employees, personnel, officers, directors, independent contractors, and any other personnel handling the Accounts and Portfolios, is and will remain fully compliant with all federal, state, and local laws, regulations, and rules including but not limited to the regulations set forth by the Fair Debt Collections Practices Act, throughout the terms of this Agreement;

(ii)    It shall obtain and maintain all necessary licenses, permits, certificates, and authorizations by all federal, state, and local government and agencies to conduct business and collection efforts entailed to the Accounts and Portfolios provided by AAM;

(iii)   It is in good standing with its respective jurisdiction(s) and is authorized and capable of entering into this Agreement;

(iv)    It is an experienced and sophisticated purchaser of consumer debt and an experienced and sophisticated collections agency that understands the industry and business, and the risks entailed, as a reasonable person would in the industry; and

(v)     It understands and acknowledges that the Accounts and Portfolios provided "AS IS" AND WITHOUT WARRANTY BY AAM AND, TO THE MAXIMUM EXTENT ALLOWED BY APPLICABLE LAW, SOURCE EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## 11. MISCELLANEOUS

11.1. Choice of Law and Venue. This Agreement shall be construed under the laws of the State of Illinois.  The parties hereby irrevocably agree to the jurisdiction and venue of any State or Federal court in Illinois. The parties freely, unconditionally and irrevocably waive any right to a trial by jury, with respect to any litigation directly or indirectly arising out of or relating to this Agreement.

11.2. Assignability. Agency shall not assign this Agreement unless agreed to by AAM in writing. Any assignment, in part or whole, by Agency without approval or consent in writing by AAM is prohibited and shall be null and void and constitute a breach of this Agreement.

11.3. Independent Relationship. The parties expressly acknowledge that they will not hold themselves out as an agent, partner, or co-venture of the other. The parties further agree that nothing in this Agreement shall be construed to create or imply a partnership, joint venture, collaboration, or contract of employment.

PX34
000397

11.4. <u>Communication</u>. Agency agrees that AAM retains the right to communicate all notices, instruction, guidelines, procedures, amendments, and any other information in writing or orally, via in person, e-mail, fax, phone, or mail.

11.5. <u>Misappropriation; Bad Actor</u>. Agency shall not misappropriate or otherwise use any information, materials, and documents connected to AAM and the Accounts and Portfolios, in a manner that is detrimental or damaging to AAM. Further, Agency and its employees, officers, directors, affiliates, and any other personnel shall not engage in any conduct, written or orally, directly or indirectly, that shall be damaging to AAM, its personnel, and its business affairs and relationships including but not limited to defamation, circumvention, competition, and solicitation.

11.6. <u>Amendments</u>. Agency understands, agrees, and acknowledges that AAM may amend this Agreement, in part or whole, and any schedules entailed from time to time. AAM shall give Agency reasonable notice to Agency of such amendment, if any. Agency shall not amend this Agreement or any part thereof, at any time, unless agreed upon, in writing, by AAM.

11.7. <u>Use of Name</u>. Agency shall not use the name, logo, likeness or trademarks of AAM, for any advertising, marketing or endorsement purposes without the prior written consent of AAM.

11.8. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute but one instrument.

*(**SIGNATURE PAGE TO FOLLOW ON NEXT PAGE**)*

PX34
000398

(*SIGNATURE PAGE TO THE COLLECTION SERVICES AGREEMENT*)

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed.

**ASHTON ASSET MANAGEMENT, INC.**        **World Wide Processing Group, LLC**

By: _____        By: _Frank Ungaro /member____

Name: _____        Name: _____

Date: _____        Date: _10-22-15_____

8

PX34
000399

**From:** fungaro   <fungaro@worldwideprocessinggroup.info>
**Sent:** Friday, March 18, 2016 4:18 PM
**To:** Kamran Bashir
**Subject:** Re: peak 9 remit
**Attachments:** (Alternate Body)


Yes more disputes.


Sent on my Samsung Galaxy S® 5

-------- Original message --------
From: Kamran Bashir <kamran@ashtonasset.com>
Date: 03/18/2016 4:12 PM (GMT-05:00)
To: Frank Ungaro <fungaro@worldwideprocessinggroup.info>
Subject: Re: peak 9 remit

Thanks Frank,
Also, What i really wanted to ask is what are some of complaints that you are hearing on the floor in regards to the new
placement, I know Rod had mentioned that people are disputing more heavily and such, just want to know some of your
concerns, and i am digging into the placement little bit more on my side.


Thanks Kamran

Kamran Bashir
Vice President of Operations

IMG  [96]Ashton Asset Management
500 Quail Ridge DriveWestmont, IL 60559M: 801.662.8341  D: 630.324.0819 On Fri, Mar 18, 2016 at 3:03 PM,
<fungaro@worldwideprocessinggroup.info [mailto:fungaro@worldwideprocessinggroup.info] > wrote:
Here you go
Frank UngaroMember ManagerWorld Wide Processing Group,LLCOffice: 1-877-472-4590 [tel:1-877-472-4590] Cell: 1-
970-218-2465 [tel:1-970-218-2465] Fax: 1-800-213-7915 [tel:1-800-213-7915]

PX34
000400

**From:**          Kamran Bashir   <kamran@ashtonasset.com>
**Sent:**          Friday, March 18, 2016 4:12 PM
**To:**            Frank Ungaro
**Subject:**       Re: peak 9 remit
**Attachments:**   (Alternate Body)


Thanks Frank,
Also, What i really wanted to ask is what are some of complaints that you are hearing on the floor in regards to the new placement, I know Rod had mentioned that people are disputing more heavily and such, just want to know some of your concerns, and i am digging into the placement little bit more on my side.


Thanks Kamran

Kamran Bashir
Vice President of Operations

IMG  [96]Ashton Asset Management
500 Quail Ridge DriveWestmont, IL 60559M: 801.662.8341  D: 630.324.0819 On Fri, Mar 18, 2016 at 3:03 PM, <fungaro@worldwideprocessinggroup.info [mailto:fungaro@worldwideprocessinggroup.info] > wrote:
Here yo go
Frank UngaroMember ManagerWorld Wide Processing Group,LLCOffice: 1-877-472-4590 [tel:1-877-472-4590] Cell: 1-970-218-2465 [tel:1-970-218-2465] Fax: 1-800-213-7915 [tel:1-800-213-7915]

PX34

000401

# EXHIBIT 3

PX34

000402

| | |
|---|---|
| **From:** | Andrew J. Shaevel  <andrew.shaevel@bobalew.com> |
| **Sent:** | Thursday, June 11, 2015 8:19 PM |
| **To:** | Jon's Gmail Account  ; Greg Grigorian (Hylan) ; Jeffrey Brooks (Hylan) ; Bruce H. Gray (bruce.h.gray@gmail.com) ; lance@hollinservicesgroup.com |
| **Cc:** | Hirsh Mohindra  ;  Preetesh Patel |
| **Subject:** | Ashton Support |
| **Attachments:** | (Alternate Body); image001.jpg |

 Gentlemen – We really need to talk about our collective expectations from Ashton as it relates to post sale product support for agencies servicing the BMG Warehouse.  Hirsh called today somewhat frustrated by the seemingly endless chain of emails and calls coming from agencies working placements for Hylan.  Some of the questions appear to be beyond product support and/or best practice sharing and Hirsh has questioned everyone's role in supporting these agencies.  To be clear, Hirsh wants to be helpful, but does not want his team to be taken advantage of (my words not his).  It is clear to me we need a conversation to establish clear roles and responsibilities for agency support and/or consultation.  As I have said many times, Hylan will not be a manager or consultant for agencies.  Hylan can provide vendor oversight as the owner/manager of the placed debt.  My understanding is that Hollins is positioned to be a manager/consultant for the agencies, and as such, if these roles have not been clearly articulated and delineated, they need to be.  Can we schedule a call for Monday for Tuesday next week to discuss and resolve this?  Let me know your respective availability…thanks!  Andy  Andrew J. Shaevel Chief Executive Officer IMG  [288]Bobalew Ventures  5477 Main Street  Amherst, New York 14221  (716) 580-3133 - Office (716) 860-1125 - Mobile (716) 580-3137 - Fax  website [http://www.bobalew.com/]   CONFIDENTIALITY NOTICE:  This communication and any attachments are confidential, and are only for the use of the intended recipient.  If you have received this transmission in error, any disclosure, copying, distribution or the taking of any action in reliance upon this communication is strictly prohibited.  If you have received this communication in error, please contact the sender immediately and delete the original message.  Thank you.

PX34

000403

**From:**        Andrew J. Shaevel  <andrew.shaevel@bobalew.com>
**Sent:**        Wednesday, July 15, 2015 1:05 PM
**To:**          'Hirsh Mohindra'
**Cc:**          Preetesh Patel
**Subject:**     Debtor Swap
**Attachments:** (Alternate Body); image001.jpg

Hirsh –
I would like to schedule a call tomorrow to talk about a debtor swap.  One of the huge mistakes of the BMG file was that the same debtor is in many of the files.  We had a good update call with Jay and Todd today.  Both want us to sort the debtors so there is no overlap (if possible) between the two files.  We have sorted through all the inventory at Hylan and now have it organized by SSN.  We would like to take the balance that is available for sale and do the same and then swap accounts between ourselves so we have distinct and exclusive debtor pools.  I know Preetesh is out of the office with his new child (I hope, I haven't heard any update on the C-Section yet)   Andy
 Andrew J. Shaevel Chief Executive Officer IMG  [288]Bobalew Ventures  5477 Main Street  Amherst, New York 14221  (716) 580-3133 - Office (716) 860-1125 - Mobile (716) 580-3137 - Fax
 website [http://www.bobalew.com/]   CONFIDENTIALITY NOTICE:  This communication and any attachments are confidential, and are only for the use of the intended recipient.  If you have received this transmission in error, any disclosure, copying, distribution or the taking of any action in reliance upon this communication is strictly prohibited.  If you have received this communication in error, please contact the sender immediately and delete the original message.  Thank you.

PX34

000404

| | |
|---|---|
| **From:** | Ryan Zawistowski (Hylan)  <ryan@hylanasset.com> |
| **Sent:** | Thursday, July 2, 2015 11:09 AM |
| **To:** | Preetesh Patel |
| **Cc:** | Hirsh Mohindra  ;  Andrew J. Shaevel ;  Jon's Gmail Account |
| **Subject:** | FW: Select Lender Recall |
| **Attachments:** | (Alternate Body); image001.jpg; Select Lender Return Summary.pdf; Attachments.html |

Preetesh-  See attached…

Thanks,
Ryan  From: Ryan Zawistowski (Hylan)
Sent: Tuesday, June 30, 2015 1:08 PM
To: Preetesh Patel
Cc: Andrew J. Shaevel; Hirsh Mohindra; Jon's Gmail Account (barabanus@gmail.com)
 Subject: Select Lender Recall    ShareFile Attachments Title Size Final Return File 1 - Ashton.xlsx 132.8 MB Final Return File 2 - Ashton.xlsx 2 MB Download Attachments [https://bobalew.securevdr.com/d/se7fc8d2c5e24ac88]  Ryan Zawistowski uses ShareFile to share documents securely. Learn More. [http://www.sharefile.com/?src=system-email-outlookplugin&amp...]  Good Morning Preetesh-  Pursuant to Andy's letter dated June 8th, 2015, and Hirsh and Andy's agreement effective June 15th, 2015, attached please find the detailed listing of accounts that Hylan is returning to Ashton on behalf of Hylan Debt Fund, LLC and its various series. In addition, I have attached a summary by lender, charge off year, and state. Ideally, we would like the replacement file to have similar characteristics. Andy and Hirsh have agreed that the effective date for this recall is June 15th, 2015.  Please note that we recalled a subset of these accounts from various placement agencies. The effective date of the recall was June 15th, although, some agencies did not confirm the recall until June 23rd.  Given the nature of this recall, we have authorized the agencies to keep 100% of the payments from June 15th to June 23rd. We anticipate the gross change in balances to be less than $30,000. All agencies have since confirmed the return of these accounts. We will advise you of the balance changes between these dates.   If you have any questions, please do not hesitate to call me. Please let me know when we can expect a replacement file.
Thanks,

Ryan

 Ryan Zawistowski Operations Manager  IMG  [0]5477 Main Street Amherst, NY 14221 (716) 580-3135 ext: 107 - Office (855) 275-3651 - Toll-Free Hot Line (716) 580-3137 - Fax www.hylanasset.com [http://www.hylanasset.com/] CONFIDENTIALITY NOTICE:  This communication and any attachments are confidential, and are only for the use of the intended recipient.  If you have received this transmission in error, any disclosure, copying, distribution or the taking of any action in reliance upon this communication is strictly prohibited.  If you have received this communication in error, please contact the sender immediately and delete the original message.  Thank you.

PX34
000405



**Select Lender Return Summary**
*Hylan Asset Management, LLC*
June 15th, 2015

| State | # of Accts | Face Value | Percent |
|---|---|---|---|
| DJR Group LLC | 84190 | $ 35,575,631.50 | 14.95% |
| St. Armands Group | 63063 | $ 26,841,510.96 | 11.28% |
| Cutter Group LLC | 57893 | $ 24,775,542.28 | 10.41% |
| Vandelier Group LLC | 56168 | $ 24,019,454.38 | 10.09% |
| Mass Street Group | 53687 | $ 23,110,884.07 | 9.71% |
| JHS Marketing | 51274 | $ 23,075,200.54 | 9.69% |
| Anasazi Group LLC | 51713 | $ 22,257,848.49 | 9.35% |
| SSM Group LLC | 47980 | $ 19,773,212.63 | 8.31% |
| Longboat Services | 26278 | $ 11,865,852.15 | 4.99% |
| Huskhawk Group Ltd. | 26271 | $ 11,841,742.43 | 4.98% |
| Anasazi Services LLC | 14106 | $ 5,781,662.92 | 2.43% |
| Huskhawk Group LTD | 11737 | $ 4,884,976.05 | 2.05% |
| Hydra Financial Limited | 8375 | $ 2,940,069.30 | 1.24% |
| Longboat Services LLC | 2369 | $ 974,797.50 | 0.41% |
| JHS Group | 338 | $ 143,440.00 | 0.06% |
| BCD/Hydra Financial Limited | 313 | $ 133,380.00 | 0.06% |
| Namakan | 59 | $ 18,780.00 | 0.01% |
| | 555,814 | $ 238,013,985.20 | 100.00% |

| CO Year | # of Accts | Face Value | Percent |
|---|---|---|---|
| 2010 | 141 | $ 60,330.00 | 0.03% |
| 2011 | 175,537 | $ 75,258,143.03 | 31.62% |
| 2012 | 259,989 | $ 112,167,123.11 | 47.13% |
| 2013 | 120,147 | $ 50,528,389.06 | 21.23% |
| | 555,814 | $ 238,013,985.20 | 100.00% |

| State | # of Accts | Face Value | Percent |
|---|---|---|---|
| TX | 81430 | $ 35,219,867.27 | 14.80% |
| FL | 66227 | $ 28,285,683.88 | 11.88% |
| NC | 48521 | $ 20,488,569.94 | 8.61% |
| CA | 36155 | $ 15,902,228.47 | 6.68% |
| IL | 33584 | $ 14,382,295.28 | 6.04% |
| SC | 26362 | $ 10,997,814.53 | 4.62% |
| MD | 24826 | $ 10,800,701.66 | 4.54% |
| MI | 24081 | $ 10,344,236.29 | 4.35% |
| LA | 24086 | $ 10,197,714.71 | 4.28% |
| NJ | 19377 | $ 8,393,410.45 | 3.53% |
| TN | 19264 | $ 8,171,413.30 | 3.43% |
| MS | 13630 | $ 5,697,909.41 | 2.39% |
| AL | 13525 | $ 5,693,652.01 | 2.39% |
| PA | 13165 | $ 5,642,636.91 | 2.37% |
| KY | 11016 | $ 4,695,126.51 | 1.97% |
| OK | 10189 | $ 4,352,077.02 | 1.83% |
| WI | 8712 | $ 3,688,106.83 | 1.55% |
| MA | 8007 | $ 3,470,998.35 | 1.46% |
| CT | 7769 | $ 3,360,690.89 | 1.41% |
| NV | 6685 | $ 2,909,540.50 | 1.22% |
| IA | 6371 | $ 2,676,737.07 | 1.12% |
| DE | 4647 | $ 1,986,410.00 | 0.83% |
| NM | 4470 | $ 1,912,119.12 | 0.80% |
| WA | 4194 | $ 1,835,515.44 | 0.77% |
| DC | 3495 | $ 1,518,826.00 | 0.64% |
| AR | 3406 | $ 1,449,819.00 | 0.61% |
| UT | 3220 | $ 1,389,287.66 | 0.58% |
| NE | 3292 | $ 1,375,977.31 | 0.58% |
| OR | 3149 | $ 1,335,484.75 | 0.56% |
| ME | 2853 | $ 1,217,002.54 | 0.51% |
| ID | 2509 | $ 1,061,818.51 | 0.45% |
| HI | 2292 | $ 978,993.42 | 0.41% |
| CO | 2158 | $ 920,458.50 | 0.39% |
| RI | 1929 | $ 824,524.44 | 0.35% |
| MO | 1737 | $ 760,611.49 | 0.32% |
| SD | 1627 | $ 686,201.28 | 0.29% |
| AK | 1572 | $ 676,354.75 | 0.28% |
| NH | 1387 | $ 603,395.73 | 0.25% |
| MT | 1283 | $ 548,271.18 | 0.23% |
| WY | 933 | $ 396,006.50 | 0.17% |
| ND | 816 | $ 344,936.85 | 0.14% |
| NY | 755 | $ 336,286.60 | 0.14% |
| VT | 778 | $ 330,850.35 | 0.14% |
| AZ | 198 | $ 91,416.00 | 0.04% |
| MN | 102 | $ 48,584.00 | 0.02% |
| IN | 12 | $ 5,385.00 | 0.00% |
| OH | 7 | $ 2,932.50 | 0.00% |
| GA | 5 | $ 2,465.00 | 0.00% |
| WV | 2 | $ 1,130.00 | 0.00% |
| (blank) | 2 | $ 680.00 | 0.00% |
| DL | 1 | $ 480.00 | 0.00% |
| VA | 1 | $ 350.00 | 0.00% |
| | 555,814 | $ 238,013,985.20 | 100.00% |

**From:**          David Carr   <dave@mdwc.net>
**Sent:**          Friday, May 2, 2014 11:03 AM
**To:**            Sarah Miller
**Cc:**            Preetesh Patel
**Subject:**       Fwd: 81-9MM Riverside Masked
**Attachments:**   (Alternate Body)


Hey Sarah
Can you handle this?  Would it be easier to do with beam?
We can load the entire unmasked file, add a unique account number and then give them a masked file out of beam.
We don't care about the 573 accounts without lender names.  Just eliminate them from the file and we can put on the side.

Begin forwarded message:From: "Andrew J. Shaevel" <andrew.shaevel@bobalew.com
[mailto:andrew.shaevel@bobalew.com] >
Subject: RE: 81-9MM Riverside Masked
Date: May 2, 2014 9:42:45 AM EDT
To: David Carr <dave@mdwc.net [mailto:dave@mdwc.net] >
Cc: Jon's Gmail Account <barabanus@gmail.com [mailto:barabanus@gmail.com] >

Dave - In order to do this right, please ask Hirsch or his team to add a unique reference number to the unmasked source file and then send me the masked file with the unique reference number.  Once I have this, then we can create a random sample of the file that we want you to have batched for BK/deceased.  These control numbers will enable us to identify the exact accounts. Also, please note that based on our review of the file, there are 573 accounts without a lender (this needs to be fixed).  Also, the more I look at this file, it appears that this is really just a BMG file.  The lenders are exactly the same as we have in prior BMG files.  Is that what this stuff really is??? Lastly, 39% of the file is Riverside, but we can't find any reference on the web for a lender by this name.  Is this really their legal name or is this just another Evergreen like pseudonym??? In the mean time, we are working on the funds but we need to resolve these loose ends in order to make this an investable deal. Andy   From: David Carr [dave@mdwc.net [mailto:dave@mdwc.net] ]
Sent: Thursday, May 01, 2014 7:07 PM
To: Andrew J. Shaevel (Hylan); Jon Purizhansky (Hylan)
Subject: Fwd: 81-9MM Riverside Masked




IMG  [Ashton Asset]


Preetesh Patel has sent you files.

PX34
000407

IMG  [&gt;] [https://ashtonasset.sharefile.com/d/470d97ebfc004ea4] Click here to download 81-9MM 5-1 Masked.xlsx [https://ashtonasset.sharefile.com/d/470d97ebfc004ea4]

Note From Preetesh:81.9MM Masked FileShareFile is a tool for sending, receiving, and organizing your business files online. It can be used as a password-protected area for sharing information with clients and partners, and it's an easy way to send files that are too large to e-mail.

Trouble with the above link? You can copy and paste the following URL into your web browser: https://ashtonasset.sharefile.com/d/470d97ebfc004ea4 [https://ashtonasset.sharefile.com/d/470d97ebfc004ea4]

Powered By Citrix ShareFile 2014 [http://www.sharefile.com/?src=emailfooter]

PX34
000408

**From:**          Jeffrey Brooks (Hylan)  <Jeff@hylanasset.com>
**Sent:**          Monday, December 1, 2014 3:12 PM
**To:**            Hirsh Mohindra
**Cc:**            Jon's Gmail Account  ;  Preetesh Patel
**Subject:**       Re: Two questions
**Attachments:**   (Alternate Body)


Sounds good. They have been doing pretty well, but def appreciative of any insight given your experience.


 Jeff Brooks Business Development Executive  IMG  [206]5477 Main Street [x-apple-data-detectors://0/0]  Amherst, NY 14221 [x-apple-data-detectors://0/0]  (716) 713-2634 [tel:(716)%20713-2634]  - Mobile (716) 580-3135 [tel:(716)%20580-3135]  - Hylan Main Office (855) 275-3651 [tel:(855)%2075-3651]  - Toll-Free Hot Line (716) 580-3137 [tel:(716)%20580-3137]  - Fax www.hylanasset.com [http://www.hylanasset.com] On Dec 1, 2014, at 3:10 PM, Hirsh Mohindra <hirsh@ashtonasset.com [mailto:hirsh@ashtonasset.com] > wrote:

we will email you later today on some pointers that will help to work this paper better and get results..
Hirsh.   Hirsh Mohindra Ashton Asset Management 500 Quail Ridge Dr., Westmont, IL 60559 M: 630.479.0000    D: 630.243.4210  IMG  [96]www.ashtonasset.com [http://www.ashtonasset.com]
On Mon, Dec 1, 2014 at 2:03 PM, Jeffrey Brooks (Hylan) <Jeff@hylanasset.com [mailto:Jeff@hylanasset.com] > wrote:
 I'm traveling. I'm not landing until 810 est. but I'd be happy to talk then. Otherwise let's find a time wed. I will be free tues evenibg as well. 8pm est.


 Jeff Brooks Business Development Executive  IMG  [206]5477 Main Street Amherst, NY 14221 (716) 713-2634 [tel:(716)%20713-2634]  - Mobile (716) 580-3135 [tel:(716)%20580-3135]  - Hylan Main Office (855) 275-3651 [tel:(855)%2075-3651]  - Toll-Free Hot Line (716) 580-3137 [tel:(716)%20580-3137]  - Fax www.hylanasset.com [http://www.hylanasset.com/] On Dec 1, 2014, at 3:01 PM, Hirsh Mohindra <hirsh@ashtonasset.com [mailto:hirsh@ashtonasset.com] > wrote:

yes, lets plan for near end of day on this jeff... say 5pm cst ? (3 hours)
Hirsh.   Hirsh Mohindra Ashton Asset Management 500 Quail Ridge Dr., Westmont, IL 60559 M: 630.479.0000 [tel:630.479.0000]     D: 630.243.4210 [tel:630.243.4210]   IMG  [96]www.ashtonasset.com [http://www.ashtonasset.com]
On Mon, Dec 1, 2014 at 1:58 PM, Jon <barabanus@gmail.com [mailto:barabanus@gmail.com] > wrote:

Preetesh, Hirsh and I spoke about you talking to Jeff on how to best collect on this paper ( the internal ).
Would you be so kind to schedule a call with Jeff and really tell him as much as possible on how to collect on it, the talk offs, the whole bit ....please be very open with him Hirsh, plz confirm Thank you, Jon  Sent from my iPhone On Dec 1, 2014, at 2:42 PM, Preetesh Patel <preetesh@ashtonasset.com [mailto:preetesh@ashtonasset.com] > wrote:

Hi Jeff, I will resend the file. I have not spoken to Ryan. I will call him shortly to find out about the file.
Thanks, Preetesh
On Dec 1, 2014, at 1:34 PM, Jeffrey Brooks (Hylan) <Jeff@hylanasset.com [mailto:Jeff@hylanasset.com] > wrote:

Hey buddy, I hope all is well. Will you send me the guaranteed fast cash (although I may have name wrong) at your earliest convenience? Also, I believe Ryan spoke with you about batch skipping a file for us. What is the status of this? Thanks.

1

PX34
000409

Jeff Brooks Business Development Executive  IMG  [206]5477 Main Street Amherst, NY 14221 (716) 713-2634 [tel:(716)%20713-2634]  - Mobile (716) 580-3135 [tel:(716)%20580-3135]  - Hylan Main Office (855) 275-3651 [tel:(855)%20275-3651]  - Toll-Free Hot Line (716) 580-3137 [tel:(716)%20580-3137]  - Fax www.hylanasset.com [http://www.hylanasset.com/]

PX34

000410

# EXHIBIT 4

PX34

000411

**From:**           Kelly Brace <ksbrace@hotmail.com>
**Sent:**           Wednesday, July 9, 2014 2:51 PM
**To:**             josh sullivan; Kelli Mac
**Subject:**        Fwd: SUG Overpays
**Attachments:**    image001.jpg; ATT00032.htm; SUG Overpayment 06-30-2014.pdf; ATT00035.htm

Sent from my iPhone
Begin forwarded message:

From: "Brian Ogilvie (Hylan)" <brian@hylanasset.com [mailto:brian@hylanasset.com] >
Date: July 9, 2014 at 2:47:46 PM EDT
To: "kelly@solidusgroupllc.com [mailto:kelly@solidusgroupllc.com] " <kelly@solidusgroupllc.com
[mailto:kelly@solidusgroupllc.com] >
Cc: "Ryan Zawistowski (Hylan)" <ryan@hylanasset.com [mailto:ryan@hylanasset.com] >, "Greg Grigoryan (Hylan)"
<Greg@hylanasset.com [mailto:Greg@hylanasset.com] >
Subject: SUG Overpays

 Good Afternoon,   This is to inform you that based on your recent remit report and our historical records, that your
agency appears to have collected over the balance due on accounts placed with your agency by Hylan Asset
Management, LLC.   Our placement and consignment agreements do not allow for collections over the assigned balance,
and we expect that you will refund the debtor the full amount of any excess collections.  You can expect to receive
checks in the mail from Hylan in the amount due back to the debtor from Hylan. Also, please find the attached report
detailing all rejected payments; If this placement is subject to a Hylan consignment, these payments will not count
towards the consignment receivable. If you believe we have rejected any of these payments inappropriately, please do
not hesitate to contact any member of our team.
 Brian Ogilvie Operations Analyst

PX34
000412

| Agency | Portfolio | Hylan ID | Original Acct | Debtor Name | Date Paid | Original Balance | Prior Payments | Submitted Payment | Current Balance | Amount Accepted | Amount Rejected | Contingency Rate | Hylan Refund to Agency | Total Refund to Debtor |
|--------|-----------|----------|---------------|-------------|-----------|------------------|----------------|-------------------|-----------------|-----------------|-----------------|------------------|------------------------|------------------------|
| SUG | Evergreen 6 | | | STEPHEN NYE | 6/23/2014 | $ 320 00 | $ 260.00 | $ 260 00 | $ (200.00) | $ 60 00 | $ 200.00 | 40% | $ 120.00 | $ 200.00 |
| SUG | Evergreen 6 | | | WILLIAM PARKS | 6/23/2014 | $ 320 00 | $ - | $ 390 00 | $ (70.00) | $ 320 00 | $ 70.00 | 40% | $ 42.00 | $ 70.00 |
| SUG | Evergreen 6 | | | GIORGIO BROWN | 6/26/2014 | $ 480 00 | $ 250.00 | $ 250 00 | $ (20.00) | $ 230 00 | $ 20.00 | 40% | $ 12.00 | $ 20.00 |
| SUG | Evergreen 6 | | | LORETTA TUNSTALL | 6/27/2014 | $ 320 00 | $ 165.97 | $ 441.64 | $ (287.61) | $ 154 03 | $ 287.61 | 40% | $ 172.57 | $ 287.61 |
| SUG | Evergreen 6 | | | LYLE REED | 6/27/2014 | $ 510 00 | $ 473.32 | $ 236.66 | $ (199.98) | $ 36.68 | $ 199.98 | 40% | $ 119.99 | $ 199.98 |
| SUG | Evergreen 6 | | | ALFRED WRIGHT | 6/27/2014 | $ 260 00 | $ 200.00 | $ 200 00 | $ (140.00) | $ 60 00 | $ 140.00 | 40% | $ 84.00 | $ 140.00 |
| SUG | Evergreen 6 | | | CLIFFORD BURT | 6/27/2014 | $ 260 00 | $ 253.00 | $ 253 00 | $ (246.00) | $ 7 00 | $ 246.00 | 40% | $ 147.60 | $ 246.00 |
| SUG | Evergreen 6 | | | KIRSTEN HALL | 6/27/2014 | $ 390 00 | $ 237.50 | $ 187 50 | $ (35.00) | $ 152 50 | $ 35.00 | 40% | $ 21.00 | $ 35.00 |
| SUG | Evergreen 6 | | | DARCIA ROBERSON | 6/27/2014 | $ 400 00 | $ 275.00 | $ 275 00 | $ (150.00) | $ 125 00 | $ 150.00 | 40% | $ 90.00 | $ 150.00 |
| SUG | Evergreen 6 | | | BULLUCK GREGORY | 6/27/2014 | $ 510 00 | $ 328.50 | $ 200 00 | $ (18.50) | $ 181 50 | $ 18.50 | 40% | $ 11.10 | $ 18.50 |
| SUG | Evergreen 6 | | | SANDI DURSO | 6/27/2014 | $ 260 00 | $ 466.00 | $ 133 00 | $ (339.00) | $ - | $ 133.00 | 40% | $ 79.80 | $ 133.00 |

**From:**             Kelly Brace <ksbrace@hotmail.com>
**Sent:**              Tuesday, July 22, 2014 4:21 PM
**To:**                 Kelli Mac
**Subject:**          Fwd: SUG Overpayments
**Attachments:**     image001.jpg; ATT00247.htm; SUG Overpayments.pdf; ATT00250.htm

Ur query needs work

Sent from my iPhone

Begin forwarded message:

> From: "Brian Ogilvie (Hylan)" <brian@hylanasset.com>
> Date: July 22, 2014 at 4:05:48 PM EDT
> To: "kelly@solidusgroupllc.com" <kelly@solidusgroupllc.com>
> Subject: SUG Overpayments
>
> Good Morning,
>
>
> This is to inform you that based on your recent remit report and our historical records, that your agency appears to have collected over the balance due on accounts placed with your agency by Hylan Asset Management, LLC.
>
> Our placement and consignment agreements do not allow for collections over the assigned balance, and we expect that you will refund the debtor the full amount of any excess collections.
>
> You can expect to receive checks in the mail from Hylan in the amount due back to the debtor from Hylan. Also, please find the attached report detailing all rejected payments; If this placement is subject to a Hylan consignment, these payments will not count towards the consignment receivable. If you believe we have rejected any of these payments inappropriately, please do not hesitate to contact any member of our team.
>
> Thank You,
>
> Brian
>
>
>
>
> Brian Ogilvie
> Operations Analyst
>
>
> 5477 Main Street
> Amherst, NY 14221
> (716) 580-3135 ext: 111 - Office
> (855) 275-3651 - Toll-Free Hot Line
> (716) 580-3137 - Fax
> www.hylanasset.com

PX34

000414

>

> CONFIDENTIALITY NOTICE:  This communication and any attachments are confidential, and are only for the use of the intended recipient.  If you have received this transmission in error, any disclosure, copying, distribution or the taking of any action in reliance upon this communication is strictly prohibited.  If you have received this communication in error, please contact the sender immediately and delete the original message.  Thank you.

>

> LEGAL DISCLOSURE: Hylan Asset Management, LLC ("Hylan") is not offering nor selling securities of any kind.  Hylan is solely an advisory and portfolio management services firm that assists clients to acquire, liquidate and dispose of pools of distressed consumer receivables ("portfolios"). Investing in distressed consumer receivables is by definition an alternative investment. There is no way to guarantee a positive return on each and every portfolio acquired, and as such, Hylan recommends that clients seriously consider limiting their investment in this sector to 5% or less of their net worth.  Hylan only offers its services pursuant to the terms of a Master Servicing Agreement.  Prospective clients must be an accredited investor and must acknowledge that there are inherent risks associated with acquiring portfolios of distressed consumer receivables. Hylan does not and cannot guarantee any specific return on any investment.

>


-----

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2014.0.4716 / Virus Database: 3986/7900 - Release Date: 07/22/14

PX34
000415

| Agency | Portfolio | Hylan ID | Original Acct | Debtor Name | Date Paid | Original Balance | Prior Payments | Submitted Payment | Current Balance | Amount Accepted | Amount Rejected | Contingency Rate | Agency Refund to Debtor | Hylan Refund to Debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SUG | Evergreen 6 | | | ERICALYNNE HARTZELL | 7/11/2014 | $ 350.00 | $ 300.00 | $ 100.00 | $ (50.00) | $ 50.00 | $ 50.00 | 40% | $ 20.00 | $ 30.00 |
| SUG | Evergreen 6 | | | JUSTYNE VILLASENOR | 7/11/2014 | $ 350.00 | $ 277.50 | $ 138.75 | $ (66.25) | $ 72.50 | $ 66.25 | 40% | $ 26.50 | $ 39.75 |
| SUG | Evergreen 6 | | | SUZANNE RUCKS | 7/11/2014 | $ 260.00 | $ 180.00 | $ 220.00 | $(140.00) | $ 80.00 | $140.00 | 40% | $ 56.00 | $ 84.00 |
| SUG | Evergreen 6 | | | NICOLE RYLANDER | 7/11/2014 | $ 350.00 | $ 245.00 | $ 122.50 | $ (17.50) | $105.00 | $ 17.50 | 40% | $ 7.00 | $ 10.50 |
| SUG | Evergreen 6 | | | GEORGE LANE | 7/11/2014 | $ 510.00 | $ 365.00 | $ 182.50 | $ (37.50) | $145.00 | $ 37.50 | 40% | $ 15.00 | $ 22.50 |
| SUG | Evergreen 6 | | | NNEKA BETTS | 7/11/2014 | $ 390.00 | $ 100.00 | $ 384.04 | $ (94.04) | $290.00 | $ 94.04 | 40% | $ 37.62 | $ 56.42 |
| SUG | Evergreen 6 | | | KELLY DEPPE | 7/11/2014 | $ 390.00 | $ 390.00 | $ 130.00 | $(130.00) | $ - | $130.00 | 40% | $ 52.00 | $ 78.00 |
| SUG | Evergreen 6 | | | DONALD KRENITSKY | 7/7/2014 | $ 430.00 | $ 400.00 | $ 100.00 | $ (70.00) | $ 30.00 | $ 70.00 | 40% | $ 28.00 | $ 42.00 |
| SUG | Evergreen 6 | | | KELVIN ROSTON | 7/7/2014 | $ 350.00 | $ 710.00 | $ 250.00 | $(610.00) | $ - | $250.00 | 40% | $ 100.00 | $ 150.00 |
| SUG | Evergreen 6 | | | ASHLEY HUFF | 7/8/2014 | $ 350.00 | $ 200.00 | $ 200.00 | $ (50.00) | $150.00 | $ 50.00 | 40% | $ 20.00 | $ 30.00 |

PX34
000416

# EXHIBIT 5

PX34

000417

**From:** Charity Baldwin <Charity@solidusgroupllc.com>
**Sent:** Thursday, September 4, 2014 1:54 PM
**To:** 'Kelly Brace'
**Subject:** Hylan



2014090413565...

PX34

000418

# RECEIVABLES PURCHASE AGREEMENT

Sale from Hylan Asset Management, LLC to Solidus Group, LLC: 9/3/2014

This Receivables Purchase Agreement ("Agreement") is made and entered into this 3rd day of September 2014, by and between Hylan Asset Management, LLC (hereinafter referred to as "Seller ") and Solidus Group, LLC (hereinafter referred to as "Purchaser")

WHEREAS, Seller desires to sell certain receivables ("Debt Receivables"); and

WHEREAS, Purchaser desires to purchase such Debt Receivables from Seller, as more particularly defined herein on the terms and conditions set forth in this Agreement;

NOW THEREFORE, in consideration of the foregoing recitals and the mutual covenants and conditions contained in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, it is agreed as follows:

1. <u>SALE AND PURCHASE OF DEBT RECEIVABLES.</u> Subject to the terms of this Agreement, Seller agrees to sell, convey, transfer and assign to Purchaser and Purchaser agrees to purchase from Seller, for the consideration herein provided, the right, title, interest, and obligations of Seller in and to those Debt Receivables as described on Exhibit A attached hereto (all of such receivables herein collectively called "Accounts" and singularly an "Account"). The Seller represents and warrants the Accounts shall not include accounts which, as of the Closing Date, are classified as follows (hereinafter referred to as "Unqualified Accounts"):

   A. Satisfied, settled, or released (the account was paid or otherwise released or settlement check was received by Seller prior to the Closing Date);

   B. Filing of bankruptcy, applicable to such Account as determined by an opinion of Counsel as reported on a credit bureau as discharged;

   C. Uncollectible due to fraud or death with reasonable evidence provided by Purchaser;

   D. Pending litigation or dispute;

   E. Seller does not have title to accounts.

   All Accounts sold to Purchaser under this Agreement are sold and transferred without recourse as to their enforceability, collectability or documentation except as stated above.

PX34
000419

2.  <u>PURCHASE PRICE.</u> Subject to the terms and conditions of this Agreement, and in reliance upon the representations, warranties and covenants of the Seller made herein, Purchaser shall pay and deliver to Seller the sum set forth in the Closing Statement attached hereto as Exhibit B, for the Accounts purchased under this Agreement.

3.  <u>PURCHASE OR SUBSTITUTION OF UNQUALIFIED ACCOUNTS.</u> In the event that Purchaser identifies and returns to Seller by 10/3/2014 an Account which was an Unqualified Account, Seller shall at its option either replace the Account or buy back the Account for the amount that the Purchaser paid for such Account. Purchaser must provide independent evidence, e.g. Accurint data, supporting request for purchase or substitution.

4.  <u>INDEMNIFICATION BY PURCHASER.</u> Purchaser agrees to indemnify and hold such Seller (including its officers, directors, employees, stockholders, and agents) harmless from and against any claims, actions, suits or other actual or threatened proceedings, and all losses, judgments, damages, expenses or other costs (including all fees and disbursements of counsel) incurred or suffered by Seller by reason of willful misconduct or violation of any applicable law, rule or regulation by Purchaser (or its employees, representatives, agents or successors) or any subsequent Purchaser (or its employees, representatives, agents or successors) in connection with the collection or enforcement of the Accounts. At its option, Seller shall have the right to require Purchaser to assume the defense of any claims, actions, suits or other actual or threatened proceedings and to directly pay for all losses, judgments, damages, expenses or other costs (including all fees and disbursements of counsel) which may be imposed.

    Purchaser agrees that in the event any subsequent Purchaser fails to defend, indemnify and hold Seller harmless that Purchaser shall be responsible to indemnify Seller.

5.  <u>INDEMNIFICATION BY SELLER.</u> Seller agrees to indemnify and hold such Purchaser (including its officers, directors, employees, stockholders, and agents) harmless from and against any claims, actions, suits or other actual or threatened proceedings, and all losses, judgments, damages, expenses or other costs (including all fees and disbursements of counsel) incurred or suffered by Purchaser by reason of willful misconduct or violation of any applicable law, rule or regulation by Seller (or its employees, representatives, agents or successors) in connection with the collection or enforcement of the Accounts. At its option, Purchaser shall have the right to require Seller to assume the defense of any claims, actions, suits or other actual or threatened proceedings and to directly pay for all losses, judgments, damages, expenses or other costs (including all fees and disbursements of counsel) which may be imposed.

6.  <u>REMITTANCE OF DIRECT PAYMENTS.</u> Seller shall remit to Purchaser all payments which are received after the Closing Date. Such remittances shall occur within seven days of receipt of payments by Seller.

7.  <u>CONDITIONS OF SALE.</u>
    A.  The obligations of Purchaser to perform hereunder and purchase the Accounts on the Closing Date shall be subject to the satisfaction on or before the Closing Date of the following further conditions: (i) the representations and warranties contained in

PX34
000420

Paragraph 1 hereof shall to the best of Seller's knowledge and belief be true and correct in all respects on the Closing Date as if made on such date; and (ii) Seller shall have performed and observed all covenants, agreements and conditions hereof to be performed or observed by it on or before the Closing Date.

B.      The obligations of Seller to perform hereunder and sell the Accounts at Closing shall be subject to the satisfaction, on or before the Closing Date, of the following further conditions: (i) Purchaser shall provide Seller with a copy of its proposed notification to Account obligor advising them that the Accounts have been transferred to Purchaser and that all payments on the Accounts shall thereafter be made to the Purchaser. Purchaser shall have delivered to Seller the Purchase Price specified in Paragraph 2 hereof.

C.      Purchaser agrees that any Accounts being purchased pursuant to this Agreement shall, if resold by Purchaser, continue to be subject to all terms and conditions set forth herein. Purchaser agrees that for any and all future Contract of Sale or other document evidencing a transfer of ownership that this Agreement shall be disclosed to such firm and that this Agreement, along with all of its terms and conditions, made a part of such Contract of Sale or other documents, except that no disclosure shall be required of sale price.

8.      <u>CLOSING.</u> The closing of the sale and applicable purchase of the Accounts shall take place on the date and at the location described in the Exhibit B hereto, or such other date and location as shall be mutually agreed upon by the parties hereto (the actual date of Closing being herein called the "Closing Date"). At the Closing, the following shall be done:

A.      Seller shall deliver the final electronic sale file of Debt Receivables.

B.      Purchaser shall pay the balance of Purchase Price as set forth on Paragraph 2 of this Agreement and in Exhibit B to seller's escrow account.

9.      <u>REPRESENTATIONS AND WARRANTIES OF PURCHASER.</u>  Purchaser covenants and agrees that in the collection of all Accounts listed in Exhibit A, Purchaser or its agents, employees, representatives or assignees shall comply with all applicable state and federal debt collection laws.

Purchaser or its assignee or successor shall, at its own expense, give the debtor of each Account written notice of the transfer by ordinary mail or debtor's last known address in its first written communication with the debtor.

Purchaser warrants and represents that it is a sophisticated informed investor, has knowledge and experience in financial and business matters that enables it to evaluate the merits and risks of the transaction contemplated by this Agreement. The Purchaser acknowledges that Seller does not represent, warrant or insure the accuracy or completeness of any information or its

PX34
000421

sources of information contained in the information provided or in any of the Account Files. The Purchaser agrees and represents that the Accounts and Account Files made available to it were an adequate and sufficient basis on which to determine whether and at what price to purchase the Accounts. The Purchaser has made such independent investigations as it deems to be warranted into the nature, validity, enforceability, collectability and value of the Accounts, and all other facts it deems material to its purchase and is entering into this transaction solely on the basis of that investigation and the Purchaser's own judgment, and is not acting in reliance on any representatives or independent contractors (other than the representations and warranties of the Seller contained herein).

Purchaser is in full compliance with its obligations under the terms of any Confidentiality Agreement executed by the Purchaser to review the information made available by Seller or its agents, and the terms thereof are hereby incorporated herein subject to Purchaser's ownership rights and interests acquired by Purchaser hereunder.

10.  NOTICES. Any notice or other communication provided for herein or given hereunder to a party hereto shall be in writing and shall be delivered in person to such party or mailed by first class registered or certified mail, postage prepaid, addressed as follows:

If to Purchaser:       Solidus Group, LLC
                       295 Main Street, Suite 1053
                       Buffalo, NY 14203
                       Attention:  Kelly S. Brace
                       kelly@solidusgroupllc.com

If to Seller:          Hylan Asset Management, LLC
                       5477 Main Street
                       Amherst, NY 14221
                       Attention:  Andrew J. Shaevel, CEO
                       andy@hylanasset.com

11.  SEVERABILITY. If any provision, or application thereof, of this Agreement is held unlawful or unenforceable in any respect, the parties hereto agree that such illegality or unenforceability shall not affect other provisions or allocations that can be given effect, and this Agreement shall be construed as if the unlawful or unenforceable provisions are amended so as to make it valid, reasonable and enforceable and agree to be bound by the terms of such provision, as modified by the court.

12.  AMENDMENTS. This Agreement may be amended or modified only by a written instrument executed by all the parties hereto.

13.  COUNTERPARTS. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute but one instrument.

PX34
000422

14.   <u>HEADINGS.</u> The headings contained in this Agreement and in the Exhibits appended hereto are for convenience only and shall not be deemed to affect the interpretation of the provisions of this Agreement.

15.   <u>SURVIVAL OF REPRESENTATIONS AND WARRANTIES.</u> The representations, warranties, covenants and agreements of the parties set forth herein shall survive the closing.

16.   <u>ROLE OF BROKER.</u> N/A

17.   <u>GOVERNING LAW.</u> This Agreement is made pursuant to, and shall be construed under the laws of the State of New York.

18.   <u>ENTIRE AGREEMENT.</u> This Agreement is intended to define the full extent of the legally enforceable undertakings of the parties hereto, and no related promise or representation, written or oral, which is not set forth explicitly in this Agreement is intended by either party to be legally binding. Both parties acknowledge that in deciding to enter into this transaction they have relied on no representations, written or oral, other than those explicitly set forth in this Agreement.

19.   <u>CONFIDENTIALITY.</u> The parties understand and agree that the terms of this Agreement are confidential and they will not be disclosed to anyone outside of their respective organizations.

20.   <u>PURCHASER'S RIGHT OF RESALE.</u>  Purchaser may not transfer, dispose, or otherwise assign the accounts prior to the effective date of the bill of sale.  Any Subsequent new buyer must be an ACA or DBA member in good standing. Lender has a file holding requirement of 180 days.

Agreement and Purchaser shall be liable to Sellers for the breach of any representations, warranty or covenant or with respect to any indemnity that Purchasers adhere to as specified above.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the date first above written.

PURCHASER:        **SOLIDUS GROUP, LLC**

By:            _____
               Kelly S. Brace, President

SELLER:           **HYLAN ASSET MANAGEMENT, LLC**

By:            _____
               Andrew J. Shaevel, CEO

Page **5** of **8**

PX34
000423

EXHIBIT A

Sale from Hylan Asset Management, LLC to Solidus Group, LLC: 9/3/2014

Number of Accounts:          16902

Face Value:                  $7,231,725.97

PX34
000424

EXHIBIT B

CLOSING STATEMENT

Sale from Hylan Asset Management, LLC to Solidus Group, LLC: 9/3/2014

| Receivable Amount | $7,231,725.97 |
|---|---|
| Accounts | 16902 |
| Purchase Rate | 0.0150% |
| Purchase Price | $108,475.89 |
| Closing Date | 9/3/2014 |

A. On or before the Closing Date, Purchaser shall pay to Seller, by Wire, the amount of the Purchase Price (see above)
B. Seller agrees to transfer the Accounts, as set forth in Exhibit A, to Purchaser within 72 hours of funding of each payment.
C. Wire Instructions:

Account Name        Hylan Asset Management, LLC
                    5477 Main Street
                    Williamsville, NY 14221

Bank                Bank of America

ABA Routing         026 009 593

Account Number      ▮▮▮▮▮▮5810

PX34
000425

EXHIBIT C

ASSIGNMENT AND BILL OF SALE

Sale from Hylan Asset Management, LLC to Solidus Group, LLC: 9/3/2014


Receivable Amount                $7,231,725.97

Accounts                         16902

Hylan Asset Management, LLC (hereinafter called "Seller") has entered into a Receivable Purchase Agreement dated September 3rd, 2014 ("Agreement") for the sale of Accounts on Exhibit "A", hereof to Solidus Group, LLC (hereinafter called "Purchaser"), upon the terms and conditions set forth in that Agreement.

THEREFORE, effective September 3rd, 2014 for good and valuable consideration, Seller hereby sells, assigns, and transfers to Purchaser, its successors and assigns, all of Seller's rights, title, and interest in each and every one of the Accounts described in the Agreement.


Hylan Asset Management, LLC


By:_____
          Andrew J. Shaevel, CEO

PX34
000426