ALDEN F. ABBOTT
General Counsel
MICHAEL WHITE
MATTHEW J. WILSHIRE
Federal Trade Commission
600 Pennsylvania Avenue, N.W., Mailstop CC-10232
Washington, D.C. 20580
Telephone:     (202) 326-3196 (White), (202) 326-2976 (Wilshire)
Facsimile:     (202) 326-3768
Email:   mwhite1@ftc.gov, mwilshire@ftc.gov

BARBARA D. UNDERWOOD
Attorney General of the State of New York
CHRISTOPHER L. BOYD
Assistant Attorney General
350 Main Street, Suite 300A
Buffalo, NY 14202
Telephone:     (716) 853-8457
Facsimile:     (716) 853-8414
Email: Christopher.Boyd@ag.ny.gov

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and PEOPLE OF THE STATE OF NEW YORK, by BARBARA D. UNDERWOOD, Attorney General of the State of New York, <br><br> Plaintiffs, <br><br> v. <br><br> HYLAN ASSET MANAGEMENT, LLC, a New York limited liability company; BOBALEW MANAGEMENT CORPORATION, a New York corporation; BOBALEW, LLC, a New York limited liability company; 6P MANAGEMENT CORPORATION, a New York corporation; 6P, LLC, a New York limited liability company; WORLDWIDE PROCESSING GROUP, LLC, a New York limited liability company, also d/b/a WORLDWIDE PROCESSING, also d/b/a FORWARD MOVEMENT RECOVERY, and also d/b/a FMR; | Case No. 1:18-cv-00710-EAW <br><br> **FIRST AMENDED COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

1

FRANK A. UNGARO, JR., individually and as a
corporate officer of Worldwide Processing Group,
LLC; ANDREW SHAEVEL, individually and as a
corporate officer of Hylan Asset Management, LLC;
and JON E. PURIZHANSKY, individually and as a
corporate officer of Hylan Asset Management, LLC,

Defendants.

Plaintiffs, the Federal Trade Commission ("FTC") and the People of the State of New York, by Barbara D. Underwood, Attorney General of the State of New York ("State of New York") (collectively, "Plaintiffs"), for their Amended Complaint allege:

1.      The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 814 of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692*l*, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FDCPA, 15 U.S.C. §§ 1692-1692p, in connection with Defendants' deceptive and abusive debt collection practices, including the marketing and selling of portfolios that are fake or the result of fraudulently originated loans, and attempting to harass consumers into paying debts that they do not owe.

2.      The State of New York, by and through the Office of the Attorney General ("OAG"), brings this action under New York Executive Law § 63(12) and New York General Business Law Article 22-A, § 349, and Article 29-H, § 602, to obtain damages, restitution, injunctive and equitable relief and penalties of up to $5,000 for each violation of General Business Law Article 22-A.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), and 1692*l*.   Subject matter jurisdiction is conferred upon this Court with respect to the supplemental state law claims of the State of New York by 28 U.S.C. § 1367.

4.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFFS

5.      The FTC is an independent agency of the United States Government created by statute.   15 U.S.C. §§ 41-58.   The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.   The FTC also enforces the FDCPA, 15 U.S.C. §§ 1692-1692p, which prohibits abusive, deceptive, and unfair debt collection practices and imposes duties upon debt collectors.

6.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the FDCPA and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.   15 U.S.C. §§ 53(b), 56(a)(2)(A), and 1692*l*(a).

7.      The State of New York, by its Attorney General, is authorized to take action to enjoin (i) repeated and persistent fraudulent and illegal business conduct under New York Executive Law § 63(12); (ii) deceptive business practices under New York General Business Law § 349; and (iii) illegal debt collection practices under General Business Law § 602; and to obtain

3

legal or equitable relief, including rescission or reformation of contracts, restitution, the appointment of a receiver, disgorgement of ill-gotten monies, or other relief as may be appropriate.

## DEFENDANTS

8.　　Defendant **Hylan Asset Management, LLC** ("Hylan") is a New York limited liability company, formerly known as Solex Asset Group, LLC, with its registered address and principal place of business at 5477 Main Street, Amherst, New York, 14221.   Hylan transacts or has transacted business in this district and throughout the United States.

9.　　Defendant **Bobalew Management Corporation** is a New York corporation with its registered address and principal place of business at 5477 Main Street, Amherst, New York, 14221.   Defendant Bobalew Management Corporation owns or controls 100 percent of Defendant Bobalew, LLC.   Bobalew Management Corporation transacts or has transacted business in this district and throughout the United States.

10.　　Defendant **Bobalew, LLC** is a New York limited liability company with its registered address and principal place of business at 5477 Main Street, Amherst, New York, 14221.   Defendant Bobalew, LLC owns or controls 43.71% of Defendant Hylan.   Bobalew, LLC transacts or has transacted business in this district and throughout the United States.

11.　　Defendant **Andrew Shaevel** is an owner, officer, and director of Defendant Hylan. Defendant Shaevel is an owner and the CEO of Defendant Bobalew Management Corporation. At times material to this Complaint, acting alone or in concert with others, Shaevel has formulated, directed, controlled, had the authority to control, or participated in Hylan's acts and practices, including the acts and practices set forth in this Complaint.   Among other things, Shaevel has controlled Hylan's finances and business operations, purchased debt through it and affiliated entities, and signed corporate papers.   Shaevel resides in this district and, in connection with the

matters alleged herein, transacts or has transacted business in this district and throughout the United States.

12.      Defendant **6P Management Corporation** is a New York corporation with its registered address and principal place of business at 25 Viscount Drive, Williamsville, NY 14221. Defendant 6P Management Corporation owns or controls Defendant 6P, LLC.   Defendant 6P Management Corporation transacts or has transacted business in this district and throughout the United States.

13.      Defendant **6P, LLC** is a New York limited liability company with its registered address and principal place of business at 25 Viscount Drive, Williamsville, NY 14221. Defendant 6P, LLC currently owns or controls 43.71% of Defendant Hylan.   6P, LLC transacts or has transacted business in this district and throughout the United States.

14.      Defendant **Jon E. Purizhansky** owns or controls Defendant 6P Management Corporation and is an owner, officer, and director of Defendant Hylan.   At times material to this Complaint, acting alone or in concert with others, Purizhansky has formulated, directed, controlled, had the authority to control, or participated in Hylan's acts and practices, including the acts and practices set forth in this Complaint.   Among other things, Purizhansky has controlled Hylan's finances and business operations and purchased debt through it and affiliated entities. Purizhansky resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

15.      Defendant **Worldwide Processing Group, LLC**, also d/b/a Worldwide Processing, also d/b/a Forward Movement Recovery or FMR ("Worldwide Processing"), is a New York limited liability company that has held its principal place of business out as 5817 South Park

Ave., Hamburg, NY 14075.   Worldwide Processing, transacts or has transacted business in this district and throughout the United States.

16.     Defendant **Frank A. Ungaro, Jr.** is or has been the owner and an officer of Worldwide Processing.   At times material to this complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Worldwide Processing, including the acts and practices set forth in this Complaint.   Among other things, Ungaro has controlled Worldwide Processing's finances and business operations, purchased debt through it, and signed corporate papers.   Ungaro resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

17.     Defendants Worldwide Processing and Frank A. Ungaro, Jr. (collectively, the "Worldwide Defendants") are third-party debt collectors that, in many instances, have purchased or received portfolios of allegedly past-due consumer debt and collected payments from consumers nationwide.   The Worldwide Defendants are "debt collectors" as defined in Section 803(6) of the FDCPA, 15 U.S.C. § 1692a(6).   The Worldwide Defendants have attempted to collect purported debts by contacting consumers using instrumentalities of interstate commerce, including telephone calls, electronic mail, and United States mail.

18.     Defendants Bobalew Management Corp., Bobalew, LLC, 6P Management Corp., 6P, LLC, and Hylan have operated as a common enterprise while engaging in the deceptive and unlawful acts and practices and other violations of law alleged below.   They have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, and office locations.   Because they have operated as a common enterprise, each of them is jointly and severally liable for the acts and

6

practices alleged below.   Defendants Shaevel and Purizhansky have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Defendants that constitute the common enterprise.

## COMMERCE

19.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' MARKETING AND DISTRIBUTION OF
## COUNTERFEIT AND UNAUTHORIZED DEBTS

20.     This is a case against Defendants who have profited from collecting on "phantom debt."   Hylan, and its owners Shaevel and Purizhansky, have purchased and distributed for collection two types of purported debts that consumers did not owe:   counterfeit debts fabricated from misappropriated information about consumers' identities and finances; and debts purportedly owed on bogus "autofunded" payday loans that fraudulent enterprises foisted on consumers without their permission.   Hylan, Purizhansky, and Shaevel have distributed and profited from these phantom debts despite receiving ample notice that the consumers did not actually owe them.

21.     The Worldwide Defendants have collected on phantom debts, including many obtained from Hylan.   The Worldwide Defendants have also received ample notice that consumers did not actually owe them.   To coerce consumers into paying the fake or unauthorized debts, the Worldwide Defendants have made unlawful threats to harass consumers' friends and family members and failed to provide consumers with statutorily required notices of how to dispute the debts.

**Creation of the Phantom Debts**

22.     Consumer debts that have been charged-off by the original creditors are often sold to third parties for collection or sale to other collectors.   Typically, the creditor or seller bundles debts into what they call "debt portfolios."   The portfolios are typically spreadsheets with details about the consumers and their alleged debts.

23.     Since no later than 2014, a person named Joel Tucker has sold debt portfolios that he either fabricated or that consisted of purported debts that consumers did not legitimately owe. Tucker has marketed counterfeit debts as owed to a number of different entities.   Tucker has also distributed "debts" from loans that were foisted on consumers without their permission, which he packaged together with other purported debts under the name "Bahamas Marketing Group" or "BMG".   Plaintiff Federal Trade Commission sued Tucker for selling phantom debt in 2016. *See FTC v. Tucker et al.*, No. 2:16-cv-02816 (D. Kan. filed Dec. 16, 2016).   On September 20, 2017, the court in that case found that Tucker had, "marketed, distributed and sold counterfeit debt portfolios that purported to represent loans made by a variety of purported originators," in contravention of Section 5 of the FTC Act.   *FTC v. Tucker*, No. 2:16-cv-02816 (D. Kan. Sept. 20, 2017), ECF No. 69 at *3.

24.     Prior to 2016, Tucker had access to sensitive consumer information for millions of consumers.   This information included consumers' bank account numbers, social security numbers, and other sensitive personal information.   Tucker used this information to create or cause to be created fake debt portfolios by matching consumers' personal information to fabricated payday loan debts.   Tucker, either directly or through entities under his control, then sold these portfolios of counterfeit debt in spreadsheet format.   The portfolios list consumer names and contact information along with social security numbers and financial account information.   For

each consumer identified, the portfolios provide detailed, but fabricated, information about purported payday loans, such as alleged original loan amounts, loan dates, repayment histories, and unpaid balances.

25.     In addition, Tucker, through entities he controlled, obtained and sold unauthorized payday loan debts.   Tucker first sold purported payday loan leads to lenders associated with him. In many instances, these lenders then issued "loans" to consumers identified in the leads without their permission, a practice referred to as "autofunding."   The lenders then attempted to withdraw money from consumers' bank accounts as "finance charges" without consumers' consent.   When consumers denied the attempted debits, the lenders transferred the unauthorized loans to Tucker as "debts."   In 2014, the FTC and Consumer Financial Protection Bureau ("CFPB") filed suits against these purported lenders.   *FTC v. CWB Services, et al.*, 4:14-cv-00783 (W.D. Mo.) and *CFPB v. Moseley, et al.*, 4:14-cv-00789 (W.D. Mo.).   Tucker, either directly or through entities under his control, sold these debts to debt brokers, including Defendant Hylan.

**Hylan Repeatedly Purchases and Distributes the Phantom Debts for Collection**

26.     Hylan has operated as a debt broker since at least March 2011.   Among other things, Hylan has purchased and sold debt portfolios.   Hylan has also placed debt for collection with third parties, including the Worldwide Defendants.

27.     Starting no later than 2014, Hylan began purchasing phantom debt portfolios from entities controlled by Tucker, through an intermediary, Hirsh Mohindra.   In 2016, the FTC sued Mohindra for selling counterfeit debt portfolios.   *FTC v. Stark Law, LLC, et al.*, No. 1:16-cv-3463 (N.D. Ill. filed Mar. 21, 2016).

28.     On October 27, 2017, Mohindra agreed to entry of a stipulated judgment that, among other things, banned him from the debt collection industry and imposed a $47,220,491 judgment.   *FTC v. Stark Law, LLC,* No. 1:16-cv-3463 (N.D. Ill. Oct. 27, 2017), at *7, *9.

29.     Hylan does not collect on phantom portfolios directly.   Instead, it "places" them with debt-collection agencies, including the Worldwide Defendants.   It also sells phantom debt to other brokers or collectors.

30.     Hylan purchases, sells, and places these portfolios despite having notice that consumers do not owe the purported debts.

31.     For example, in July 2014, Mohindra contacted Shaevel and Purizhansky about a portfolio of Tucker debts supposedly owed to online payday lender "500fastcash."   Mohindra proposed that Hylan market the portfolio and sent it to the company.   The portfolio was a counterfeit; 500FastCash never sold its loans to a third party for collection.   Shortly thereafter, 500FastCash's General Counsel warned Purizhansky that "500FastCash has not sold and is not selling its charged off debts for collection by any third-parties," and asked for the source of the purported portfolio.   In response, Purizhansky refused to identify Mohindra as the source.   Three weeks later, Mohindra sold the 500FastCash portfolio to Kelly Brace, a Buffalo-area debt collector who previously had collected for Hylan.

32.     By no later than the fall of 2014, a Hylan employee was raising issues internally about the accuracy and veracity of the information contained in other portfolios.   And by November 2014, Hylan, Shaevel, and Purizhansky began receiving from collection agencies reports of a high number of consumer complaints stating that consumers did not owe the alleged debts.   From their discussions with Mohindra, the federal government enforcement actions

against Mohindra, CWB Services, and Moseley, and information from debt buyers, Hylan, Shaevel, and Purizhansky had notice that they were disseminating phantom debts.

33.     In a November 2014 email to Mohindra and Purizhansky regarding a debt portfolio that originated from Tucker, Shaevel stated, "There is a MAJOR problem with data on this file. Either there was a data transformation error or there is major FRAUD with this file.   [A Hylan employee] discovered that there are debtors with the same name and address that have different SSNs, same bank accounts but different names and/or SSN's.   THIS IS NOT KOSHER!" Mohindra assured Shaevel that, "Joel [Tucker] would not and is not frauding over these amounts," and one of Mohindra's employees blamed consumers who input incorrect Social Security numbers during the application process.   The employee added that Tucker was willing to replace the $4.79 million of disputed loans.   Shaevel remained unconvinced, stating, "We understand the business and the data.   These problems are not consistent with the data we have received in the last $500m of payday loans.   This is a problem that needs to be fixed."   After Mohindra told Shaevel and Purizhansky that he would provide them with "replacement files" and assured them that it was "a non issu[e]," Shaevel replied "Ok thanks!"   Hylan continued to purchase from Mohindra, and sell to third parties, debts originating from Joel Tucker.

34.     Likewise, in a November 2014 email forwarded to Shaevel and Purizhansky, a collection agency stated that a "[c]onsiderable number of people are saying that they never received the loan and we were able to get a few bank statements showing that there was no deposit matching the loan amount anywhere near the loan date."

35.     In January 2016, Hylan emailed Mohindra an attachment listing 74 alleged debtors who had signed sworn affidavits denying that they owed the debts.   Shaevel and Purizhansky

were copied on the email.   Nevertheless, Hylan continued to sell and place portfolios for collection with third parties.

36.      Hylan, Shaevel, and Purizhansky also received notice that they had purchased and were selling autofunded "debts."   In February 2015, Shaevel and Purizhansky received an email with a news article describing the FTC and CFPB's actions against the companies engaged in autofunding.   The article described how the purported lenders in Tucker portfolios "used information from online loan shopping sites to deposit loans in unwitting consumers' accounts and then repeatedly dinged them for finance charges."   The article further reported, "When people disputed the debits with their banks, the lenders fabricated documents that purported to show consumers had agreed to the loans."   Finally, the article noted that many consumers that tried to stop the unauthorized charges "were hounded by debt collectors."   Shaevel forwarded the email to Mohindra and Purizhansky, adding the text "FYI.   This might be an issue."

37.      Within the debt collection industry, BMG debts were notoriously problematic.   On April 7, 2015, a collection agency forwarded to a Hylan employee an email that it had received from another debt seller who was attempting to sell BMG debts.   The email stated in part, "At the end of last nights convo I said if you wanted squeaky clean BMG with legit chain [of title] I said go to Hylan. After speaking with a few companies this morning who have bought this BMG i market and Hylans BMG i hear that it does come with the same issues because the issues lie in the underwriting process from BMG directly and not the companies selling it. … With BMG you always have to expect issues but if you have experience with BMG these will be normal issues that your agencies are already familiar with."   Shortly after receiving it, the Hylan employee forwarded the email to Shaevel and Purizhansky with the comment, "Wow," specifically flagging the issue for them.   The email's reference to "issues [] in the underwriting process" was yet

another warning that Tucker-related debts were tainted at the source.   Purizhansky then

forwarded the email to Mohindra with the comment, "Wtf."

38.     On June 17, 2015, counsel for the Receiver in the *FTC v. CWB Services* matter

mailed Hylan a copy of the preliminary injunction in that case.   In an accompanying cover letter,

counsel for the Receiver identified by name 18 "Receivership Defendants" that had originated

autofunded loans and noted that a third-party debt collection agency "has informed the Receiver's

counsel one or more consumer loan portfolios of alleged debt owed to [one of the receivership

defendants] were purchased from Hylan Asset Management, LLC.   The FTC contests the validity

of the underlying loans insofar as they originated without consumer consent.   Accordingly, the

Receiver has directed the collection of any loan balances and the sale of any loan portfolios

immediately cease. . . .   Furthermore, Hylan Asset Management, LLC is directed to immediately

cease the sale of any loans allegedly originated by any of the Receivership Defendants."   He also

demanded that Hylan provide him, "with an accounting of any loan or loan portfolio containing

loans originated by any of the Receivership Defendants. . . ."

39.     Despite these reports and voluminous complaints from consumers asserting that

they did not actually owe the debts, Hylan, Shaevel, and Purizhansky did not stop purchasing,

selling, and placing Tucker portfolios for collection.   Nor did they recall Tucker portfolios that

they had already placed, or tell purchasers of these portfolios that they contained phantom debt.

40.     On November 27, 2015, Shaevel, Purizhansky and Mohindra sold BMG debts that

originated from Joel Tucker to an overseas corporation.   Through a series of complex

transactions, a Brazilian company called "Prudent Investimentos" purchased $200 million in

"BMG Warehouse Debt" from a joint venture controlled by Hylan and Mohindra at a cost of $2

million.   The parties also agreed that Hylan and Mohindra would continue to collect on the debt

by taking a percentage of collections and remitting the remainder to Prudent.   In an email to Prudent and copied to Purizhansky, Shaevel acknowledged that even after the sale, "our affiliates are servicing the paper so in effect we have control of the debt and the cash."

41.   In numerous instances, using information in debt portfolios marketed, distributed, sold, and placed by Hylan, Shaevel, and Purizhansky, debt collectors have contacted these consumers, demanded payment, and successfully induced consumers to pay the purported debts. In many instances, the debts in these portfolios were counterfeit or from "autofunded" loans.

42.   Consumers cannot reasonably avoid collection on these phantom portfolios. Consumers are not aware that their personal information has been misappropriated and used to create a counterfeit debt or an unauthorized loan.   From the portfolios, debt collectors, including the Worldwide Defendants, obtain consumers' private personal information and sensitive financial information, such as Social Security numbers, bank account numbers, and names of references. Debt collectors recite such information to consumers to convince them that the purported loan is legitimate or that the collectors will be able to coerce the consumers to pay, even if they do not legitimately owe the loan.   Using this detailed information, collectors intimidated consumers into paying the purported debts.

**The Worldwide Defendants' Illegal Collection Practices**

43.   In many instances, Hylan placed debts that were counterfeit or from unauthorized loans for collection with the Worldwide Defendants.

44.   The Worldwide Defendants have operated as a debt collection enterprise since at least 2011.   The Worldwide Defendants call consumers and demand payment for purported debts arising from payday loans purportedly taken out several years ago.   But many of these debts simply do not exist, or are not owed by the consumers whom these Defendants contact.

45.     As part of their attempt to deceive and intimidate consumers into paying these debts, the Worldwide Defendants have often refused to provide consumers with critical information about the debts.   And they fail to send statutorily required validation notices that would also provide consumers with information about how to dispute the debts – something critically important here, where the consumers do not actually owe the debts.   In addition, these Defendants have threatened to harass consumers' friends and family members.

### Attempts to Collect Fake or Unauthorized Debts

46.     In numerous instances, since at least 2014, the Worldwide Defendants have attempted to collect money on debts that were either fake or from loans that were not authorized by the consumers.

47.     In many of these instances, the Worldwide Defendants have claimed that consumers owed a debt arising from a payday loan.   They often assert that the underlying loan was several hundred dollars, and that the debt includes this amount plus hundreds of dollars from interest or fees.   In some cases, the Worldwide Defendants state that the loan was from 2010, 2011, 2012, or 2013.   And in other cases, they fail to provide a date for when the purported loan was taken out.

48.     But many of the consumers that the Worldwide Defendants contact have never taken out a payday loan, do not owe any outstanding debts, or were the victims of an autofunded loan scam.

49.     In numerous instances, consumers have asked for additional information or have explained to the Worldwide Defendants that they do not owe the purported debts.   The Worldwide Defendants often respond to these inquiries by reciting consumers' personal information—including addresses, social security numbers, employment history, and banking

information—in an attempt to make the debt appear legitimate or represent that they can collect on the debt regardless of its validity.

50.     The Worldwide Defendants continued to collect on the debts even after consumers told them that they had never heard of the lenders, did not owe debts, and in some cases provided bank statements and other records to prove it.   Worldwide Processing also was the top generator of Better Business Bureau consumer complaints in its geographical region, many of which contained statements by consumers that they did not owe the alleged debts.   The Better Business Bureau generally forwarded these complaints to Worldwide Processing, as did the New York Attorney General, who received similar complaints.   Even after acknowledging receipt of numerous consumer complaints, Defendants continued to collect on the fake and autofunded debts and failed to make any meaningful attempt to verify the authenticity of the debts.

## Unlawful Threats to Contact Third Parties

51.     In numerous instances, to pressure consumers into paying the purported debts, the Worldwide Defendants have threatened to contact consumers' family members or other third parties—even after the Worldwide Defendants have already spoken with the consumer or otherwise verified the consumer's location information.   In many of these instances, the Worldwide Defendants have sent pre-recorded messages from "Sarah" that state the call "is regarding our location and tracing efforts" for the purported debtor.   The messages claim that "if we cannot verify this information through you, the law allows us to contact all references on file." In fact, the FDCPA limits the parties that a debt collector may contact, particularly when the collector has already obtained location information about the consumer, and the law does not give a debt collector carte blanche to contact "all references on file."

16

**Unlawful Contacts with Third Parties**

52.     In numerous instances, the Worldwide Defendants have communicated with third parties where they already possessed contact information for the consumer, including the consumer's place of abode, telephone number, or place of employment.

**Failure to Provide Statutorily Required
Disclosures and Notices**

53.     In numerous instances, in initial calls to consumers, the Worldwide Defendants' collectors have not disclosed that the call is coming from a debt collector who is attempting to collect a debt from the consumer and that any information obtained from the consumer will be used for that purpose.

54.     In numerous instances, in subsequent communications with consumers, the Worldwide Defendants' collectors have failed to disclose that they are debt collectors.

55.     In numerous instances, the Worldwide Defendants also have failed to provide consumers with a statutorily required notice, either orally in their initial communication with the consumer or in writing within five days of the initial oral communication, setting forth the following:   (1) the amount of the alleged debt; (2) the name of the creditor to whom the purported debt is owed; (3) a statement that unless the consumer disputes the debt within 30 days, the debt will be assumed valid; (4) a statement that if the consumer disputes all or part of the debt in writing within 30 days, the debt collector will obtain verification of the debt and mail it to the consumer; and (5) a statement that, upon the consumer's written request within the 30-day period, the debt collector will provide the name and address of the original creditor, if different from the current creditor.

56.     In numerous instances, the Worldwide Defendants have refused to provide consumers with this notice.   Indeed, the Worldwide Defendants did not provide this notice even

when consumers requested it.   As a result, consumers have been unable to exercise their rights under the FDCPA.

## VIOLATIONS OF THE FTC ACT

57.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

58.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

59.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.   15 U.S.C. § 45(n).

### Count I by Plaintiff FTC
### Means and Instrumentalities to Mislead
(Against Hylan, Bobalew Management Corp., Bobalew, LLC, Andrew Shaevel, 6P Management Corp., 6P, LLC, and Jon E. Purizhansky)

60.     In numerous instances, in connection with their marketing, distribution, sale, and placement of purported payday loan debt portfolios, Defendants have represented, directly or indirectly, expressly or by implication, that consumers listed in those portfolios owe unpaid payday loan debts, and that those who obtain the portfolios through Defendants have the right to collect debts listed in the portfolios.

61.     In truth and in fact, consumers listed in those portfolios that Defendants have marketed, distributed, placed, and sold did not owe the purported debts, and collectors that obtained those portfolios did not have the right to collect those purported debts.

18

62.     By making the representations in Paragraph 51, Defendants placed in the hands of debt collectors the means and instrumentalities by and through which they may mislead consumers regarding their debt obligations.

63.     Therefore, Defendants' representations, as set forth in Paragraph 51 of this Complaint are false or misleading, and constitute deceptive acts and practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II by Plaintiff FTC**
**Distribution of Counterfeit or Unauthorized Debts for Collection**
(Against Hylan, Bobalew Management Corp., Bobalew, LLC, Andrew Shaevel,
6P Management Corp., 6P, LLC, and Jon E. Purizhansky)

64.     In numerous instances, Defendants have distributed, placed for collection, and sold debts that were counterfeit or from unauthorized loans.

65.     Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

66.     Therefore, Defendants' actions as described in paragraph 55 above constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and (n).

**Count III by Plaintiff FTC**
**False or Unsubstantiated Representations That Consumers Owe Debts**
(Against Worldwide Processing and Frank A. Ungaro, Jr.)

67.     In numerous instances, in connection with the collection of purported consumer debt, Defendants have represented, directly or indirectly, expressly or by implication, that:

  a.     a consumer is delinquent on a debt that Defendants have the authority to collect; or

  b.     the consumer has a legal obligation to pay Defendants.

68.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 58 of this Complaint, these representations have been false, or Defendants have not had a reasonable basis for the representations at the time Defendants made them.

69.     Therefore, Defendants' representations as set forth in Paragraph 58 of this Complaint are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count IV by Plaintiff FTC
### False or Misleading Representations Regarding Contacts
### with Consumers' Friends and Families
(Against Worldwide Processing and Frank A. Ungaro, Jr.)

70.     In numerous instances, in connection with the collection of purported consumer debts, Defendants have represented to consumers, directly or indirectly, expressly or by implication, that the law allows them to contact third parties without limitation.

71.     In truth and in fact, the FDCPA strictly limits the circumstances under which a debt collector may contact a third party, 15 U.S.C. §§ 1692b, 1692c(b).

72.     Therefore, Defendants' representations as set forth in Paragraph 61 of this Complaint are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### VIOLATIONS OF THE FDCPA

73.     In 1977, Congress passed the FDCPA, 15 U.S.C. §§ 1692-1692p, which became effective on March 20, 1978, and has been in force since that date.   Under Section 814 of the FDCPA, 15 U.S.C. § 1692*l*, a violation of the FDCPA is deemed an unfair or deceptive act or practice in violation of the FTC Act.   Further, the FTC is authorized to use all of its functions and powers under the FTC Act to enforce compliance with the FDCPA.

20

74.     Throughout this Complaint, the term "consumer," as defined in Section 803(3) of the FDCPA, 15 U.S.C. § 1692a(3), means "any natural person obligated or allegedly obligated to pay any debt."

75.     Throughout this Complaint, the term "debt," as defined in Section 803(5) of the FDCPA, 15 U.S.C. § 1692a(5), means "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."

76.     Throughout this Complaint, the term "location information," as defined in Section 803(7) of the FDCPA, 15 U.S.C. § 1692a(7), means "a consumer's place of abode and his telephone number at such place, or his place of employment."

**Count V by Plaintiff FTC**
**Unlawful Communications with Third Parties**
(Against Worldwide Processing and Frank A. Ungaro, Jr.)

77.     As described in Paragraph 43, in numerous instances, in connection with the collection of debts, Defendants have communicated with persons other than the consumer, the consumer's attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, the attorney of the debt collector, the consumer's spouse, parent (if the consumer is a minor), guardian, executor, or administrator for purposes other than acquiring location information about the consumer, without having obtained directly the prior consent of the consumer or the express permission of a court of competent jurisdiction, and when not reasonably necessary to effectuate a post judgment judicial remedy, in violation of Section 805(b) of the FDCPA, 15 U.S.C. § 1692c(b).

**Count VI by Plaintiff FTC**
**False, Deceptive, or Misleading Representations to Consumers**
(Against Worldwide Processing and Frank A. Ungaro, Jr.)

78.     In numerous instances, in connection with the collection of debts, Defendants have, directly or indirectly, expressly or by implication, used false, deceptive, or misleading representations or means, in violation of Section 807 of the FDCPA, 15 U.S.C. § 1692e, including, but not limited to:

a.      falsely representing the character, amount, or legal status of any debt, in violation of Section 807(2)(a) of the FDCPA, 15 U.S.C. § 1692e(2)(a);

b.      threatening to take an action that Defendants cannot legally take, such as contacting third parties for reasons other than confirming or correcting location information, in violation of Section 807(5) of the FDCPA, 15 U.S.C. § 1692e(5);

c.      using false representations or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer, in violation of Section 807(10) of the FDCPA, 15U.S.C. § 1692e(10); and

d.      failing to disclose in the initial communication with a consumer that Defendants are debt collectors attempting to collect a debt and that any information obtained will be used for that purpose, or failing to disclose in subsequent communications that the communication is from a debt collector, in violation of Section 807(11) of the FDCPA, 15 U.S.C. § 1692e(11).

**Count VII by Plaintiff FTC**
**Failure to Provide Statutorily Required Notice**
(Against Worldwide Processing and Frank A. Ungaro, Jr.)

79.     In numerous instances, in connection with the collection of debts, Defendants have failed to provide consumers, either in the initial communication or a written notice sent within five days after the initial communication, with the information required by Section 809(a) of the FDCPA, 15 U.S.C. § 1692g(a), including information about the debt and consumers' rights to dispute the debt.

## VIOLATIONS OF NEW YORK STATE LAW

**Count VIII by Plaintiff State of New York**
**Repeated Fraudulent or Illegal Acts**
(Against All Defendants)

80.     New York Executive Law § 63(12) empowers the Attorney General to seek restitution and injunctive relief when any person or business entity has engaged in repeated fraudulent or illegal acts or otherwise demonstrates persistent fraud or illegality in the carrying on, conducting, or transaction of business.

81.     Defendants have engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting, or transaction of their debt collection business for purposes of Executive Law § 63(12).

**Count IX by Plaintiff State of New York**
**Deceptive Acts or Practices**
(Against All Defendants)

82.     New York General Business Law § 349 provides that "[d]eceptive acts or practices in the conduct of any business […] in this state are hereby declared unlawful."

83.     In numerous instances, Defendants have violated New York General Business Law § 349 by engaging in deceptive acts or practices in connection with conducting their debt collection business.

**Count X by Plaintiff State of New York**
**Violation of New York State Debt Collection Law**
(Against Hylan, Andrew Shaevel, Jon E. Purizhansky, Worldwide Processing and
Frank A. Ungaro, Jr.)

84.     New York General Business Law § 601 sets forth a list of prohibited debt collection practices, including:

   a.     disclosing or threatening to disclose information affecting the debtor's reputation for credit worthiness with knowledge or reason to know that the information is false (N.Y. Gen. Bus. Law § 601(3));

   b.     disclosing or threatening to disclose information concerning the existence of a debt known to be disputed by the debtor without disclosing that fact (N.Y. Gen. Bus. Law § 601(5));

   c.     claiming, or attempting or threatening to enforce a right with knowledge or reason to know that the right does not exist (N.Y. Gen. Bus. Law § 601(8)).

85.     In numerous instances, Defendants Hylan, Shaevel, Purizhansky, Worldwide Processing and Ungaro have violated New York General Business Law § 601 by engaging in prohibited debt collection practices under that statute.

**CONSUMER INJURY**

86.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the FDCPA, New York Executive Law § 63(12), and New York General Business Law Articles 22-A and 29-H.   In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.   Absent injunctive relief by this Court,

24

Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

87.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and Section 814(a) of the FDCPA, 15 U.S.C. § 1692*l*(a), empower this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

88.     New York Executive Law § 63(12) empowers the Attorney General to seek injunctive relief, restitution, damages, disgorgement, and other relief when any person or business entity has engaged in repeated fraudulent or illegal acts, or has otherwise demonstrated persistent fraud or illegality in the carrying on, conducting, or transaction of business.   New York General Business Law § 349 prohibits deceptive business practices and empowers the Attorney General to seek injunctive relief, restitution, and civil penalties when violations occur.   General Business Law Article 29-H, § 602 empowers the Attorney General to bring an action to restrain any violation of Article 29-H, New York's Debt Collection Procedures.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs FTC and the State of New York, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Section 814(a) of the FDCPA, 15 U.S.C. § 1692*l*(a), New York Executive Law § 63(12), and New York General Business Law §§ 349, 350-d, and 602(2), and the Court's own equitable powers, request that the Court:

A.      Award Plaintiffs such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including, but not limited to, temporary and preliminary injunctions with ancillary equitable relief.

B.      Enter a permanent injunction to prevent future violations of the FTC Act, the FDCPA, New York General Business Law Articles 22-A and 29-H, and New York Executive Law § 63(12) by Defendants;

C.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, the FDCPA, New York General Business Law Articles 22-A and 29-H, and New York Executive Law § 63(12), including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

D.      Pursuant to New York General Business Law § 350-d, impose a civil penalty of $5,000 for each violation of New York General Business Law Article 22-A; and

E.      Award Plaintiffs the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated:   August 27, 2018                    Respectfully submitted,


BARBARA D. UNDERWOOD                ALDEN F. ABBOTT
Attorney General of the State of New York   General Counsel


CHRISTOPHER L. BOYD                 MICHAEL WHITE
Assistant Attorney General          MATTHEW J. WILSHIRE
350 Main Street, Suite 300A         Federal Trade Commission
Buffalo, NY 14202                   600 Pennsylvania Avenue, N.W.
P: (716) 853-8457                   Mailstop CC-10232
F:   (716) 853-8414                 Washington, D.C. 20580
E: Christopher.Boyd@ag.ny.gov       P: (202) 326-3196 (White), (202) 326-2976
                                    (Wilshire)
*Attorney for Plaintiff State of New York*   F: (202) 326-3768
                                    E: mwhite1@ftc.gov; mwilshire@ftc.gov

                                    *Attorneys for Plaintiff Federal Trade*
                                    *Commission*

27